ENTERED

APR 1 9 2012

IN REGISTER BY KDP

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| THE STATE OF OREGON, by and through the OREGON STATE TREASURER on behalf of the COMMON SCHOOL FUND, the HIGHER EDUCATION ENDOWMENT FUND, and, together with the OREGON PUBLIC EMPLOYEE RETIREMENT BOARD on behalf of the OREGON PUBLIC EMPLOYEE RETIREMENT FUND, <br><br> Plaintiff, <br><br> v. <br><br> BP P.L.C.; BP AMERICA, INC.; and BP EXPLORATION & PRODUCTION, INC. <br><br> Defendants. | Case No. **1204-04955** <br><br> **COMPLAINT**      **04955** <br><br> CLAIMS NOT SUBJECT TO MANDATORY ARBITRATION <br><br> JURY TRIAL DEMANDED <br><br> Fee Authority: ORS 21.160(1)(e) (State of Oregon exempt from fee) |

The State of Oregon by and through the Oregon State Treasurer on behalf of the

Common School Fund, the Higher Education Endowment Fund, and, together with the Oregon

Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund

(collectively, "Plaintiff" or "Oregon"), alleges as follows based on publicly available materials:

I. **PREFACE**

1.

This action seeks to hold BP P.L.C., BP America, Inc., and BP Exploration & Production,

Inc., (hereinafter, collectively referred to as "Defendants" or "BP") accountable for materially

false or misleading statements and omissions made in violation of ORS 59.135 pursuant to ORS

59.137 and for common law fraud, which had the effect of artificially inflating the price of BP's

Page 1 - COMPLAINT

1  securities until the events of the *Deepwater Horizon* catastrophe revealed that BP was concealing

2  a known risk of environmental catastrophe.

3                                     2.

4        More specifically, BP made materially false or misleading statements in the following

5  areas: (1) BP's purported improvements in process safety as measured against the Baker Panel

6  recommendations following the Texas City Refinery explosion; (2) BP's Operating Management

7  System's ("OMS") application to BP operations that were not fully-owned by BP; (3) BP having

8  completed the transition to OMS in the Gulf of Mexico in 2008; (4) BP's ability to respond to

9  and contain a significant oil spill in the Gulf of Mexico; and (5) the spill-rate after the Deepwater

10  Horizon explosion.

11                                     3.

12        Oregon purchased BP ordinary shares on the London Stock Exchange from May 2007

13  through May 2010. As relevant to this lawsuit, Oregon purchased BP ordinary shares beginning

14  in May 2007 at prices as high as £6.56 or, converted, $10.10 per share. As a result of the BP

15  defendants' illegal conduct, Oregon suffered damages in this state in the amount of $18,848,641

16  in connection with its purchases of BP's ordinary shares.

17                                     4.

18        In this complaint, Plaintiff asserts claims arising solely out of its purchases of BP

19  ordinary shares. Plaintiff remains a putative class member in the federal court action currently

20  pending in the U.S. District Court for the Southern District of Texas, styled as *In re BP plc Sec.*

21  *Litig.*, No. 4:10-md-2185, which seeks to hold BP and the other individual defendants liable for

22  violations of the federal securities laws arising out of material misrepresentations with respect to

23  BP's American Depositary Shares ("ADS") sold on the New York Stock Exchange ("NYSE").

24

25

26

Page 2 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

1  **II.**   <u>**INTRODUCTION**</u>

2                                            5.

3        On April 20, 2010, the deep sea oil rig, *Deepwater Horizon* – which Transocean owned

4  and BP leased, operated, and controlled – exploded in the Gulf of Mexico. The crew was

5  preparing to place the Macondo well – which they referred to as the "***well from hell***"[1] – into

6  "temporary abandonment," whereby a drilling rig finishes a well and then seals it with cement,

7  allowing another production rig to return, quickly drill through the cement, and begin pumping

8  oil or gas for production.

9                                            6.

10        The temporary abandonment was 45 days late and $58 million over-budget. A series of

11  last minute modifications – hallmarks of BP's operations – had rattled the crew, with one

12  supervisor reporting that "***we're flying by the seat of our pants***."

13                                            7.

14        At approximately 9:00 p.m. on April 20, 2010, drilling mud laced with oil and gas

15  rocketed up through the well, knocking birds from the sky and covering the deck of the rig in a

16  thick layer of hydrocarbon-filled drilling mud. Shortly thereafter, gas and oil flowing from the

17  well ignited, causing an explosion aboard the *Deepwater Horizon* that claimed the lives of 11

18  crew members and injured many others, including some who jumped from the rig to save their

19  lives.

20                                            8.

21        The *Deepwater Horizon* burned for almost two days before sinking on the morning of

22  April 22, 2010. As the *Deepwater Horizon* sank, it further damaged the pipe that had connected

23  the rig to the wellbore.

24

25

26  ───────────────────
[1] Unless otherwise indicated, emphasis has been added throughout.

Page 3 - COMPLAINT

Exhibit A Page 3 of 136

1                                         9.

2          Eighty-seven days passed before BP stopped the flow of oil from the Macondo well on

3   July 15, 2010.  Approximately *5 million barrels* of oil (more than 206 million gallons) – or about

4   60,000 barrels a day – spilled into the waters of the Gulf of Mexico causing the largest oil spill in

5   the history of the petroleum industry.  As noted in an article appearing in *Fortune* magazine, the

6   oil spill in the Gulf of Mexico surpassed the Exxon *Valdez* disaster by at least 1,800 percent, in

7   terms of the number of barrels of oil spilled into the sea.

8                                        10.

9          Put simply, representations made by BP to outside investors were far different from the

10  reality of its internal operations.  By touting the growth potential of its Gulf of Mexico

11  operations and highlighting compliance with recommendations for improvement in process

12  safety, BP convinced investors, including Plaintiff, that BP would be able to generate

13  tremendous growth with carefully managed and minimal risk.  However, BP made

14  misrepresentations to, and misled, the investing public.

15                                       11.

16         As the truth regarding the lack of safety and integrity of BP's operations emerged, as well

17  as information regarding:  (i) the true size of the oil spill; (ii) BP's inability to control the spill;

18  and (iii) the mounting costs BP would pay as a result of the environmental disaster – BP's

19  ordinary shares plunged in value.  From the date of the *Deepwater Horizon* explosion through

20  May 28, 2010, BP's securities fell in value by 48% and wiped out over ***$91 billion*** in market

21  capitalization.

22                                       12.

23         No fewer than nine governmental investigations reviewed the incident, including a

24  commission appointed by the President of the United States to study the catastrophe:  the

25  National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (the

26  "Presidential Commission").  The Presidential Commission, after interviewing hundreds of

Page 4 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1   witnesses, reviewing hundreds of thousands of pages of documents and consulting with industry

2   experts, issued the "Presidential Commission Report" in January 2011.  The first conclusion of

3   the Presidential Commission Report was simple yet powerful:  "*[t]he explosive loss of the*

4   *Macondo well could have been prevented.*"  Indeed, the Presidential Commission specifically

5   found that:  "*the blowout was not the product of a series of aberrational decisions made by*

6   *rogue industry or government officials that could not have been anticipated or expected to*

7   *occur again.  Rather, the root causes are systemic*" to BP.

8                                    13.

9           Moreover, the Presidential Commission detailed numerous safety tests and procedures

10  that the *Deepwater Horizon* crew failed to perform or outright ignored.  For instance, the

11  Presidential Commission concluded, "there was nothing to suggest that BP's engineering team

12  conducted a formal, disciplined analysis of the combined impact of [] risk factors on the

13  prospects of a successful cement job."  The Presidential Commission Report concluded that

14  "*[t]he immediate causes of the Macondo well blowout can be traced to a series of identifiable*

15  *mistakes made by BP, Halliburton, and Transocean that reveal such systematic failures in risk*

16  *management that place in doubt the safety culture of the entire industry.*"

17                                   14.

18          In November 2010, the National Academy of Engineering, which was conducting a

19  separate investigation into the Deepwater Horizon incident, issued an "Interim Report" detailing

20  BP's operational failures that led to the Deepwater Horizon catastrophe.  The report stated: "The

21  various failures mentioned in this report indicate the lack of a suitable approach for anticipating

22  and managing the inherent risks, uncertainties, and dangers associated with deepwater drilling

23  operations and a failure to learn from previous near misses. . . . Of particular concern is an

24  apparent lack of a systems approach that would integrate the multiplicity of factors potentially

25  affecting the safety of the well, monitor the overall margins of safety, and assess the various

26  decisions from perspectives of well integrity and safety."

Page 5 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

15.

BP is no stranger to catastrophic industrial incidents, including incidents related to its off-shore drilling operations.  For example:

(a)      In May and June 2000, a BP refinery, the Grangemouth Complex, located in Scotland, suffered three potentially life threatening incidents.  The U.K. Health and Safety Executive (the "UK HSE") investigated and found "a number of weaknesses in the safety management systems . . . ."  In particular, the UK HSE found that "BP failed to achieve the operational control and maintenance of process systems required by law."

(b)      In 2003, the U.S. Department of the Interior's Minerals Management Service ("MMS") – which is responsible for monitoring and regulating offshore drilling activities in the U.S. – criticized BP's safety practices in the Gulf of Mexico after two back-to-back blowouts on gas rigs in 2002.  MMS noted that inadequate safety process planning and inadequate personnel training had enabled an erroneous chain of decision-making in the field and caused these blowouts.  The otherwise preventable incidents stemming from BP's offshore drilling mishaps in the Gulf of Mexico were prescient of incidents to come in the *Deepwater Horizon* explosion.

(c)      Shortly thereafter, in November 2003, a gas line ruptured on BP's *Forties Alpha* platform in the North Sea, flooding the platform with hazardous methane gas and almost causing an explosion.  In response, UK regulators cited BP for numerous violations of statutory safety rules.  A former BP employee on the platform later told the Presidential Commission that "BP focused heavily on personnel safety and not on maintaining its facilities" – *i.e.,* process safety.

(d)      In 2005, a blast at BP's Texas City, Texas refinery killed 15 workers and injured more than 170.  The U.S. Chemical Safety Board's ("CSB") report regarding the Texas City incident found that "*the overall safety culture and process safety management . . . program had serious deficiencies*."

(e)      In March 2006, BP shut down one of its Prudhoe Bay transit pipelines in Alaska after discovering a 212,000 gallon oil leak in a section of corroded pipe, which was later found to

Page 6 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

1    have resulted from poor maintenance and almost non-existent inspections.  BP subsequently shut

2    down additional sections of corroded pipeline for repairs once additional problems were

3    discovered during subsequent inspections in early 2007.

4                                                          16.

5             In 2005, at the CSB's urging, BP established its own independent panel to review and

6    improve its safety procedures.  Former U.S. Secretary of State James Baker, III, chaired what is

7    referred to herein as the "Baker Panel."  After completing its investigation, the Baker Panel

8    issued a report on January 16, 2007 (the "Baker Report"), finding, in the words of the

9    Presidential Commission, that "*BP management had not distinguished between occupational*

10   *safety – concern over slips, sprains, and other workplace accidents – and process safety:*

11   *hazard analysis, design for safety, material verification, equipment maintenance, and process-*

12   *changing reporting*.  And the [Baker P]anel further concluded that BP was not investing

13   leadership and other resources in managing the highest risks."  More specifically, the Baker

14   Panel found that:  "*from the top of the company, starting with the Board and going down . . .*

15   *BP has not provided effective process safety leadership and has not adequately established*

16   *process safety as a core value*."  Indeed, even then-BP CEO Lord John Browne admitted that BP

17   had failed to adequately address process safety issues prior to the Texas City disaster and that it

18   was those failures that led to the explosion.  For example, Lord Browne stated, in part, that:

19            We had emphasised that individuals had to be safe as they went about their daily
20            work – "personal safety."  That led to dramatic improvements.  *But we had not*
              *emphasised that processes and equipment had to be safe under all*
21            *circumstances and operated in a safe way at all times – "process safety."*

22                                                          17.

23            The Baker Panel singled out organizational problems as the root cause of BP's continued

24   failure to learn from, and respond to, major incidents, finding "a lack of operating discipline,

25   toleration of serious deviations from safe operating practices, and apparent complacency toward

26   serious process-safety risks."

Page 7 - COMPLAINT

1

18.

2     In May 2007, the chairman of the Chemical Safety Board, Carolyn Merritt, testified

3  before Congress about "striking similarities" between the Alaska and Texas incidents, stating

4  that "[v]irtually all of the seven root causes identified for the Prudhoe Bay incidents have strong

5  echoes in Texas City," and noting "flawed communication of lessons learned, excessive

6  decentralization of safety functions and high management turnover.  BP focused on personal

7  safety statistics but allowed catastrophic process safety risks to grow."

8

19.

9     On January 16, 2007, the Baker Panel released its Report which contained 10

10  recommendations "***to help bring about, sustainable improvements in process safety***

11  ***performance.***"

12

20.

13     BP professed its commitment to becoming an industry leader in process safety.  Lord

14  Browne responded to the Baker Report recommendations with the following statements, among

15  others:  "***BP gets it.  And I get it too.***"  He continued: "***BP's workforce is ready, willing and***

16  ***able to participate in a sustained Group-wide effort to move BP towards excellence in process***

17  ***safety.  BP's safety lapses have been chronic.***"

18

21.

19     Lord Browne's acknowledgement of BP's troubled past – and his pledge to investors that

20  BP would be a different company going forward – was the beginning of a purported sea change

21  in BP's operations.  In the months and years that followed, Defendants would consistently return

22  to this pledge and the recommendations of the Baker Report, assuring investors that BP had

23  learned its lesson and that its operations were now safe and reliable.  BP went so far as to say

24  that it strived to be an industry leader in process safety and managing risk.

25

26

Page 8 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

22.

For example, in conference calls with analysts, Browne reaffirmed his and BP's commitment to implementing the Baker Report recommendations: "above all else we need to concentrate on two things – safety and performance. *Safety is fundamental to everything that we will do. We will embrace with equal commitment each of the three dimensions of safety -- personal safety, <u>process safety</u> and the environment.* Our aspiration is to be an industry leader in each."

23.

When Anthony B. "Tony" Hayward ("Hayward") succeeded Browne as CEO in May 2007, one of his first commitments was to "*focus on safety like a laser.*" In public statements and in public filings with United States Securities and Exchange Commission ("SEC") directed and disseminated to investors in Oregon through the mails and other means of interstate commerce, BP's Hayward, other BP representatives, and BP itself, repeatedly reaffirmed BP's commitment to process safety and, in particular, the virtues of such efforts in one of its greatest profit centers, the Gulf of Mexico.

24.

As has since been revealed, the truth greatly diverged from BP's public statements. A January 24, 2011 *Fortune* magazine article entitled "BP: An Accident Waiting to Happen," revealed a previously unreleased internal BP strategy document dated December 2008 that specifically warned BP executives of serious process safety "gaps" in the Gulf of Mexico:

> *It's become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel. Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process-safety related incidents.*

The document concluded that BP employees needed "major hazard awareness" training.

Page 9 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

25.

The *Fortune* article quoted Nancy Leveson ("Leveson"), an industrial safety expert at the Massachusetts Institute of Technology ("MIT") who served on a panel that investigated BP's safety practices after its Texas City refinery explosion and, subsequently, taught safety classes to BP executives in a course entitled BP "Operations Academy." More recently, Leveson served as an advisor to the Presidential Commission. In the article, Leveson was quoted for criticizing BP's approach to safety, explaining that BP "just did safety wrong." She determined that BP was "producing a lot of standards but many were not very good and many were irrelevant." She was so troubled by BP's approach to safety that, in January 2010, she warned colleagues that BP is "***an accident waiting to happen***."

26.

The *Fortune* article discussed the BP Operations Academy implemented by the Company. The program focused on process safety and taught universal lessons: "***Critical procedures should be formalized*** and carried out with rigor; it's essential to maintain multiple safeguards against an accident; ***it is dangerous to change operating plans on the fly***; anomalies need to be clearly resolved; ***small incidents are warning signs that conditions are ripe for a disaster***."

27.

Notably, the deficiencies above existed not only with refineries and pipelines, but also with offshore drilling operations. Despite supposedly learning from the prior disasters about the need for clear operational protocols and safety measures, the Presidential Commission Report concluded that BP had no adequate process safety procedures in place with regard to well testing in deep sea drilling. It similarly lacked established protocols for securing a well before placing it into temporary abandonment. The Company also failed to properly outfit rigs with properly designed and tested equipment to meet the extreme risks posed by deepwater drilling operations.

Page 10 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

Exhibit A Page 10 of 136

28.

Rig personnel had excessive discretion in making critical decisions, including, but not limited to: how to case and cement the well; how to test the well for integrity; and what to do when warning signs develop. The Presidential Commission Report found, much like the Baker Report three and a half years earlier, that BP's "*approach to managing safety has been on individual worker occupational safety but not on process safety. These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety*."

29.

Throughout the relevant period, BP made misrepresentations to, and misled, Plaintiff and the market by conveying BP's commitment to and implementation of process safety reform throughout the Company and that, in the event of an emergency well blowout, BP was prepared to contain and adequately address an oil spill in the Gulf of Mexico. Thus, Oregon was deceived as to BP's true risk profile in deep sea drilling when it purchased BP's ordinary shares at prices artificially inflated by BP's material misrepresentations and omissions of material fact.

30.

When BP's Hayward took over as CEO in 2007, he stated that he would focus on safety like a laser, when in reality the Company failed to conduct the process safety overhaul it represented to investors it would implement. In short, BP was not an industry leader in safety processes for its drilling operations. Moreover, BP's Oil Spill Response Plan (defined below) was highly misleading and riddled with material misstatements about its ability to respond to a major oil spill; the reality was that BP was in a "trial by fire" situation in trying to contain the oil spewing into the Gulf of Mexico.

Page 11 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

31.

After the explosion, the truth about BP and its lack of commitment to and implementation of safety processes to avoid preventable incidents began to emerge. Plaintiff learned that:

- BP was not the safe and secure company it portrayed itself to be;
- BP was not making the progress it claimed in overhauling process safety as it claimed it would in response to the Baker Report;
- BP had not completed the transition of all its operations to its process safety protocol, OMS, in the Gulf of Mexico although BP represented to investors that it had done so by 2008;
- Despite its public statements regarding the scope of OMS, BP knew that OMS was never designed or intended to be operational on third-party rigs, such as the *Deepwater Horizon*; and
- BP knew or recklessly disregarded that its statements regarding the size of the oil spill were materially false and misleading when made.

32.

BP could not contain the oil spill or stop the flow of oil from the well until 87 days after the explosion; the total cost to BP as a result of the spill will be well over $20 billion (BP has now raised the estimated cost to $40 billion); and BP had to temporarily suspend its stock dividend to pay for the spill related clean up costs.

33.

As a result, when the truth was revealed, BP's stock price plunged in value, causing Oregon to suffer enormous losses.

III. **JURISDICTION AND VENUE**

34.

The Court has subject matter jurisdiction over this action under ORS 14.030.

Page 12 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400 Fax (503) 373-7067

35.

This Court has personal jurisdiction over the Defendants under ORCP 4A and 4J.

36.

The claims alleged in this complaint are not subject to removal from state court under the Securities Litigation Uniform Standards Act, 15 USC §77p(d)(2)(A)-(B). That statute specifically preserves state-court claims brought, as here, by states and state pension plans. The claims are also not subject to removal under diversity jurisdiction principles because "[t]here is no question that a state is not a 'citizen' for purposes of the diversity jurisdiction." *Moor v. County of Alameda*, 411 US 693, 717 (1973); *and see State of Oregon et al v. Merck & Co., Inc. et al*, CV 05-1463-PK, Jan 6, 2006 Findings and Recommendation; *State of Oregon et al v. American International Group, Inc.*, CV 08-6110-HO, Aug 20, 2008 Order.

IV. **THE PARTIES**

   A.  **Plaintiff**

37.

The State of Oregon maintains several public funds for the benefit of public employees, K-12 education, and higher education. The Oregon State Treasury manages and invests those public funds. These state funds purchased and sold BP ordinary shares throughout the relevant time frame and suffered damages in an amount to be proven at trial.

38.

The Oregon Public Employee Retirement Fund ("OPERF") maintains and provides retirement benefits for hundreds of thousands of public employees and their beneficiaries. These benefits are maintained and provided through the Oregon Public Employee Retirement System ("OPERS"). The Oregon Public Employee Retirement Board ("OPERB") is the governing authority of OPERS and the Trustee of OPERF. Public employer and employee retirement contributions are placed into OPERF. OPERB, through the State Treasurer and the Oregon

Page 13 - COMPLAINT

1    Investment Council oversees the investments of those contributions in various investments in

2    OPERF.

3                                              39.

4           The Common School Fund, managed by the Oregon State Treasurer, provides funding for

5    Oregon's K-12 public schools.

6                                              40.

7           The Higher Education Endowment Fund, managed by the Oregon State Treasurer,

8    provides funding for Oregon's higher education system.

9    **B.      Defendants**

10                                             41.

11          Defendant BP p.l.c. ("BP" or the "Company") is a public company limited by shares

12   registered in and organized and existing under the laws of England and Wales, with its principal

13   executive offices located in London, England.  Although BP is a global group operating or

14   marketing its products in more than 80 countries, BP engages in substantial operations and

15   activities in the United States: (a) BP is the largest oil and gas producer in the United States; (b)

16   BP has more than 40 percent of its fixed assets and more than 30 percent of its employees

17   located in the United States; (c) BP's ADSs are listed on the NYSE and BP is the largest non-

18   U.S. company listed on the NYSE; (d) BP's ordinary shares are listed on the NYSE in

19   connection with its ADS program; (e) roughly 40 percent of BP's ordinary common shares are

20   owned by individuals and institutions within the United States; and (f) BP files annual reports

21   and other documents with the SEC.  BP operates entirely through its subsidiaries and affiliates,

22   and BP's designated agent in the United States is Defendant BP America, Inc., a Delaware

23   corporation registered and authorized to conduct business in the state of Oregon.  BP conducts

24   and maintains substantial operations in Oregon, including a pipeline, pipeline terminals, and

25   numerous filling stations operating under the ARCO brand.

26

Page 14 - COMPLAINT

42.

Defendant BP America, Inc. ("BP America"), is a Delaware corporation with its principal place of business in Houston, Texas.  BP America is a wholly-owned subsidiary of BP[2] and BP's designated agent in the United States.  BP America is (and has been since October 2000) registered and authorized to conduct business in the state of Oregon under ORS 60.711-60.721. All of BP's operations in the United States, including Oregon, are conducted by and through BP America and BP America's subsidiaries and affiliates, including Defendant BP Exploration & Production, Inc.

43.

Defendant BP Exploration & Production, Inc. ("BP E&P"), is a Delaware corporation with its principal place of business in Houston, Texas.  BP E&P is a wholly-owned subsidiary of BP and BP America.  BP E&P provided materially false and misleading filings to the MMS during the relevant period.

C.      **BP's Non-Party Representatives and Agents**

44.

Anthony B. "Tony" Hayward ("Hayward") served as the Company's Chief Executive Officer ("CEO") from May 2007 until October 2010 and served as an executive director of the Company from 2003 to November 2010.  Hayward, who holds a PhD in Geology, began working at BP in 1982 as a rig geologist offshore of Aberdeen, Scotland and later as a field geologist in various locations throughout the world.  From 2002 to 2007, he served as the CEO of BP's Exploration and Production business segment, which oversees exploration and drilling in the Gulf of Mexico, among other places.  Hayward was a member of BP's executive

---

[2] Before 2007 BP directly owned a 100 percent interest in BP America.  In 2007, BP interposed BP Holdings North America Limited ("BPHNA"), a company whose sole function is to hold BP's ownership interest in BP America.  BP is the sole shareholder of BPHNA.  The directors of BPHNA are directors and senior executives of BP who are not compensated for their services as directors of BPHNA.  BPHNA has no employees.

Page 15 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1   management.  Starting in 2006, Hayward headed BP's Group Operations Risk Committee

2   ("GORC"), an executive committee that reviewed the BP's safety protocols, including OMS, and

3   responded to safety incidents in BP's operations.  Hayward also was the executive liaison to

4   BP's Safety and Ethics & Environment Assurance Committee ("SEEAC"), which was the BP

5   Board committee responsible for ensuring that BP's safety protocols were implemented and

6   followed, including the implementation of the Baker Panel's recommendations.  GORC prepared

7   regular safety reports for SEEAC, including quarterly reports called the Health Safety

8   Environment & Operations Integrity Report, otherwise known as the "Orange Book."  During

9   the relevant periods, BP's Hayward signed certain BP Annual Reports that are alleged herein to

10   have been knowingly or recklessly false and misleading when made and made other knowingly

11   or recklessly false and misleading statements as alleged herein.

12                     45.

13       Douglas J. Suttles ("Suttles") served as BP's Chief Operating Officer for Exploration and

14   Production from January 2009 until at least January 2011.  Suttles has worked in the oil industry

15   since 1983 and has worked in several different engineering and leadership roles at BP, including

16   Vice President for Northern North Sea Operations and President of BP's Trinidadian oil

17   business.  In January 2007, he was named President of BP Exploration (Alaska) Inc.  Suttles

18   holds a degree in Mechanical Engineering.  During the relevant periods, BP's Suttles made

19   knowingly or recklessly false and misleading statements as alleged herein.

20                      46.

21       Andrew G. "Andy" Inglis ("Inglis") served as the CEO of BP E&P and as an executive

22   director of BP from February 2007 until October 2010.  Inglis joined BP as a Mechanical

23   Engineer in 1980 and worked in various locations throughout the world, including the Gulf of

24   Mexico, Alaska, and the North Sea.  In 1996, Inglis became Chief of Staff for Exploration and

25   Production, and from 1997 to 1999 he was responsible for leading BP's activities in the

26   deepwater Gulf of Mexico.  Beginning in July 2004, Inglis was Executive Vice President and

Page 16 - COMPLAINT

1   Deputy Chief Executive Officer of Exploration and Production.  Inglis was a member of BP's

2   executive management.  As CEO of BP E&P, Inglis attended SEEAC meetings to report on

3   topics specific to BP Exploration and Production.  Inglis also served as a GORC member,

4   provided special reports on Exploration and Production to the Chairman of GORC (BP's

5   Hayward), and received quarterly Orange Book reports that monitored the progress of OMS

6   implementation across BP.  Inglis is a Chartered Mechanical Engineer and is a Fellow of the

7   Royal Academy of Engineering and of the Institute of Mechanical Engineers.  BP's Inglis made

8   knowingly or recklessly false or misleading statements regarding BP's process safety system, as

9   alleged herein.

10  **V.    BACKGROUND**

11       **A.    <u>BP's Relevant Operations</u>**

12                                              47.

13       BP is a global oil and gas company and is the third-largest energy company in the world.

14  BP is active in every area of the oil and gas industry, including drilling exploration and

15  production, refining, distribution and marketing, petrochemicals, power generation and trading.

16  With operations in over 80 countries, BP produces around 3.8 million barrels of oil equivalent

17  per day.  Its largest division is BP America, which is the largest producer of oil and gas in the

18  United States.

19                                              48.

20       BP's Exploration and Production segment includes oil and natural gas exploration, field

21  development and production, and marketing and trading of natural gas.  It has exploration and

22  production activities in Angola, Azerbaijan, Canada, Egypt, Libya, the Russian Federation,

23  Trinidad and Tobago, Norway, the United Kingdom, and the United States (including the Gulf of

24  Mexico), as well as in the Asia Pacific, Latin America, North Africa, and the Middle East.

25

26

Page 17 - COMPLAINT

49.

Throughout the relevant period, BP touted its Exploration and Production business and, more specifically, its operations in the deepwater Gulf of Mexico, a region BP hailed as a "profit centre" and a "high margin" production area.  BP described the Gulf of Mexico as "an important source of domestic energy, and offshore deepwater developments" and told investors that oil from that region accounted for one-sixth of all oil produced in the United States.

50.

Specifically, in its 2008 Annual Report filed on Form 20-F on March 4, 2009, BP highlighted the safety and success of its operations in the Gulf of Mexico, emphasizing the fact that it was one of the largest deepwater operators in the world.  At the same time, BP failed to disclose that it had not implemented safety measures for its Gulf of Mexico operations, and BP also failed to disclose that it had disregarded safety warnings about its operations and that it lacked robust risk management processes that left the Company dangerously exposed to a catastrophic accident.

**B.**     **BP's Process Safety Controls Were Deficient Well-Before the Relevant Period**

51.

Historically, BP was no stranger to the risks involved in the petroleum industry and deepwater drilling and, in fact, was at the center of a number of catastrophic incidents that took a toll on lives and the environment.

***BP's Flawed Process Safety Controls Cause Grangemouth Incidents***

52.

Between May 29 and June 10, 2000, BP's Grangemouth storage and refining complex in Scotland experienced three major incidents.  These included a power failure leading to the emergency shutdown of the oil refinery; the rupture of a key steam pipe; and a fire in the refinery's catalytic cracker unit, which produces gasoline. The UK HSE investigated the

Page 18 - COMPLAINT

1  incidents and issued a report in 2003 finding in all three incidents "weaknesses in [BP's] safety

2  management systems on-site over a period of time."  BP carried out an internal investigation,

3  which concurred in many of the UK HSE's findings.  BP later pled guilty to criminal charges

4  stemming from the incidents and paid over £1 million in fines.

5  ***Safety Lapses in BP's Deepwater Drilling Operations***

6                         53.

7       In 2002, the *Ocean King*, a drilling rig under BP's operational control in the Gulf of

8  Mexico, experienced two separate blowout incidents within a three-month span, raising

9  questions about BP's process safety and well design procedures and practices.

10                        54.

11       The first incident occurred in August 2002, when the *Ocean King* suffered a gas blowout

12  while drilling a well in the Gulf of Mexico's Grand Isle block near Louisiana. The crew's efforts

13  to contain the well failed, and they soon evacuated the rig because of the high level of airborne

14  gas.  The flow of gas and other material exploded, causing a fire on the rig and $2 million in

15  damage.

16                         55.

17       During its investigation, MMS discovered that BP had inexplicably installed a non-

18  compliant blowout diverter system, which contributed to the explosion and fire, rather than the

19  one specifically designed and approved for the rig.  MMS also found that the fire's effects were

20  intensified because BP personnel had stored pressurized containers of flammable gas too close to

21  the diverter output.  Worse still, the investigation revealed that BP engineers, because of a nearby

22  well drilling project, knew that there was a shallow gas pocket at 2,700 feet beneath the sea floor

23  surface, the precise depth which the rig had reached when the well blew out.  The incident was

24  both caused by and revealed a host of systemic safety issues involving BP's failures to build and

25  execute wells as designed, ensure the proper design of the drill rig, and keep accurate up-to-date

26  designs of their equipment.

Page 19 - COMPLAINT

56.

Just three months later, in November 2002, after the *Ocean King* had undergone major repairs and returned to the Grand Isle block, a second incident occurred, similar to the first. After cementing the steel casing in another newly drilled well hole, mud and gas began to flow onto the rig, indicating a failed cementing job. After an unsuccessful effort to contain the well, the crew evacuated. The MMS issued a harsh critique of the second incident, noting the flawed attempt to bring the well under control, and serious deficiencies in BP's safety protocols and knowledge of equipment.

57.

The two incidents in 2002 resulted in MMS issuing a special "Safety Alert" to all drilling companies in the Gulf of Mexico regarding the serious risk of a blowout in the event of a failed cementing job. The Safety Alert specifically mentioned MMS's findings about BP during the *Ocean King* incident, cautioning others in the industry about "erroneous chain of decisions, inadequate training of personnel or knowledge of the diverter system, and inadequate planning."

58.

In May 2003, BP suffered a near blowout not far from the Macondo well. In that incident, the Transocean *Discoverer Enterprise*, on contract with BP, drifted off its drill site just as a well was being completed, breaking the riser pipe linking the rig to the ocean floor. The breaking of the riser was strikingly similar to what occurred on the *Deepwater Horizon* after it exploded. Fortunately for BP, the backup "deadman" switch on the rig's blowout preventer ("BOP") worked: the BOP's rams closed, preventing the flow of oil or gas into the Gulf of Mexico from the damaged riser. A subsequent inspection, however, showed that pieces of broken riser pipe were leaning up against the BOP, close to its control lines, and that the BOP itself was partially damaged – demonstrating that the "fail safe" BOP device, regardless of its immediate effectiveness, was subsequently vulnerable to damage or incapacitation by a falling riser pipe – an outcome which in fact occurred during the *Deepwater Horizon* incident.

Page 20 - COMPLAINT

59.

In August 2004, BP experienced a blowout in the Nile delta, off the coast of Egypt, when the *GSF Adriatic IV*, a gas drilling rig leased from Global Santa Fe (which, in 2007, merged with Transocean) exploded while completing a well for a joint consortium, which included BP. The fire raged for over a week before the well was brought under control. Analysts later said that Egypt's natural gas production was reduced by 10-15 percent because of the incident. As with the *Deepwater Horizon* incident, the blowout occurred after a final cementing job failed.

***Pipeline Cracks in the Thunder Horse PDQ***

60.

In July 2005, BP's massive and newly-deployed production and drilling rig in the Gulf of Mexico, *Thunder Horse PDQ*, was evacuated for a passing hurricane and almost capsized after a key internal valve, which had been installed backwards, allowed ballast water to accumulate in one section of the rig, causing a dangerous tilt. When the rig was later put in dry-dock for repairs, cracks were discovered in the underwater pipelines beneath the rig. A senior engineering consultant who worked on the *Thunder Horse* project later told *The New York Times* that the pipeline cracks: "could have been catastrophic." He continued by noting that: "You would have lost a lot of oil a mile down before you would have even known. It could have been a helluva spill – much like the *Deepwater Horizon*." The *Thunder Horse* repairs took three years to complete.

***Safety Lapses that Caused the Texas City Refinery Explosion***

61.

On March 23, 2005, an explosion occurred at BP's Texas City refinery. Fifteen people were killed and approximately 170 were injured. The U.S. Environmental Protection Agency's ("EPA") criminal investigative division launched a criminal investigation, as did the U.S. Occupational Safety and Health Administration ("OSHA"), EPA civil inspectors, the CSB, and the Texas Environmental Quality Commission ("TCEQ").

Page 21 - COMPLAINT

1

62.

2     In April 2005, OSHA placed BP under its Enhanced Enforcement Program for employers

3 who are "indifferent to their obligations under the OSH Act." EPA civil inspectors entered into a

4 settlement with BP, laying out a timeline and plan to bring the refinery's operations into

5 compliance with EPA regulations. TCEQ reached a similar agreement with BP in mid 2006.

6

63.

7     In mid-2005, the CSB recommended that BP appoint an independent commission to

8 investigate the Company's internal safety culture and uncover the causes of the incident as well

9 as to investigate other general concerns with BP's safety environment. In response, in October

10 2005, BP announced the formation of the "U.S. Refineries Independent Safety Review Panel,"

11 chaired by former Secretary of State James Baker, III. The Baker Panel began conducting

12 investigations in October 2005 and issued its final report on January 16, 2007.

13

64.

14     In March 2007, CSB completed its investigation of the Texas City incident and issued its

15 report on March 22, 2007. The report flagged weaknesses in BP's safety culture. It criticized

16 BP's management for its lack of "focus on controlling major hazard risk," finding that managers

17 provided "ineffective corporate leadership and oversight." CSB's report also identified the

18 Company's failures to heed warning signs and internal concerns raised by its own staff, writing

19 that BP's managers "provided ineffective leadership and oversight" and "did not implement

20 adequate safety oversight, provide needed human and economic resources, or consistently model

21 adherence to safety rules and procedures." The CSB found a direct correlation between the blast

22 and BP's cuts in safety and staffing budgets, concluding: BP "did not effectively evaluate the

23 safety implications of major organizational, personnel, and policy changes." Finally, the CSB

24 report criticized BP for failing to learn from its earlier, similar mistakes.

25

26

Page 22 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400 Fax (503) 373-7067

1     *Widespread Corrosion Causes Leaks in BP's Alaskan Pipeline Operations*

2                                          65.

3          In early 2006, an oil spill of 210,000 to 260,000 gallons occurred on BP's Prudhoe Bay

4     pipelines on Alaska's North Slope, facing the Arctic Sea.  The pipeline had been leaking for

5     weeks and was first discovered on March 2, 2006.  Joint federal and state investigations,

6     encompassing both criminal and civil matters, began in March 2006.  The investigations

7     ultimately addressed not only the March 2006 leak, but also addressed weaknesses in other parts

8     of the pipeline, and a subsequent leak that occurred on another part of the pipeline in August

9     2006.

10                                         66.

11         An EPA criminal investigation concluded that widespread corrosion in the pipelines had

12    led to the March and August leaks (and other points of corrosion uncovered in the investigation)

13    and that BP could have prevented the leaks by maintaining and inspecting its pipelines.  It further

14    concluded that the duration of the spill revealed BP's criminal neglect of the pipeline.

15                                         67.

16         In 2007, BP pled guilty to a criminal charge in connection with the March 2006 spill,

17    admitting that BP's "criminal negligence" caused the corrosion – and thus the spill itself.  BP

18    was sentenced to three years of probation and fined 22 million dollars.

19                                         68.

20         The 2006 spill was BP's second criminal plea in the United States in a decade:  in the late

21    1990s BP was indicted because its engineers were injecting dangerous materials into a well

22    casing to dispose of the materials.  In response, BP pled guilty in 2000, was put on five years of

23    probation, and entered into a compliance agreement with the EPA's debarment division.

24                                         69.

25         In March 2007, the Company received warnings about the deficiencies in its corporate

26    governance from the consulting firm Booz Allen Hamilton ("Booz Allen").  In the wake of the

Page 23 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1    2006 spill on its Prudhoe Bay pipeline, BP retained Booz Allen to "identify potential

2    organizational, process, and governance issues" that related or contributed to the incident.  The

3    Booz Allen report found that BP's executive management and Board of Directors had created a

4    culture focused on cost-cutting and ensuring that budget targets were met, while ignoring safety

5    issues and critical maintenance.  Among other findings, Booz Allen found major shortcomings in

6    the Company's internal communications culture noting, in particular, that "critical risk data" and

7    concerns about major risks were not properly communicated within BP.  More specifically, the

8    report noted that "[r]isk-related vertical and horizontal communications do not elevate critical

9    risk data to senior leadership."  Booz Allen effectively put Defendants on notice that they could

10   not rely on the Company's internal reporting mechanisms to receive "critical risk data" and thus

11   understand the risk of catastrophic operating failure.

12                                         70.

13           In May 2007, the chairman of the Chemical Safety Board, Carolyn Merritt, testified

14   before Congress about similarities between the Booz Allen report on Alaska and the CSB's

15   report on Texas City, noting that "[v]irtually all of the seven root causes identified for the

16   Prudhoe Bay incidents have strong echoes in Texas City," and identified "common findings" that

17   included "flawed communication of lessons learned, excessive decentralization of safety

18   functions and high management turnover.  BP focused on personal safety statistics but allowed

19   catastrophic process safety risks to grow."

20   ***BP Nominally Adopts the Baker Panel Recommendations***

21                                         71.

22           With all of its past problems staring BP in the face, the Company in early 2007 finally

23   appeared to address its previous safety shortcomings.  The Baker Panel strongly suggested that

24   BP immediately implement the following ten recommendations:

25   RECOMMENDATION #1 – PROCESS SAFETY LEADERSHIP – The Board of
     Directors of BP p.l.c, BP's executive management (including its Group Chief
26   Executive), and other members of BP's corporate management must provide

Page 24 - COMPLAINT

effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

RECOMMENDATION #2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM – BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE – BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

RECOMMENDATION #4 – PROCESS SAFETY CULTURE – BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY – BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT – BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY – BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemical processing industries.

RECOMMENDATION #8 – PROCESS SAFETY AUDITING – BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

RECOMMENDATION #9 – BOARD MONITORING – BP's Board should monitor the implementation of the recommendations of the Panel . . . and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to

Page 25 - COMPLAINT

report annually to the Board on BP's progress in implementing the Panel's recommendations . . . . The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

RECOMMENDATION #10 – INDUSTRY LEADER – BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management. The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

72.

Following the release of the Baker Panel recommendations, BP consistently stated that it would implement the mandates across all lines of its business.  In a January 16, 2007, press conference responding to the findings of the Baker Report, then-CEO Browne announced:

If I had to say one thing which I hope you will all hear today it is this 'BP gets it.' And I get it too. This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred. *I recognise the need for improvement and that my successor, Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations*.

* * *

The list of what we have done since the accident *shows how seriously we take process safety*.

73.

Yet the truth, as described herein, is not only that BP did not "get it," but that BP and certain of its executives knew of or recklessly disregarded their continued failure to implement the process safety programs and procedures either as promised or necessary to avoid the recurrence of similarly preventable deep sea drilling incidents.  The occurrence of the worst industrial incident in history, along with the Presidential Commission's finding that BP has not met "it's professed commitment to safety" belied BP's public representations concerning its professed commitment to ensuring the safety of its deep sea drilling operations.

Page 26 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

*BP Creates the Group Operations Risk Committee and the Safety, Ethics and Environment Assurance Committee to Implement and Monitor Process Safety Systems*

74.

As part of the Company's professed commitment to process safety, BP told investors OMS was designed to address the Baker Panel's recommendation to establish and implement an integrated and comprehensive system that would systematically identify, reduce and manage process safety risks.  In connection with this public mandate, BP set up a committee called GORC – Group Operations Risk Committee – that was tasked with oversight and implementation of OMS, among other responsibilities.  GORC met monthly and included sectional CEOs, with BP's CEO, Hayward, as Committee Chair.  GORC's role was to insure that BP's operational risks were identified and properly managed.

75.

GORC and its members, including Hayward and Inglis, received regular status updates via the Orange Book concerning the scope and implementation of OMS.  The purpose of BP's Orange Book was to provide GORC and its members with key performance indicators concerning implementation of OMS and BP's safety and operation integrity agenda.

76.

GORC and its members, including Hayward and Inglis, monitored the implementation of OMS through the Orange Book.

77.

The Orange Book provided a clear indication of what areas of BP's operations had or had not implemented OMS.

*BP's SEEAC Closely Monitored BP's Safety Performance Including OMS Implementation*

78.

BP created Safety, Ethics and Environment Assurance Committee ("SEEAC") as a board-level committee to ensure that the Company's publications concerning environmental, safety, and ethical matters were accurate.  SEEAC purportedly carried out that purpose by

Page 27 - COMPLAINT

1   obtaining reports from GORC concerning issues within GORC's purview, including the status of

2   BP's implementation of OMS. SEEAC also independently monitored progress in BP's process

3   safety efforts. SEEAC met regularly (more than quarterly) – eight times in 2008, seven times in

4   2009, and nine times in 2010 – and was continuously updated with respect to BP's

5   implementation of OMS.

6                            79.

7       SEEAC's responsibilities, as described in BP's 2008 Annual Report, published on March

8   4, 2009, included "[r]eviewing material to be placed before shareholders that addresses

9   environmental, safety and ethical performance and make [*sic*] recommendations to the Board

10  about their adoption and publication." The report described "the main tasks and requirements for

11  SEEAC" as including "monitoring and obtaining assurance that the management or mitigation of

12  material non-financial risks [was] appropriately addressed by the group chief executive."

13  William Castell, chairman of SEEAC, testified that non-financial risks included safety-related

14  risks.

15                          80.

16      BP's 2008 Annual Report further explained that "[SEEAC] receives information on

17  agenda items from both internal and external sources, including internal audit, the safety and

18  operations function, the group compliance and ethics function, and Ernst & Young. Like other

19  board committees, SEEAC can access independent advice and counsel if it requires, on an

20  unrestricted basis."

21                          81.

22      SEEAC members received on a quarterly basis the Orange Book and its detailed data

23  concerning BP's safety performance. The metrics included reports of major incidents, and audit

24  functions, and lost days of work, among others.

25

26

Page 28 - COMPLAINT

*BP Launches OMS to Purportedly Implement the Baker Panel's Recommendations, but Exempts OMS's Application from Rigs that BP Did Not Fully-Own*

82.

In 2007, BP introduced OMS at twelve representative pilot sites, and by early 2008 BP purportedly sought to implement OMS company-wide.  OMS was supposedly the cornerstone of BP's efforts at improving its process safety protocols and preventing major accidents in the wake of the Texas City disaster.  According to Ellis Armstrong, CFO of BP E&P, BP's executive management made the determination to extend the Baker Panel process safety recommendations across the entire panoply of the BP Group, including Exploration and Production in the Gulf of Mexico, rather than limiting implementation to its refineries.  BP repeatedly and publicly referred to OMS as the means by which BP would improve its process safety performance.

83.

BP, in its 2006 Sustainability Report, made publicly available on May 9, 2007, represented that "OMS is a comprehensive system that covers *all aspects* of our operations . . . ," and that "[t]he new OMS will apply to *all operations*," and BP stated in its 2007 Annual Review that "OMS is the foundation for a safe, effective, and high-performing BP."

84.

On September 25, 2007, BP's Inglis, speaking at the Sanford Bernstein 4th Annual Strategic Decisions Conference, misleadingly stated:  "One aspect of our focus on safe and reliable operations that I mentioned earlier is our new standardised Operating Management System (OMS).  This will provide a blueprint for safety and *all aspects of operations* throughout BP."

85.

On May 20, 2008, BP released its 2007 Sustainability Report, in which BP stated that it was "still learning lessons from" Texas City and had "agreed to implement all [the Baker Panel's] recommendations and we are now working to do so."  Describing BP's efforts in that regard, BP's Hayward stated in the report that "[w]e are also now introducing our new operating

Page 29 - COMPLAINT

1    management system (OMS), designed to bring greater consistency to our operations.  My

2    executive team continues to monitor closely our safety performance."  The 2007 Sustainability

3    Report further noted that GORC met 14 times in 2007.

4                       86.

5        On February 24, 2009, BP released its 2008 Annual Review, in which BP stated that

6    "[t]he BP operating management system (OMS) turns the principle of safe and reliable

7    operations into reality by governing how *every BP project, site, operation, and facility is*

8    *managed.*"   Similarly, on March 4, 2009, BP released its 2008 Annual Report filed on Form 20-

9    F, in which BP stated that OMS was a "*framework for operations across BP* that is integral to

10   improving safety and operating performance in *every site.*"

11                      87.

12       Contrary to BP's representations, however, and as admitted by BP at the hearing on its

13   motions to dismiss in the *In re BP plc Sec. Litig.* 04-md-2815 action, BP did not apply OMS to

14   its operations on any rig unless the rig was fully-owned by BP.  Of BP's seven wells in the Gulf

15   of Mexico during early 2010, six were not fully owned by BP, including the Transocean-owned

16   *Deepwater Horizon.*

17                      88.

18       Indeed, BP never intended for OMS to apply to the entirety of BP's operations, and OMS

19   specifically was not applicable to drilling rigs that BP did not fully own.  Massive portions of

20   BP's riskiest and potentially most profitable exploration and production projects were largely

21   exempt from OMS because the well sites were physically drilled by contracted drilling rigs.

22   Indeed, BP used contracted rigs to drill the majority of wells in the deepwater Gulf of Mexico.

23   This practice and BP's intent to exclude contracted drilling rigs from OMS coverage meant that

24   BP did not apply OMS to the vast majority of its deepwater drilling operations in the Gulf of

25   Mexico, including the Transocean-owned *Deepwater Horizon.*

26

Page 30 - COMPLAINT

1                                          89.

2          GORC members, including Hayward and Inglis as well as John Mogford, BP's former

3   Global Head of Safety and Operations, were familiar with the scope of OMS and its applicability

4   to only BP owned, operated and controlled sites.

5                                          90.

6          In particular, OMS did not apply to the *Deepwater Horizon* and as a result

7   numerous safety and risk management procedures instituted in direct response to the

8   Baker Panel recommendations were not applicable to the majority of BP's drilling fleet in

9   the Gulf of Mexico, including the *Deepwater Horizon*.  For example, BP did not apply its

10  Integrity Management, Major Accident Risk ("MAR") analysis, Safety & Operations

11  Audits, or Control of Work to the majority of its drilling rig fleet, including the

12  *Deepwater Horizon*, because OMS was limited to rigs that were fully owned by BP.

13                                         91.

14         BP's drilling and completion rigs in the Gulf of Mexico, including the *Deepwater

15  Horizon* – did not receive information on OMS, which underscores the fact that OMS was never

16  intended to apply to some of BP's most critical projects involving drilling rigs that were not

17  fully-owned by BP.

18  **BP Knew That a Deepwater Blowout Was the Highest Risk Facing BP Operations in the Gulf
    of Mexico and Knew That Drilling in the Gulf of Mexico Itself Was Highly Risky**
19

20                                         92.

21         BP's CEO  Hayward stated that OMS -- BP's cornerstone process safety program in the

22  Gulf of Mexico – would apply "across all of BP's operations," that BP had "completed the

23  transition to OMS in" the Gulf of Mexico and that OMS "turns the principle of safe and reliable

24  operations into reality by governing how every BP project, site, operation and facility is

25  managed."  These and other similar statements were, at a minimum, severely reckless,

26  considering his knowledge that a deepwater blowout was the highest risk facing BP in the Gulf

Page 31 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

1  of Mexico.  Not only did BP's Hayward know that his misrepresentations concerning BP's OMS

2  implementation were false, but he also knew that those misrepresentations concerned the highest

3  risk that BP faced in the Gulf of Mexico, and one of the highest risks facing the company.

4  ***Contrary To BP's Assertions, the Gulf of Mexico Had Not Completed the Transition to OMS***
5  ***at the Time of the Deepwater Horizon Disaster***

6                                    93.

7           In BP's 2008 and 2009 Annual Reports on Form 20-F, BP represented that OMS was in

8  place at BP's exploration and production projects in the Gulf of Mexico.  BP stated

9  unequivocally that, "[e]ight sites completed the transition to OMS in 2008," including "the Gulf

10  of Mexico."  In reality, however, this statement was false when made.

11                                    94.

12          During the relevant period, BP presented specific information about OMS, including the

13  number of sites in which the program was supposedly implemented, specific sites where it was

14  supposedly already implemented, and statistical percentages demonstrating that the Company

15  was supposedly on track with implementation.  BP presented this hard data on OMS

16  implementation – and the benefits that OMS had allegedly already begun to achieve – alongside

17  the Company's expectations for continued success in its Gulf of Mexico operations.  However,

18  the transition to OMS in the Gulf of Mexico was not complete in 2008 and was not even

19  complete at the time of the *Deepwater Horizon* disaster.

20                                    95.

21          BP as well as its former CEO, Hayward, have now admitted that they knew OMS

22  was not fully implemented in the Gulf of Mexico as of April 2010.

23                                    96.

24          In fact, BP did not even begin to implement OMS in the Gulf of Mexico until the

25  Fall of 2009, and BP did not expect implementation to be complete until the end of 2010.

26

Page 32 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

Exhibit A Page 32 of 136

97.

BP's failure to complete implementation of OMS in the Gulf of Mexico had enormous repercussions. BP's Hayward testified that the *Deepwater Horizon* tragedy could potentially have been avoided if OMS had been fully implemented in the Gulf and/or had been applicable to the *Deepwater Horizon*.

98.

Likewise, SEEAC knew that implementation of OMS had not been completed in the Gulf of Mexico by 2008.

99.

In addition, the people charged with implementing OMS in the Gulf of Mexico were transferred or terminated in Q4 2009 and Q1 2010. Moreover, BP's OMS lagged far behind its peers (*e.g.* Chevron and Exxon) in 2009, and by 2010, the program was still in its pilot phase and yet to be fully implemented in the Gulf of Mexico.

100.

In the fourth quarter of 2009 and in January 2010, BP, as part of a global cost-cutting restructuring, reorganized the drilling operations unit for the Gulf of Mexico. A consequence of the restructuring was the termination or forced transfer for those chiefly responsible for BP's Gulf of Mexico Operations, including but not limited to safety processes and the implementation of BP's OMS in the Gulf of Mexico.

101.

Further as described below, the individuals brought in to implement BP's OMS and manage BP's Gulf of Mexico Operations lacked the knowledge, experience and expertise of those they were replacing. In fact, in September 2009 a non-public BP rig audit of the *Deepwater Horizon* found that safety goals were not commonly known or properly communicated to employees and not all relevant rig personnel were knowledgeable about drilling and well operations practices.

Page 33 - COMPLAINT

1       102.

2           The restructuring of BP's Gulf of Mexico operations was undertaken despite concerns

3   raised by senior BP employees to top-level management with direct reporting responsibilities to

4   BP's board of directors.  These concerns related to BP's ability to operate safely in the Gulf.

5       103.

6           Ian Little was the Gulf of Mexico wells manager for BP.  Little was replaced by David

7   Sims who lacked Little's knowledge and expertise.  Despite this, Sims was required to make

8   decisions regarding not only management of the well, but also required to manage the response

9   to the *Deepwater Horizon's* explosion.

10      104.

11          Prior to becoming Vice President of Drilling and Completions, London in December

12  2009, Harry Thierens served from 2006-2009 as the well director for the Gulf of Mexico.  He

13  managed the engineering and operations group in the Gulf of Mexico.  Thierens was replaced by

14  David Rich who lacked the expertise of Thierens.

15      105.

16          Kevin Lacy was the vice president of Drilling and Completions for BP until December

17  15, 2009 when he left the Company.  Lacy, who worked in exploration and production for thirty

18  years, was replaced by Patrick O'Bryan.

19      106.

20          O'Bryan lacked Lacy's experience and expertise.  By 2009 and 2010, BP still had not

21  implemented a robust operations management system to ensure offshore processes could be

22  managed effectively for both exploration and risk.  Given the difficulties of Gulf of Mexico

23  exploration, this invited disaster.

24

25

26

Page 34 - COMPLAINT

VI.   **SCIENTER CONCERNING BP'S FALSE OR MISLEADING STATEMENTS REGARDING RISKS IN OFFSHORE DRILLING AND BP'S FAILURE TO IMPLEMENT PROPER PROCESS SAFETY CONTROLS AND PROCEDURES**

A.   **When They Spoke BP's Executives Knew, or Recklessly Disregarded, That BP's Process Safety Procedures Did Not Adequately Address the Known Risks in Deepwater Drilling, Risks that Materialized at the Macondo Well**

107.

Throughout the relevant period, BP was aware, or recklessly disregarded, that its public statements regarding BP's commitment to safety were not true and that its statements touting the importance of deepwater drilling in the Gulf of Mexico omitted material information regarding BP's highly risky and unsafe practices in its deep sea operations.

*Faulty Cementing Jobs and Other Stability Issues Were Known as the Most Frequent Causes of Well Control Problems*

108.

As early as 2003, BP knew or recklessly disregarded risks associated with oil spills in offshore drilling related to the failure of cementing at various stages of well development, from the cementing around well casings and annuluses to the cementing of plugs, or shoes, to block pressure during the process of "temporary well abandonment."

109.

BP was aware – though it failed to disclose its awareness to the investing public – that as early as 2003, MMS had determined that failed cement jobs were associated with 33 blowout or well kick incidents in the Gulf of Mexico since 1973, some of which involved "well loss" and "rig and platform destruction by fire."  Indeed, an October 22, 2003 MMS alert noted that "*[a]nnular flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of Mexico.*"

110.

BP had experienced cementing failures and knew of similar failures on other companies' rigs prior to and during the relevant time.  Additionally, BP experienced, but did not disclose, its

Page 35 - COMPLAINT

1    own problems with a faulty cement job on one of its deepwater wells in the Caspian Sea, off the

2    coast of Azerbaijan, in September 2008.

3                                    111.

4          More specifically, on or around September 17, 2008, BP experienced a gas leak at one of

5    its central production platforms in the Azeri-Chirag-Guneshi ("ACG") field in the Caspian Sea –

6    which is the largest of BP's deepwater drilling operations in Azerbaijan.  Shortly thereafter,

7    another rig in the field, called *B-17*, suffered a blowout, causing gas, water, and mud to shoot

8    onto the rig floor, raising the possibility of an explosion.  *B-17* was evacuated and its well was

9    sealed, either by annular rams or because the well simply "bridged" (collapsed on itself or

10   otherwise stopped flowing on its own).  As a result, BP shut down most of the entire field's

11   operations, cutting daily production by over 600,000 barrels per day.  In later communications,

12   BP told U.S. officials that they suspected that numerous wells had a "bad cement job."

13                                   112.

14         BP made no announcement or disclosure of this incident at the time it occurred.  In fact,

15   BP's Form 20-F for 2008 merely mentioned a "subsurface gas release" on September 17, 2008

16   and notably omitted references to the blowout on *B-17*, the fact that gas alarms went off on the

17   field's central production platform, and the possibility that cementing jobs on other wells were

18   faulty as well.  As noted by *The Wall Street Journal* on December 17, 2010:  "BP had been

19   'exceptionally circumspect in disseminating information' about the [ACG gas] leak, both to the

20   public and [to] its partner."  Moreover, according to the same article, several of BP's partners

21   "were upset with BP for allegedly withholding information from them about the incident."

22   ***BP Knew or Recklessly Disregarded That BOPs Were Known to Fail, Yet Did Not Adjust Its***
23   ***Process Safety Procedures Accordingly***

24                                   113.

25         As early as 2000, and on a continuous basis throughout the relevant period, BP was

26   aware of or recklessly disregarded the substantial and known risks associated with relying on a

Page 36 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1  single blind shear ram in a BOP to prevent an uncontrolled oil or gas release. Indeed, BP was

2  well aware that blind shear rams were highly untrustworthy and failed nearly 50 percent of the

3  time.

4                                    114.

5        A BOP is a large, five-story device typically set on the ocean floor at the so-called "mud

6  line," beneath the riser connecting the rig to the sea floor and on top of the cement surface casing

7  that seals around the "annulus," which runs down further into the earth toward the "pay sands" in

8  which oil and gas are found.

9                                    115.

10        More specifically, BP knew, or recklessly disregarded, that, in the event the BOP needed

11  to be activated, the following should occur:

12     • Closure of the "variable rams," which would seal the area around the drill pipe

13        in the well (or, with "annular rams" or "blind rams," if no pipe lay in the well),

14        thereby sealing oil and gas in the annulus below the BOP; and then attempting

15        to pump drilling mud into the annulus to outweigh and balance the pressure of

16        rising oil and gas; or:

17     • In a worse scenario, and if the method described above did not work, activate

18        the BOP's "blind shear rams," which are intended to cut through drill pipe in

19        the well and then seal the oil down in the annulus below the BOP; or

20     • In an emergency setting, set the BOP to activate all of its rams – variable,

21        annular, and blind shear – and disconnect from the riser, preventing further gas

22        or oil from rising to the rig above.

23                                    116.

24        As set forth below, as early as 2000, and on a continuous basis throughout the relevant

25  period, BP knew, or was reckless in not knowing, that various components of BOPs in use (both

26  on their own rigs and Transocean-owned rigs) had high probabilities of failure, especially in

Page 37 - COMPLAINT

1     deepwater and ultra-deepwater settings, where drill piping is thicker and more difficult to cut and

2     where hydrostatic pressures affect hydraulic systems which control the BOP rams.

3                                    117.

4        In July 2001, the analyst group SINTEF, the largest independent research organization in

5     Scandinavia, provided the MMS with a report recommending that all deepwater and ultra-

6     deepwater drilling rigs in operation in the Gulf of Mexico be equipped with not one, but *two*

7     separate blind shear rams, because of the significant risk that one might fail. The SINTEF

8     report, while not publicly released, was shared with BP and other industry operators.

9                                      118.

10        In both December 2002 and September 2004, MMS provided to BP and other industry

11     operators several reports written by West Engineering Services revealing serious deficiencies

12     with blind shear rams. In particular, the reports mentioned:

13         •    The incapacity of shears to cut through many newer types of drill pipe, which

14              tend to be thicker than older pipes;

15         •    The certainty with which the shears that close on the thick joints that connect

16              the sections of pipe together (rather than simply closing on the pipe itself) fail;

17              and

18         •    The significantly lower capabilities of shears to cut pipe at extreme depths, for

19              instance, in excess of 5,000 feet, because of the effect of hydrostatic pressure

20              on BOPs' hydraulic systems.

21                                    119.

22        The studies noted above, although not known to the general public, were shared with and

23     made available to industry members, including senior BP managers and directors involved in

24     drilling operations, and were discussed at industry conferences that occurred during the relevant

25     period, including, but not limited to, conferences held by the Society of Petroleum Engineers

26     ("SPE") and the International Association of Drilling Contractors ("IADC") in New Orleans,

Page 38 - COMPLAINT

1    February 2-4, 2010 and in Amsterdam in 2009.  Senior BP drilling managers routinely attended

2    SPE and IADC conferences, including those noted above.

3                                      120.

4         In April 2000, an independent expert report by EQE International, a risk and insurance

5    consulting group, conducted an extensive analysis of the BOP to be installed on the *Deepwater*

6    *Horizon*.  The report, which was not publicly disclosed until June 20, 2010, identified a serious

7    flaw in the BOP's design – despite extensive back-up systems, or so-called "redundancies," in

8    the BOP's layout – there was a particular component in the unit's hydraulic system, a single

9    "shuttle valve," which had no backup.  In response, EQE noted the potential for a "single point

10   failure" of the shuttle valve and explained that if the shuttle valve failed, the remaining

11   redundancies built into the BOP would be rendered irrelevant.

12                                     121.

13        Significantly, throughout the relevant period, BP actually utilized the services of West

14   Engineering, the company that carried out the research for MMS on BOP reliability, to carry out

15   specific studies for the Company on risk issues relating to BOP testing.  In both 2008 and early

16   2010, BP specifically requested, as a member of the joint industry group focused on deepwater

17   drilling issues, that West Engineering carry out research projects on BOP reliability and testing,

18   and integrate past studies analyzing BOPs and their device failures.

19                                     122.

20        A July 2009 report also put BP on notice that BOPs were unreliable.  BP's partner,

21   Transocean, commissioned the report, which analyzed past BOP performance (including in the

22   Gulf of Mexico) as part of a risk assessment for deepwater drilling in the Beaufort Sea, north of

23   Alaska.  The report, written by the consultant group Det Norske Veritas, which was subsequently

24   contracted by the U.S. government to perform an extensive investigation into the *Deepwater*

25   *Horizon*'s BOP in the wake of the April 2010 blowout and explosion, found that, in practice,

26   blind shear rams on offshore BOPs had a failure rate of 45 percent.

Page 39 - COMPLAINT

1
                        123.

2
      BP's Hayward acknowledged in his deposition that he was aware that problems had been

3 identified with BOPs and that those problems were generally known throughout the industry.

4 Nevertheless, the existence of this report and its findings were not disclosed to the investing

5 public until June 20, 2010.

6
                        124.

7
      BP exacerbated the risk of BOP failure by permitting rigs operating in the Gulf of

8 Mexico to be equipped with just one single blind shear ram. In addition, BP contracted with

9 Transocean in 2004 to replace one of the variable bore rams on the *Deepwater Horizon*'s BOP

10 with a test ram in order to speed up subsea testing procedures. Yet, the installation of this test

11 ram lowered the unit's reliability even further. Indeed, an agreement between BP and

12 Transocean executed in October 2004, Transocean noted BP's awareness that the removal of the

13 variable bore ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk

14 profile." The existence of this agreement was not made public until June 20, 2010.

15
                        125.

16
      Thus, despite all the knowledge and information about difficulties with cementing and

17 BOPs, BP either knew, or recklessly disregarded, that BP failed to establish uniform process

18 safety features for rig operators to follow during off shore drilling to address cementing issues

19 and for the Company to follow with regard to BOPs.

20 ***BP Received No Less Than One Hundred Safety Warnings for its Safety Protocol Lapses in its***
21 ***North Sea Deepwater Drilling Operations***

22
                        126.

23
      BP knew of the significant risks in its deepwater drilling operations during the relevant

24 period that were pervasive across BP's deepwater operations. Yet, BP knew, or recklessly

25 disregarded, that BP's process safety protocols failed to properly and sufficiently address these

26 known risks.

Page 40 - COMPLAINT

1                               127.

2        Unknown to the investing public, the UK HSE had levied extensive citations and fines on

3  BP, sending no fewer than 100 letters or notices to BP between 2006 and 2010, and citing the

4  Company for safety or environmental violations related to exploration or production rigs,

5  pipeline or storage systems, or other facilities.  Many of the communications related to offshore

6  deepwater rigs operated by BP in the North Sea around Scotland, including the *Schiehallion*,

7  *Unity*, *Bruce*, *Hutton*, *Magnus*, *Clair*, and *Miller* vessels.  Some of these rigs and the ships that

8  serviced them were decades old, and the safety issues, in many cases, concerned a failure to

9  properly maintain and inspect equipment.

10                              128.

11       According to UK HSE records, the *Schiehallion*, an aging floating production storage and

12 offloading ("FPSO") ship in the far North Sea, experienced a 2005 engine room fire and a 2006

13 "mooring chain failure," resulting in special UK HSE inspections and meetings with BP

14 officials, and notifications concerning various violations of safety and environmental violations

15 during the relevant time.

16                              129.

17       In correspondence in 2006, UK HSE strongly urged BP to dry-dock the *Schiehallion* for

18 repairs. BP refused, arguing that they would instead prioritize efforts to improve the ship's

19 condition through a focus on maintenance.  UK HSE, in a letter to BP on February 2, 2007,

20 strongly criticized BP's decision, noting several areas of maintenance backlog and numerous

21 cases in which past UK HSE notices were not addressed, and listing various continuing

22 operations which were not in compliance with "relevant statutory provisions" ("RSPs"):

23        Finally, it is HSE's view that ***the overall magnitude of the various categories of***
24       ***maintenance backlog [on the Schiehallion] is such that BP does not have***
         ***sufficient control of the situation***. . . . [T]he situation means that there are
25       concerns for BP's continued ability to comply with the fundamental duties under
         Sections 2 and 3 of the HASWA [Health and Safety at Work Act]. At the meeting
26       of 29th January, we discussed with BP the issues associated with drydocking,
         shutting down production and prioritizing integrity management (i.e., the latter

Page 41 - COMPLAINT

being BP's current approach) as a means of addressing the overall maintenance backlog. *We listened to BP's opinions on the issues associated with the various options, but remain unconvinced that BP's proposed course of actions to remain on station, with an increased focus on integrity, is compatible with achieving compliance with the RSPs given the historic susceptibility of the FPSO Schiehallion to events or conditions that exacerbate ongoing maintenance backlogs* (e.g., 2005 Compressor Fire, 2006 Mooring Chain Failure).

130.

The February 2, 2007 *UK* HSE letter continued, laying out concerns that were prescient of the *Deepwater Horizon* incident:

[UK HSE maintains] the view that *major accidents result when a series of failings with several critical risk control systems materialize concurrently. . . . The number and relatedness of backlogs on the Schiehallion is such that it appears as though there is a significant risk of such a series of failings arising.*

131.

The February 2, 2007 UK HSE letter *concluded* with criticism of BP's larger problem with its lax safety culture and inability to avoid a major incident that echoed the MMS's findings about BP in 2002: "BP's decisions on the *Schiehallion* have not in any way been informed by a systematic assessment [by independent safety inspectors] of the adequacy of the management system to achieve compliance with those RSPs . . . that are intended to avoid the failings that might align to cause major accidents."

132.

According to a 2009 UK HSE letter, BP again suffered a "significant Hydrocarbon Release" (*i.e.*, an oil spill or gas release) on the *Schiehallion* rig on August 4, 2008. The UK HSE said the release was attributable to a "failure to comply" with BP's own process safety procedures.

133.

Several other UK HSE letters were sent to BP between 2007 and 2010 as well. These letters outlined safety and maintenance problems on other rigs that could create a serious risk of hydrocarbon release:

Page 42 - COMPLAINT

1     • A March 5, 2009 UK HSE letter discussed inspections of BP's *Harding* rig,

2          criticizing BP's failure to inspect several "high risk" systems for corrosion, as

3          requested in previous notices. The inspector wrote: "This lack of progress is

4          unsatisfactory. It is important that the condition of these systems is

5          ascertained in a timely manner, in order to reduce the risk of loss of

6          containment incidents" (*i.e.*, spills); and

7     • Additional letters to BP Exploration Operating Company Ltd. on March 25,

8          2008, March 5, 2009, and July 7, 2009 relating to the *Bruce*, *Magnus*, *Unity*,

9          and *ETAP* platforms criticize BP for failing to conduct maintenance programs

10         compatible with the intended lifespan of its rigs – suggesting, in other words,

11         that BP was running its own equipment into ruin.

12     **B.**     **BP's Scienter for Corporate Statements**

13     *BP's Internal Reporting Structures Mandated that the CEO and Board Review Process Safety*

14     *and Risk*

15                     134.

16       The Safety & Operations *segment* ("S&O") was a key component of OMS that BP

17 utilized to achieve monitoring of process safety performance. Before and during the relevant

18 time, BP utilized the S&O function for a variety of reporting mechanisms, progress updates and

19 metrics which allowed for the Executive and Board to monitor process safety performance.

20                     135.

21       The Orange Book was a reporting format conceived of by BP to relay key safety

22 information to GORC. Ellis Armstrong, CFO of BP E&P, testified that the purpose of the

23 Orange Book was to cull safety metrics across BP and regional business units, including E&P in

24 the Gulf of Mexico that "had the same level of standing in the firm as financial information."

25 This information was reported on a quarterly basis to GORC and SEEAC in connection with the

26 committees' safety monitoring roles.

Page 43 - COMPLAINT

***SEEAC Approved BP's Publications Regarding Safety***

136.

As noted above, SEEAC responsibilities included:  "[r]eviewing material to be placed before shareholders which addresses environmental, safety and ethical performance and make recommendations to the Board about their adoption and publication."  For example, BP's "Sustainability Reporting 2009 Safety" ("Sustainability Report") was published on April 15, 2010.  Just weeks before the publication of the Sustainability Report, SEEAC met and the top item on its agenda was commendation of the final draft form of the report.

***BP Consciously Limited The Scope of Safety & Operations Audits So As Not To Apply To The Majority Of BP's Deepwater Drilling Fleet***

137.

Contrary to BP's representations that OMS was a systematic management framework that provided superior monitoring of safety, BP made the decision to exclude some of the most lucrative – and the riskiest – of all BP operations from S&O audits.

138.

These S&O audits were especially critical because they tested rig and rig personnel's compliance with safety standards and risk management practices, including requirements set forth under OMS.

139.

BP made a deliberate decision to exclude these risky BP operations, which were responsible for drilling the vast majority of BP's deepwater wells in the Gulf of Mexico, from the scope of the S&O audit function.  Had such operations not been purposefully excluded, GORC and SEEAC (which received all S&O audits) would have received detailed information concerning the myriad process safety failures on the *Deepwater Horizon* (such as those identified throughout the Presidential Commission's Report).

Page 44 - COMPLAINT

140.

The decision to exclude Gulf of Mexico from BP's S&O Audits belied BP's repeated public statements regarding a systematic framework for improved process safety.

**C.     Additional Scienter Allegations:  BP's Disregard of Safety and Operational Concerns**

141.

BP was informed of significant problems with its process safety with respect to refineries. For example, in May 2010, it was revealed that between June 2007 and February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful."  The willful violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period – BP's main competitors' combined citations were 22.  Center for Public Integrity, *OSHA Says BP Has "Systemic Safety Problem,"* May 16, 2010.  These were precisely the types of safety issues BP informed investors it was addressing after release of the Baker Report.

**D.     Additional Scienter Allegations:  BP Retaliated Against Individuals Who Raised Concerns About the Safety and Integrity of its Operations**

*Whistleblower Retaliation in the Gulf of Mexico*

142.

Throughout the relevant period, and contrary to BP's representations to its shareholders, BP engaged in continuous and systemic retaliation against employees who reported concerns about the safety and integrity of BP's operations.  These whistleblowers provide further support of BP's knowledge or reckless disregard of the falsity and misleading nature of their statements.

143.

In August 2008, Kenneth Abbott ("Abbott"), a BP engineer working on design and blueprint management issues relating to the operations of BP's *Atlantis* rig (a major BP rig

Page 45 - COMPLAINT

1   involved in drilling deepwater exploration and production wells in the Gulf of Mexico), began to

2   raise concerns with BP managers about the Company's practices and policies for managing and

3   updating designs and blueprints for its infrastructure and equipment on the *Atlantis*.  One

4   particular concern was that designs for critical units on the rig were not updated to reflect

5   changes made during repairs, maintenance, or other modifications.

6                                        144.

7           On or around August 15, 2008, BP manager Barry Duff ("Duff"), who worked with

8   Abbott, wrote to BP managers and corroborated Abbott's concerns, stating that a lack of

9   properly-reviewed and approved designs could result in "***catastrophic operating errors***" and that

10  "***currently there are hundreds if not thousands of Subsea documents that have never been***

11  ***finalized***," a situation which Duff referred to as "***fundamentally wrong***."

12                                       145.

13          Abbott continued to raise the above concerns from November 2008 through January 2009

14  when he was fired in retaliation for his whistle-blowing.  Shortly after his termination, Abbott

15  raised his concerns with the Company's Ombudsman.  On June 17, 2010, Abbott was invited to

16  testify before Congress to describe the circumstances that led him to initially report his concerns

17  to senior BP management.  During his testimony, Abbott stated, in part, that:

18          *From my experience working in the industry for over 30 years, I have never*
            *seen these kinds of problems with other companies*.  Of course, everyone and
19          every company will make mistakes occasionally.  *I have never seen another*
            *company with the kind of widespread disregard for proper engineering and*
20          *safety procedures that I saw at BP and that we hear from the news reports*
            *about BP Horizon, or BP Texas City, or the BP's Alaska pipeline spills.  BP's*
21          *own investigation of itself,* by former Secretary of State James Baker, *reported*
            *that BP has a culture which simply does not follow safety regulations.  From*
22          *what I saw, that culture has not changed*.

23                                       146.

24          Among the documents sent to the BP Ombudsman, and forwarded to senior BP managers

25  during the Ombudsman's investigation into Abbott's allegations in 2009 and early 2010, was a

26

Page 46 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

1    declaration by a safety engineer in Houston, Texas, Mike Sawyer, who independently reviewed

2    Abbott's allegations, internal BP emails, and applicable regulations.

3                                      147.

4           The Sawyer affidavit affirmed that a "large portion of [the *Atlantis'*] subsea safety critical

5    drawings, documents, specifications, and certificates were not in final, 'as-built' status," and

6    warned: "***The lack of 'as-built' design documents is a violation of Federal requirements under***

7    ***the Department of Interior MMS Safety and Environmental Management Systems as specified***

8    ***in 30 CFR Part 250 [including] 30 CFR 250.903 and 905***." The Sawyer affidavit specifically

9    warned that:

10   • Time is of the essence in avoiding an Outer Continental Shelf (OCS)
11     environmental disaster, Atlantis production should be shut in until resolution
       of its design short comings is complete and a thorough inspection confirms
12     that critical breaches have been satisfactorily resolved. . . . ***It is inconceivable***
       ***that BP could justify the risk of commissioning Atlantis production without***
13     ***completed design documentation reflecting the latest approved design***
       ***version*** . . . .

14   • The absence of a complete set of final, up-to-date, 'as-built' engineering
15     documents, including appropriate engineering approval, introduces substantial
       risk of large scale ***damage to the deepwater Gulf of Mexico (GOM)***
16     ***environment and harm to workers***, primarily because analyses and
       inspections based on ***unverified design documents can not accurately assess***
17     ***risk or suitability for service***. . . .

18   • "The wide spread pattern of unapproved design, testing, and inspection
       documentation on the Atlantis subsea project creates a risk of a catastrophic
19     incident threatening the GOM deepwater environment and the ***safety*** of
       platform workers. ***The extent of documentation discrepancies creates a***
20     ***substantial risk that a catastrophic event could occur at any time***.

21                                      148.

22          In April 2010, BP's Ombudsman wrote to Abbott and affirmed that his allegations had

23   been substantiated. More specifically, Abbot received a letter from BP's Deputy Ombudsman,

24   Billie Garde ("Garde"), on April 13, 2010, stating: "Your concerns about the [Atlantis] project

25   not following the terms of its own Project Execution Plan were substantiated. . . . [BP] did not do

26   a comprehensive documentation audit regarding the documentation issues on Atlantis. . . . ***The***

Page 47 - COMPLAINT

1  *concerns that you expressed about the status of the drawings upgrade project were . . . of*

2  *concern to others who raised the concern before you worked there, while you were there, and*

3  *after you left*."

4                                                                   149.

5          In addition, the Presidential Commission Report found that a contributory factor to the

6  *Deepwater Horizon* explosion and the problems in attempting to trigger the BOP related to BP's

7  practice of not updating designs and plans from their original schematics – much like the

8  problems complained about with regard to the *Atlantis*.

9                                                                   150.

10         On the issue of retaliation, the Presidential Commission Report also noted that a survey

11  conducted in March 2010 indicated that crew members working on the *Deepwater Horizon*

12  feared retaliation.  The survey, which included workers on the *Deepwater Horizon* and three

13  other rigs, was conducted between March 12 and March 16, 2010 – *i.e.,* approximately one

14  month prior to the *Deepwater Horizon* explosion.  According to the Presidential Commission,

15  the survey found that: "Some 46 percent of crew members surveyed felt that some of the

16  workforce feared reprisals for reporting unsafe situations, and 15 percent felt that there were not

17  always enough people available to carry out work safely."

18  *Whistleblower Retaliation in Alaska*

19                                                                   151.

20         The BP Ombudsman conducted a robust investigation of Acuren, the company

21  responsible for pipeline inspection and monitoring of BP's pipelines in Alaska, where BP

22  contractor Marty Anderson ("Anderson") had worked until 2008 and who had began to raise

23  serious criticisms with his supervisors and BP intermediaries about BP's pipeline corrosion and

24  inspection system in Alaska and Acuren's staffing for that program.  According to 2009

25  communications between the BP Ombudsman's office and Lynch, in 2007 Anderson began to

26  cite "a significant quality control breakdown" in Acuren's and BP's testing procedures,

Page 48 - COMPLAINT

1  "inadequate record keeping," and "unqualified inspectors in the field performing inspections."

2  BP's Ombudsman's office stated that "[t]he concerns were serious, and although people try to

3  downplay the significance of the issues, they reveal a complete breakdown." According to the

4  BP Ombudsman's office, the audit confirmed Anderson's claims.

5  152.

6      The matters concerning Anderson and pipeline inspections were serious enough for the

7  BP Ombudsman's office to raise them with BP and BP North America officials, including Rick

8  Cape, BP's Vice President for Compliance and Ethics, *specifically recommending to him that*

9  *Anderson's concerns be reported to the BP Board of Directors and to Lynch.* In addition, the

10  Ombudsman himself, Judge Sporkin, communicated Anderson's concerns in 2008 with then-

11  President of BP North America Bob Malone. Garde wrote to Lynch about it in September 2009,

12  and Anderson himself met with Lynch on August 3, 2009. BP did not adequately address the

13  continuing concerns that had been raised. An internal email dated July 15, 2010, from Christine

14  Anastos, a BP Ombudsman Inspector, to other Ombudsman staff, stated that "many of the issues

15  identified by Marty [Anderson] years ago appear to be persisting" [*i.e.*, into mid 2010] and "it is

16  clear that, over time, root causes have not been identified and/or addressed . . . ."

17  153.

18      A 2008 BP Ombudsman "Workforce Briefing" containing an assessment of Acuren's

19  "Work Environment" reported that a survey of Acuren employees by the Ombudsman's office

20  found significant problems with workers' perceptions of potential retaliation for reporting safety

21  or environmental concerns. A "key insight" in the presentation stated that "[a]ctions and events

22  in the past 18 months [*i.e.*, during the period BP vowed to improve safety practices in Alaska in

23  the wake of the 2006 spills] have had a decidedly chilling impact on worker attitudes." The

24  section noted: "[p]roduction is viewed by very many workers as the primary focus," (*i.e.*, as

25  opposed to safety). The presentation also noted that the "actual or perceived presence of HIRD

26  [Harassment, Intimidation, Retaliation, Discrimination] is high in the Acuren organization. . . ."

Page 49 - COMPLAINT

1    In fact, one in three employees believed "recent resignations" were due to HIRD, and 38 percent

2    of employees – and 80 percent of the employees who worked on natural gas lines – indicated as

3    the reason for not reporting safety concerns: "nothing seems to happen to reported items."

4                    154.

5        The Ombudsman also noted that about one in ten Acuren employees said in the last 18

6    months that they had been asked to perform a job that was not in compliance with regulations or

7    safety practices.  (The number was even higher for workers who monitor BP natural gas

8    pipelines:  almost half of Acuren's workers indicated that they had been asked to perform "non-

9    compliant work".)

10                   155.

11        The 2008 presentation also included selected quotes from employees, including the

12    following:

13    • "I've raised issues, now I'm labeled a troublemaker."

14    • "You get treated better when your supervisor doesn't hear from you."

15    • "[A] co-worker falsified production numbers and I brought it to my
16      supervisor's attention with the result that I was ostracized, moved to a
       different shift, moved to the ghetto and told I should produce more in line
17      with the guy who falsified the records."

18    • "Supervisors talk safety but when concerns are brought up they are viewed as
       irritating and just given lip service."

19    • "I have stopped jobs for safety reasons and they just hand it to the next guy till
20      they find someone who will do it" [*i.e.*, the job that was stopped].

21    • "I was pressured to change my evaluation of some pipe which I deemed to be
       defective."

22    • "BP doesn't listen, they put too much emphasis on rules to look good but have
23      no common sense when it comes to safety."

24    • "BP's support of safety comes off as lip service and seems to only be in place
       to lower their insurance rates. While superficially, BP delivers lip service
25      about safety, their continually increasing demands accompanied by
       consistently decreasing resources create a 'results oriented' atmosphere where
26      the ends justify the means."

Page 50 - COMPLAINT

- "BP creates the adverse and dysfunctional world we work in here. Many problems that occur are because they drive people too hard to perform with limited resources. . . ."

156.

Furthermore, BP Ombudsman records from 2010 include numerous other examples of serious issues raised by Acuren employees. For instance, according to an article published by ProPublica on June 7, 2010, on December 9, 2009 a "Concerned Individual" at Acuren raised process safety concerns about other personnel "pencil whipping" test results (manipulating devices to change readings) and "falsified inspections." This individual's name is Stuart Sneed ("Sneed"). Sneed worked on BP's Alaska pipeline and stated that: "They [BP] say it's your duty to come forward . . . but then when you do come forward, they screw you. They'll destroy your life. . . . No one up there [in Alaska] is going to say anything if there is something they see is unsafe. They are not going to say a word."

## VII.   THE MATERIALIZATION OF THE UNDISCLOSED RISKS – DEEPWATER HORIZON OIL SPILL AND ITS AFTERMATH

### A.   BP's Systematic Failures Caused the Explosion on and the Sinking of the Deepwater Horizon Rig

***BP Acquires the Rights to the Macondo Well and Began Its Preparation to Drill Despite Having an Inadequate and Error-Filled Oil Spill Response Plan***

157.

The tragedy of the Macondo well explosion was avertable, but BP's overarching culture of indefensible risk-taking prevailed. At every turn, BP's conduct evidenced a systematic departure from recognized industry safety practices. Thus, the Presidential Commission found that "*the cumulative risk that resulted from these decisions and actions was both unreasonably large and avoidable[.]*"

158.

In March 2008, BP paid approximately $34 million to acquire the exclusive drilling rights from the MMS for the Mississippi Canyon Block 252, a nine-square-mile plot in the Gulf of

Page 51 - COMPLAINT

1   Mexico that encompasses the Macondo well. Although the Mississippi Canyon area has many

2   productive oil fields, BP knew little about the specific geology of Block 252 and, in fact, the

3   Macondo was the Company's first well on the new lease. BP planned to drill the well to 20,200

4   feet in order to learn the geology of the area and to determine whether the oil and gas reservoir

5   would warrant installing production equipment. The Macondo well was located 47.6 miles off

6   the coast of Louisiana. It was believed that the well could hold as much as fifty (50) million

7   barrels (or 2.1 billion gallons) of producible oil.

8                                    159.

9          Throughout the relevant period, MMS required BP to prepare and file oil spill response

10  plans demonstrating the Company's specific strategy and ability to respond to an oil spill if one

11  occurred while drilling in the Gulf of Mexico. MMS regulations required that an oil spill

12  response plan include, *inter alia*: (i) an emergency response action plan; (ii) disclosure of the

13  equipment available to combat an oil spill; (iii) any oil spill response contractual agreements

14  with third-parties; (iv) calculations of the worst-case discharge scenarios; (v) a plan for

15  dispersant use in case of a spill; (vi) an in-situ oil burning plan; and (vii) information regarding

16  oil spill response training and drills. *See* 30 C.F.R. § 254.21.

17                                   160.

18         The first of these requirements, the "emergency response action plan," is the "core" of the

19  overall operational response plan and required BP to disclose, among other things: (i)

20  information regarding the Company's oil spill response team; (ii) the types and characteristics of

21  oil at the facility; (iii) procedures for early detection of a spill; and (iv) procedures to be followed

22  in the event of an oil spill. *See* 30 C.F.R. § 254.23.

23                                   161.

24         BP publicly filed its oil spill response plan for the Gulf of Mexico – entitled "Regional

25  Oil Spill Response Plan – Gulf of Mexico" – with the MMS on December 1, 2000 and last

26  revised the plan on June 30, 2009 ("BP's Regional OSRP for the GOM"). A regional oil spill

Page 52 - COMPLAINT

1  response plan is designed to cover multiple facilities or leases of a lessee that have: (i) similar

2  modeled spill trajectories and worst case discharge scenarios, (ii) the potential to affect the same

3  ecological or socioeconomic resources, and (iii) are located in close enough proximity to be

4  served by the same response equipment and personnel. BP's Regional OSRP for the GOM

5  covers a massive area, including all of the United States' interests in the Gulf of Mexico. This

6  area encompasses the coastal waters of Texas, Louisiana, Alabama, Mississippi, and Florida. BP

7  has approximately 600 leases and operates roughly 70 oil wells in the Gulf of Mexico. BP's

8  Regional OSRP for the GOM applied to all of these wells.

9                     162.

10      According to BP's Regional OSRP for the GOM, the "***TOTAL WORST CASE***

11  ***DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 barrels of oil***

12  ***per day to 250,000 barrels of oil per day***. More specifically, BP's Regional OSRP for the GOM

13  stated: (i) an oil spill occurring less than ten miles from the shoreline could create a worst case

14  discharge of 28,033 barrels of oil per day; (ii) an oil spill that occurred greater than ten miles

15  from the shoreline could create a worst case discharge of 177,400 barrels of oil per day; and (iii)

16  an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst

17  case discharge of 250,000 barrels of oil per day. BP's Regional OSRP for the GOM explicitly

18  states that the Company and its subcontractors ***could recover approximately 491,721 barrels of***

19  ***oil per day*** (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico.

20  Moreover, the Company claimed and provided certified statements to the MMS that BP and its

21  subcontractors "*maintain the necessary spill containment and recovery equipment to respond*

22  *effectively to spills.*"

23                     163.

24      On March 10, 2009, the MMS deemed the Company's initial exploration plan for

25  Mississippi Canyon Block 252 ("BP's EP") "submitted." BP's EP included the area

26

Page 53 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400 Fax (503) 373-7067

1    encompassing the Macondo well.[3]  In connection with the EP, BP sought a permit from the

2    MMS to drill to a total depth of 19,650 feet at the Macondo Well.  Following the sinking of the

3    *Deepwater Horizon*, a BP crewman admitted that this depth had been misrepresented to the

4    MMS, and that BP had in fact drilled in excess of 22,000 feet, in violation of its permit.

5                                        164.

6         According to BP's EP, the worst case scenario of an oil spill occurring in Mississippi

7    Canyon Block 252 would be the release of approximately *162,000 barrels of oil per day*.

8                                        165.

9         In BP's EP, the Company claimed it would have no difficulty responding to a worst case

10   scenario while drilling the Macondo well:

11        *Since BP ... has the capability to respond to the appropriate worst-case*
          *scenario included in its regional OSRP ..., and since the worst-case scenario*
12        *determined for our [EP] does not replace the appropriate worst-case scenario in*
          *our regional OSRP, I hereby certify that BP ... has the capability to respond, to*
13        *the maximum extent practicable, to a worst-case discharge, or a substantial*
          *threat of such a discharge, resulting from the activities proposed in our [EP].*
14

15                                    * * *

16        *[D]ue to the distance to shore (48 miles) and the response capabilities that*
          *would be implemented, no significant adverse impacts are expected.*

17                                        166.

18        Because the worst case scenario discharge figures in BP's EP – which BP calculated –

19   fell below the threshold established in BP's Regional OSRP for the GOM, the Company was not

20   required to submit a site-specific drilling plan for the Macondo well itself.

21                                        167.

22        In October 2009, the semi-submersible Transocean rig *Marianas* began drilling the

23   Macondo well.  However, operations were halted at approximately 4,000 feet below the sea floor

24   due to damage caused to the rig by Hurricane Ida.

25   _____

26   [3]  BP's Regional OSRP for the GOM and EP are collectively referred to herein as "BP's Oil Spill
     Response Plan."

Page 54 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1      168.

2      The replacement rig, the *Deepwater Horizon*, arrived at the Macondo well on January 31,

3   2010.  Although the rig was in place on that date, several steps needed to occur prior to

4   beginning any drilling operation, including connecting the rig's BOP to the wellhead.  BP

5   completed these steps by February 10, 2010 and the *Deepwater Horizon* began drilling shortly

6   thereafter.

7      169.

8      Once the rig was connected to the BOP via the riser, BP inserted the drill bit and drilling

9   pipe through the riser and BOP in order to reach the wellbore in the ocean floor.  As drilling

10   progressed, so-called "drilling mud" was pumped down through the drilling pipe and emerged

11   through holes in the drill bit.

12      170.

13      Drilling mud is not mud in the traditional sense; it is a blend of synthetic fluids, polymers

14   and weighting agents costing approximately $100.00 per barrel.  Drilling mud accounts for as

15   much as ten percent of the total cost in drilling a deepwater well.  Drilling mud is a critical part

16   of the drilling process.  For example, as it is circulated down the drilling pipe and back up the

17   wellbore to the rig, drilling mud clears the wellbore of broken rock and other debris (referred to

18   as "cuttings"), cools the drill bit and maintains stable pressure within the well, which is critical to

19   the mechanical stability and integrity of the wellbore.

20      171.

21      When drilling a deepwater well like the Macondo – which lies approximately 5,000 feet

22   (or about 1 mile) below the ocean's surface and extends another 13,000 feet below the ocean

23   floor – controlling pressure is a paramount concern.  The inward or "pore" pressure (*i.e.*, the

24   pressure exerted by the fluid in the surrounding rock formation on the wellbore) must be

25   balanced with the outward or "fracture" pressure (*i.e.*, the pressure exerted by the drilling fluids

26

Page 55 - COMPLAINT

1   in the wellbore on the surrounding rock formation).  Following proper safety procedures is

2   critical because uncontrolled well pressure can cause an explosion.

3                     172.

4       On April 9, 2010, the weight of the drilling mud being pumped into the Macondo well

5   was too high and fractured the surrounding formation; drilling mud began flowing into the cracks

6   in the formation.  In an attempt to plug the fractures and stop the outflow of drilling fluid, BP

7   circulated 172 barrels of thick, viscous fluid, referred to as a "lost circulation pill," into the

8   wellbore.  The lost circulation pill succeeded in staunching the outflow of drilling mud, but the

9   episode underscored the sensitivity of the Macondo well.  As noted by the Presidential

10   Commission: *"BP's on-shore engineering team realized the situation had become delicate.*

11   *They had to maintain the weight of the mud in the wellbore at approximately 14.0 pounds per*

12   *gallon (ppg) in order to balance the pressure exerted by the hydrocarbons in the pay zone."*

13   Thus, BP's engineers were on notice that they must be even more vigilant in monitoring and

14   controlling the competing pressures within the wellbore.

15   ***Casing and Cementing the Well***

16                     173.

17       Once the initial drilling of the well was complete, BP then needed to insert casing to seal

18   off the walls of the wellbore to provide structural integrity.  BP considered two casing methods:

19   a long-string casing and a liner/tie-back casing.  The long-string casing involves hanging a single

20   continuous wall of steel from the wellhead on the ocean floor down to the bottom of the well

21   over thirteen thousand feet below.  The liner/tie-back method entails hanging shorter segments of

22   casing to one another in order to form a stronger and less flexible piece of metal.  A critical

23   distinction between the two methods is that the long-string casing method provides two barriers

24   to flow up the annular space (once cementing is complete) whereas the liner/tie-back casing

25   provides four barriers to annular flow.  This means that the liner/tie-back method provides twice

26   the safety precautions as compared with the long-string casing method.  In addition, BP knew

Page 56 - COMPLAINT

1 that obtaining a reliable primary cement job with the long-string casing would be much more

2 difficult.

3                                    174.

4        In fact, between April 14 and 15, 2010, the BP engineering team in Houston, Texas

5 modeled the likely success of the cementing process using the two casing methods and

6 determined that **the long- string method would fail in effectively cementing the Macondo well**.

7                                    175.

8        In light of this determination, the engineering team elected to proceed with the liner/tie-

9 back method, but, according to the Presidential Commission, others at BP opposed the decision.

10 In the end, despite the conclusion that the long-string method could not be cemented reliably,

11 BP's view prevailed and the crew proceeded with the long-string casing method.

12                                    176.

13       The next step in the drilling process was to thread the long-string casing through the

14 center of the wellbore down to the bottom of the well. Centering the casing is of vital

15 importance to obtaining a secure cement job. As the cement mixture flows out of the casing, it

16 ascends through the annular space surrounding the casing. If the space around the casing is

17 uneven (*i.e.*, there is more space on one side than on the other), the cement begins to fill in the

18 annular space in an uneven manner, leaving channels of drilling mud in the cement. These

19 channels are pathways through which highly pressurized hydrocarbons can flow.

20                                    177.

21       To ensure that the long-string casing will be centered, guides called "centralizers" are

22 placed around the casing at regular intervals. For the Macondo well, BP decided that it would

23 use only six centralizers because that was the amount currently available on the rig. It does not

24 appear that the Company's reasoning was based on any scientific or engineering calculations.

25 However, before BP could actually place the centralizers in the well, it needed Halliburton – who

26 BP contracted for this cementing job – to verify that six centralizers would be sufficient.

Page 57 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

178.

On or about April 15, 2010, Halliburton engineer Jesse Gagliano ("Gagliano") performed computer simulations to assess the likelihood of a satisfactory cement job using six centralizers. Gagliano's calculations demonstrated a high likelihood of channeling resulting in a cement failure if the Company used only six centralizers. Computer simulations showed that twenty-one centralizers were necessary – *i.e.,* almost four times as many as BP intended to use.

179.

After reviewing the modeling data himself, BP Drilling Team engineer Gregory Walz ("Walz") agreed with Gagliano's conclusions. On April 16, 2010, Walz wrote to other BP engineers and stated, in part, that the operation needs "to honor the … modeling to be consistent with our previous decisions to go with the long string." Walz proceeded to make arrangements to obtain the additional centralizers.

180.

However, BP Well Team Leader John Guide ("Guide"), who was also based in BP's Houston office, opposed using the additional centralizers because the installation would delay the team by approximately ten hours and would therefore cost BP money. Although BP ordered additional centralizers, when they arrived on the *Deepwater Horizon* it was determined that the centralizers were the wrong type. Despite the serious threat of channeling identified in the modeling data, however, Guide's view prevailed and only six centralizers were used to center the more than thirteen thousand foot long-string casing in the wellbore.

181.

BP's culture of unreasonable, indefensible risk taking is echoed in an email by Brett Cocales (a drilling operations engineer in BP's Houston office), dated April 16, 2010, in which he stated:

> Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it.

Page 58 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1     *But, who cares, it's done, end of story, will probably be fine* and we'll get a good cement job.

2                      182.

3     On April 17, 2010, after learning that BP would proceed with only six centralizers,

4 Gagliano re-ran the computer simulations and modeling using seven centralizers and the

5 conclusion was the same: the well would have "*a SEVERE gas flow problem.*"  BP, however,

6 continued to ignore its own expert's opinion.

7                      183.

8     On April 18, 2010, BP began lowering the long-string casing into the wellbore.  To

9 enable the drilling mud located in the wellbore to flow smoothly and distribute evenly as the

10 long-string casing is lowered, two trap doors within the long-string casing, referred to as the

11 "float collar," are propped open with a tube called an "auto fill tube."

12                      184.

13     On April 19, 2010, after the long-string casing reached the bottom of the wellbore, BP

14 needed to dislodge the auto fill tube, converting the float collar from a two-way valve to a one-

15 way valve.  Successfully converting the float collar insures that the pumped cement will only

16 flow downward through the casing, a critical step in the cementing process.

17                      185.

18     Two events should have indicated to BP that the conversion of the float collar was not

19 proceeding properly.  First, the tube should be dislodged once the flow through the tube reaches

20 six barrels of mud per minute (6 bpm), equivalent to six hundred pounds of pressure per square

21 inch (600 psi).  Yet, as the crew pumped drilling mud down the casing, pressure began to climb

22 beyond the 600 psi threshold which should have converted the float collar, but still the crew was

23 unable to establish flow.  The pressure continued to rise, peaking at 3,142 psi (more than five

24 times more pressure than should have been needed to convert the float collar) before suddenly

25 dropping precipitously.  It appears that BP assumed that this meant the float collars had

26 converted.  This is a scientifically indefensible position, however, because, as noted by the

Page 59 - COMPLAINT

1    Presidential Commission: "[t]he auto fill tube was designed to convert in response to *flow-*

2    *induced* pressure. Without the required rate of flow, an increase in *static* pressure, no matter

3    how great, will not dislodge the tube."

4                             186.

5        Second, after the tube is dislodged and the float collar is converted to a one way passage,

6    the amount of pressure needed to circulate drilling mud from the rig, down the drilling pipe and

7    up the annular space to the rig again should have been 570 psi. Yet, as BP began the process of

8    converting the float collars, the results differed considerably. After the spike and sudden drop in

9    pressure, the circulation pressure was only 340 psi.

10                            187.

11        BP personnel on the rig erroneously ignored the mounting evidence that something was

12    amiss, and proceeded to the next step in the well abandonment plan – mud circulation.

13                            188.

14        Correct mud circulation requires a complete circulation of drilling mud in the wellbore,

15    referred to as "bottoms up" circulation. The process, which requires about 12 hours, allows

16    workers on the rig to test the mud for gas influxes, safely remove any gas pockets, and evacuate

17    any debris or other foreign matter that could contaminate the cement. Given the heightened

18    challenges of cementing a long-string (as opposed to a liner/tie-back) casing, this step was

19    critical. In addition, "bottoms up" circulation would allow the BP crew to test the mud at the

20    bottom of the well for hydrocarbons, the presence of which would indicate a leak in the cement

21    job at the bottom of the well.

22                            189.

23        In order to complete a "bottoms up" circulation, BP needed to circulate 2,760 barrels of

24    drilling mud. Instead, as noted by the Presidential Commission, BP circulated only 350 barrels

25    of mud – eight times less than the amount required to properly complete the "bottoms up"

26    circulation of the well.

Page 60 - COMPLAINT

1                                              190.

2         In cementing the Macondo well, BP used nitrogen foam, a cement with which it had little

3    experience in the Gulf of Mexico.  In February 2010, Gagliano conducted tests regarding the

4    stability of the nitrogen foam cement.  The tests showed that the mixture was unstable and

5    therefore represented an additional risk of well failure.  According to the Presidential

6    Commission Report, these test results were communicated to BP personnel in Houston on March

7    8, 2010, however, the warnings were ignored and BP pumped nitrogen foam cement into the

8    Macondo well.

9                                              191.

10        BP's internal guidelines dictated that the top of the annular cement should be 1,000 feet

11   above the uppermost hydrocarbon zone.  For the Macondo well, BP injected just enough cement

12   to extend the annular cement barrier half the distance, or only 500 feet above the uppermost

13   hydrocarbon zone.  According to the Presidential Commission Report, this deviation reduced the

14   safety margin for this procedure by 50 percent and meant that a total of sixty barrels of cement

15   would be used to cement the well, which BP's own engineers recognized left absolutely no

16   margin for error.  Also according to the Presidential Commission Report, BP was also keenly

17   aware that it was pumping the cement at an unsafe rate (four barrels per minute rather than six

18   barrels per minute), further impeding the efficiency with which cement would be displaced from

19   the annular space, and reducing its safety margin even further.

20                                             192.

21        At 12:40 a.m. on April 20, 2010, the crew finished pumping the primary cement job.  A

22   team of outside technicians was on hand to conduct the battery of tests needed including, but not

23   limited to, the "cement log," which was designed to evaluate and test the sufficiency of the

24   cement job.  The cement log is an acoustical test used to identify areas (if any) where the cement

25   failed to channel up through the annular space in a uniform fashion.  If cement channeling is

26

Page 61 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1  uneven, pockets form, creating the possibility that hydrocarbons will enter the wellbore where

2  they can ascend (and expand) rapidly.

3  193.

4  The acoustical test was especially critical given BP's prior erroneous decisions regarding

5  the construction of the Macondo well, which included, *inter alia*: (i) using the difficult-to-

6  cement long-string casing method; (ii) foregoing the "bottoms up" mud circulation; (iii) failing

7  to use twenty one centralizers as the Company's expert recommended; (iv) ignoring scientifically

8  accepted data pertaining to the float collar conversion; (v) electing to use nitrogen foam cement

9  deemed unstable in prior testing; (vi) pumping the cement at reckless rates; and (vii) halving the

10 safety margin by setting the cement 500 (rather than 1,000) feet above the hydrocarbon bearing

11 "pay zone." BP decided to forego the acoustical test and sent the team of technicians home by

12 helicopter at 11:15 a.m. that morning. Forgoing the acoustical test saved the Company

13 approximately ten hours and $100,000. This decision was contrary to industry practice and the

14 recommended safe practices of the American Petroleum Institute.

15 ***BP Begins the Temporary Abandonment Process***

16 194.

17 The *Deepwater Horizon* rig is a drilling rig as opposed to a production rig. Once drilling

18 operations are complete, the well is placed in "temporary abandonment" until the arrival of the

19 production rig, which will connect to the well and begin pumping oil and gas from the site.

20 Placing the well into temporary abandonment means that that the drilling rig will be removing its

21 own BOP and riser from the wellhead. There are several key features in the temporary

22 abandonment process to insure that the well is secure before the BOP and riser are removed. For

23 one, a cement plug, which acts like a cap, is placed in the well. Typically this cap is placed at or

24 near the mudline. The area in the well *beneath* the cap is filled in with heavy drilling mud,

25 which applies additional downward pressure on the hydrocarbon bearing zone. If the cement

26 plug is placed at a greater depth, this necessarily means that there will be less heavy drilling mud

Page 62 - COMPLAINT

1   in the well underneath the cement plug. Finally, the crew will install a "lockdown sleeve" at the

2   wellhead. Throughout this process, the well is monitored and a series of tests are performed to

3   insure that the well is secure – *i.e.*, that no hydrocarbons are leaking into the well. According to

4   the Presidential Commission, neither the BP Well Site leaders, nor any of the rig's crew, had

5   seen the temporary abandonment plan for the Macondo well prior to 10:43 a.m. on the day

6   abandonment procedure began. Indeed, the temporary abandonment plan had undergone

7   numerous changes leading up to April 20, 2010, but, according to the Presidential Commission:

8   "It does not appear that the changes to the temporary abandonment procedures went through any

9   sort of formal review at all."

10                                                195.

11          Prior to abandonment, the well must be tested to insure that there are no leaks. In part,

12   this involves conducting a "negative-pressure test" to assess whether hydrocarbons are flowing

13   into the well. To conduct this test, BP needed to simulate the pressure conditions that would

14   exist in the well once it was placed into temporary abandonment. As part of the negative

15   pressure test, the crew removed 3,300 feet of mud from the wellbore.

16                                                196.

17          To remove the drilling mud from the wellbore (and later the riser), BP pumped "spacer"

18   through the drilling pipe followed by seawater. Spacer is a synthetic blend that acts as a barrier

19   between the drilling mud and seawater. Although the use of spacer is a common and accepted

20   practice, BP's spacer concoction was mixed on board the rig from leftover chemicals that would

21   enable BP to save money and skirt environmental regulations. As explained by the Presidential

22   Commission:

23          While drilling crews routinely use water-based spacer fluids to separate oil-based
24          drilling mud from seawater, *the spacer BP chose to use during the negative
            pressure test was unusual.* BP had directed . . . mud engineers on the rig to *create
            a spacer out of two different lost-circulation materials left over on the rig – the*
25          *heavy, viscous drilling fluids used to patch fractures in the formation* . . . .

26

Page 63 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1   *BP wanted to use these materials as spacer in order to avoid having to dispose of*
2   *them onshore as hazardous waste pursuant to the Resource and Conservation*
    *Recovery Act,* exploiting an exception that allows companies to dump water-based
3   "drilling fluids" overboard if they have been circulated down through a well. *At*
    *BP's direction, the [mud engineers] combined the materials to create an*
    *unusually large volume of spacer that had never previously been used by anyone*
4   *on the rig or by BP as a spacer, nor been thoroughly tested for that purpose.*

5                                            197.

6       Testimony before the Presidential Commission indicates that this concocted, untested

7   spacer may have clogged the BOP's kill line, interfering with the results of later testing designed

8   to assess the integrity of the well.

9                                            198.

10      After removing drilling mud from the wellbore, BP began a negative-pressure test to

11  determine whether the well was sealed such that gas or liquid could not permeate into the well.

12  This negative pressure test is the ***only*** test that assesses the integrity of the cement job at the

13  bottom of the well.  BP had no established procedure or protocol for conducting a negative

14  pressure test.

15                                           199.

16      To conduct the negative-pressure test, the crew "bled off" pressure from the drilling pipe

17  until it was 0 psi.  The pipe was then sealed and monitored.  For a successful negative pressure

18  test, the pressure within the drilling pipe must remain at 0 psi for a certain period of time.  The

19  BP crew went through this process ***three*** times – bleeding down the pressure and then sealing the

20  pipe – and all ***three*** times the pressure within the drill pipe jumped, reaching 1400 psi on the

21  third attempt.  Thus, the pressure test failed three times, in identical fashion.

22                                           200.

23      The negative-pressure test performed exactly as intended.  It gave the clear, unequivocal

24  warning that the integrity of the well was compromised.  As noted by the Presidential

25  Commission: "[B]ased on available information, *the 1400 psi reading on the drill pipe could*

26  *only have been caused by a leak* into the well."  In May 2010, BP admitted in Congressional

Page 64 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

1    testimony that these pressure test results clearly signaled a "very large abnormality" in the well.

2    Yet, notwithstanding the unequivocal results of the negative pressure test and without

3    communicating the results to safety experts in Houston, BP ignored the warnings and instead

4    applied the same test to the "kill line," one of the pipes used to circulate fluids into and out of the

5    well.

6                                                201.

7            After conducting the negative-pressure test a *fourth* time (this time on the kill line), BP

8    achieved what it considered to be a successful test result, and continued with the temporary

9    abandonment process. During this last test, the crew was able to maintain 0 psi on the kill line,

10   but the pressure on the drill pipe continued at 1400 psi. The Presidential Commission Report

11   found that "BP used a spacer that had not been used by anyone at BP or on the rig before, that

12   was not fully tested, and that may have clogged the kill line," leading to the so-called successful

13   test result.

14                                               202.

15           As part of the negative-pressure testing of the well, the crew had already removed 3,300

16   feet of drilling mud below the sea floor from the well and replaced it with seawater. This

17   decision was driven by BP's choice to place the "cement plug" at a depth of 3,000 feet. The

18   cement plug is a three hundred foot cap, which is placed in the well as an additional safety

19   measure to secure the well while it is in temporary abandonment. Placing the cement plug 3,300

20   feet below the ocean floor is not in accordance with accepted industry practice for performing

21   this function. Indeed, placing the cement plug three *thousand* feet below the mud line was

22   inconsistent with MMS regulations and required special dispensation.

23                                               203.

24           The associated risks were amplified by BP's decision: (i) to leave 3,300 feet of the well

25   below the ocean floor filled with only seawater, rather than heavy drilling mud and (ii) to

26   postpone placement of the cement plug in the well. As a result, once BP opened the annular

Page 65 - COMPLAINT

1    preventers on the BOP to facilitate the removal of mud from the riser, the only remaining

2    barriers between the rig and the highly pressurized hydrocarbons in the well were the drilling

3    mud remaining in the bottom section of the well and, beneath that, the cement job at the very

4    bottom of the well.

5                          204.

6        At this stage, there was nothing to prevent leaked hydrocarbons (if present in the

7    wellbore) from traveling up the riser to the rig. An influx of hydrocarbons is called a "kick" and

8    is exceedingly dangerous due to the highly pressurized conditions. One gallon of gas at the

9    bottom of the well is capable of expanding to 1,000 gallons by the time it reaches the rig on the

10    ocean's surface. As the gas expands, it accelerates the kick. It is therefore imperative that the

11    well be monitored closely for any evidence of a mounting kick.

12                         205.

13        At 8:02 p.m. on April 20, 2010, BP began to remove the drilling mud from the riser. As

14    operations proceeded, the drilling mud was returning to the rig, but BP failed to monitor the rate

15    of return. The returned mud should have been placed in a subset of the rig's mud pits, referred to

16    as the "active mud pits," to facilitate monitoring. Instead, the returned mud was being dispersed

17    over a number of pits and mud from other operations was being routed to the active mud pits. As

18    a result, there was no way to know whether more mud was returning to the rig than was being

19    pumped into the well, a fact that would have been evidence that a kick was in progress.

20                         206.

21        At 9:01 p.m. on April 20, 2010, pressure measurements in the well signaled the

22    impending crisis. Pressure in the well should have remained constant or decreased because the

23    pumping pressure remained constant. However, the pressure in the drilling pipe slowly began to

24    *increase*, signaling an influx of hydrocarbons into the well.

25

26

Page 66 - COMPLAINT

1

207.

2　　　The crew did not respond to the pressure reading until approximately 9:30 p.m., when

3　driller Dewey Revette ordered a crew member to bleed pressure from the drilling pipe.  Despite

4　the strong evidence of a kick, BP and its crew took no steps to assess the cause of the pressure

5　reading or to seal the well.  In addition, no employee in BP's Houston office was monitoring the

6　pressure in the Macondo well.  As Fred Bartlit ("Bartlit"), a Presidential Commission

7　investigator, made clear during a Commission presentation on November 9, 2010, drill pressure

8　data was "available" in BP's office in Houston, but BP did not in fact monitor it the night of the

9　*Deepwater Horizon* blowout: "There was nobody in that B.P. Macondo well office that night,"

10　Bartlit said. "Everybody had gone home."

11

208.

12　　　Sometime after 9:40 p.m. on April 20, 2010, drilling mud began spewing onto the rig

13　floor and, a few minutes later, the crew began its initial attempt to activate the BOP.

14　***Explosion on the Deepwater Horizon***

15

209.

16　　　The crew initially attempted to activate the rig's BOP annular preventer, a doughnut-

17　shaped rubber and steel seal that fits around the drill pipe and seals the hydrocarbons from

18　flooding the rig itself.  However, the annular preventer failed to stop the flow of oil, most likely

19　because the device had been ruptured four weeks earlier when the drilling pipe was moved

20　through the annular preventer while the preventer was in the closed position, sending a plume of

21　drilling fluid filled with chunks of rubber to the surface.

22

210.

23　　　Well data indicates that at 9:38 p.m., the first hydrocarbons passed through the BOP.

24

25

26

Page 67 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

1          211.

2          At 9:46 p.m. the crew attempted to activate the variable bore ram, which (like the annular

3    preventer) should have sealed off the area around the drilling pipe.  This effort also failed to stop

4    the flow of hydrocarbons.

5          212.

6          At 9:49 p.m., the hydrocarbon-filled drilling mud that was continuing to spew onto the

7    deck of the rig ignited, causing the first explosion aboard the *Deepwater Horizon*.  One

8    eyewitness referred to "a cascade of liquid" pouring out twenty stories above the main deck of

9    the rig.  Another described hearing an explosion that sounded like a "blown tire, times

10   100."  Barrels filled with explosive materials were catching fire and launching into the sky like

11   missiles.

12         213.

13         After the explosion, workers on the bridge did not immediately act to deploy the

14   Emergency Disconnect System ("EDS").  Andrea Fleytas ("Fleytas"), a Dynamic Positioning

15   Operator for the *Deepwater Horizon* who was in the bridge at the time of the explosion, told *The*

16   *New York Times* that it did not occur to her to use the EDS and, in fact, she had never been

17   taught how to use it.  With respect to the EDS system, Fleytas stated, "I don't know of any

18   procedures."

19         214.

20         Sometime after the explosion, BP's Subsea Supervisor Christopher Pleasant made his

21   way to the bridge and attempted to activate the EDS, which should have activated the BOP's

22   blind shear ram.  The blind sheer ram – the last line of defense – is designed to seal a wellbore by

23   cutting through the drilling pipe and pinching it closed, as the rams close off the well.  However,

24   the blind shear ram failed to respond.

25

26

Page 68 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1          215.

2          Despite the failure of the EDS, the BOP's "deadman switch" (an automatic response

3    mechanism) should have triggered the blind sheer ram. The deadman switch also failed to

4    activate the blind sheer ram. Later inspections revealed that the device had a myriad of problems

5    due to lack of inspection and poor maintenance, including low battery charges in the critical

6    components responsible for deploying the blind sheer ram and defective relays that supply the

7    power to close the blind sheer ram.

8          216.

9          At this point, the only option left to the crew to activate the BOP would have been an

10   acoustical control signal that would trigger deployment of the blind sheer ram via an encoded

11   pulse of sound transmitted by an underwater transducer. However, BP decided not to install the

12   acoustic switch. While an acoustic switch is not required in the United States, it is mandated in

13   many places throughout the world. In those foreign locations, BP uses rigs that do include such

14   a safety device.

15         217.

16         Witnesses on a supply ship stood horrified as they watched the fire growing on the rig

17   and crew members leaping from the main deck and jumping 100 feet into the sea. With no way

18   to bring the explosion under control, crew members abandoned ship, struggling to fight their way

19   to safety. The *Deepwater Horizon* burned for thirty-six hours before finally tipping and sinking.

20   The impact to human lives was stark – 11 crew members were killed and 17 more were injured.

21   ***BP Continues to Attempt to Activate the BOP Following the Abandonment of the Deepwater***

22   ***Horizon***

23         218.

24         Beginning at 1:15 a.m. on April 21, 2010, BP and other personnel began attempts to

25   activate the BOP with remotely operated vehicles ("ROVs"). Over the ensuing days, BP

26   attempted to activate the blind sheer ram on several occasions. All efforts failed.

Page 69 - COMPLAINT

219.

First, the ROVs applied hydraulic pressure to a panel controlling the blind shear ram, a method of activating the ram, referred to as "hot stab." It would take BP ten days to learn that the method would necessarily fail because the targeted panel was actually attached to a useless test ram.

220.

The ROVs also cut electrical wires in an attempt to simulate the deadman switch and attempted to activate the ram by triggering the autoshear (an automated disconnect that is triggered if the rig drifts too far from the well, threatening to break the riser). Still the ram did not deploy.

221.

At 10:22 a.m. on April 22, 2010, the *Deepwater Horizon* sank, wrenching and further damaging the riser.

222.

On May 5, 2010, after learning that the attempts to activate the blind shear ram through the "hot stab" method were actually targeting a useless test ram, BP ceased its attempts to activate the BOP.

**B.**    **BP Was Wholly Unprepared to Contain the Oil Spill**

*BP Was Knowingly or Recklessly Unprepared to Manage and Respond to a Spill in the Gulf of Mexico*

223.

In the wake of the Deepwater *Horizon* catastrophe, it has become evident that BP's OSRP was materially false and misleading when filed. Indeed, the Presidential Commission has described BP's OSRP as outright "***embarrassing***." Moreover, Suttles admitted on May 10, 2010 that BP failed to have an oil spill response plan with "***proven equipment and technology***" in place that could contain the oil spill. Similarly, in a November 9, 2010 interview with the BBC,

Page 70 - COMPLAINT

1   Hayward ultimately confirmed that the Company had failed to draw up sufficient emergency

2   response plans, admitting that "*we were making it up day to day.*"

3                                        224.

4          For example, since BP claimed that it was prepared to recover approximately 500,000

5   barrels of spilled oil per day, and the worst case scenario for the Macondo well was the release of

6   only 162,000 barrels of oil per day, the Company should have had no problems containing the oil

7   spill.  However, as noted by the Presidential Commission:  "*Despite [BP's claims that it 'could*

8   *recover nearly 500,000 barrels of oil per day'], the oil-spill removal organizations were quickly*

9   *outmatched.*"

10                                       225.

11         Furthermore, while BP's Regional OSRP for the Gulf of Mexico claimed that an oil spill

12   occurring under the three different scenarios – *i.e.,* less than ten miles from the shoreline, more

13   than ten miles from the shoreline, and from a mobile drilling rig that is drilling an exploratory

14   well – could cause differences in the amount of oil spilled, BP consistently stated that the

15   "shoreline impact" under each scenario would be identical.  This led the Presidential

16   Commission to find that BP's Regional OSRP for the Gulf of Mexico "*evidenced [a] serious*

17   *[lack] of attention to detail.*"

18                                       226.

19         The Presidential Commission also noted several other errors in BP's OSRP.  For

20   instance, the Presidential Commission found that BP's Regional OSRP for the Gulf of Mexico

21   was false when issued because "half of the 'Resource Identification' appendix (five pages) …

22   was copied from material on [The National Oceanic and Atmospheric Administration

23   ("NOAA")] websites, without any discernable effort to determine the applicability of that

24   information to the Gulf of Mexico. *As a result, the BP Oil Response Plan described biological*

25   *resources nonexistent in the Gulf – including sea lions, sea otters, and walruses.*"

26

Page 71 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1            227.

2       Likewise, BP's Regional OSRP for the Gulf of Mexico named Dr. Peter L. Lutz ("Lutz")

3   from the University of Miami's School of Marine Sciences as a wildlife expert.  Lutz was a

4   pioneer in whole-organism integrative physiology, but the Presidential Commission found that

5   he "***had died several years before BP submitted its plan.***"  Not only had Lutz been deceased

6   since 2005, but he left the University of Miami almost twenty years prior to chair the marine

7   biology department at a different university.

8            228.

9       Similarly, BP's Regional OSRP for the Gulf of Mexico included incorrect contact

10  information for the Marine Spill Response Corporation ("MSRC").  According to the

11  Presidential Commission, the MSRC was "BP's main oil-spill removal organization in the Gulf,"

12  but, inexplicably, "*a link in [BP's Regional OSRP] that purported to go to the Marine Spill*

13  *Response Corporation website actually led to a Japanese entertainment site.*"  Likewise, the

14  names and phone numbers of several Texas A&M University marine specialists were wrong and

15  the listing of certain mammal stranding network offices in Louisiana and Florida were outdated

16  and, in certain cases, had been closed.

17            229.

18      On June 8, 2010, journalist Tim Dickinson from *Rolling Stone* magazine published an

19  article decrying BP's OSRP.  The article's powerful message was clear:  "***The effect of leaving***

20  ***BP in charge of capping the well***, says a scientist involved in the government side of the [clean

21  up] effort, ***has been 'like a drunk driver getting into a car wreck and then helping the police***

22  ***with the accident investigation***" or, in other words, allowing a fox to guard the hen house and

23  hoping that it does not get hungry.  The article also stated, in part, that:

24          'This response plan is not worth the paper it is written on,' said Rick Steiner, a retired
           professor of marine science at the University of Alaska, who helped lead the scientific
25          response to the Valdez disaster.  'Incredibly, this voluminous document never once
           discusses how to stop a deepwater blowout.'
26

Page 72 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

230.

Likewise, these gross deficiencies, errors and misrepresentations, among others, caused the Associated Press to publish an article on June 10, 2010 entitled "BP Spill Response Plans Severely Flawed" which detailed the *"glaring errors and omissions in BP's oil spill response plans."* The article states, in relevant part, as follows:

> *BP PLC's 582-page regional spill plan for the Gulf, and its 52-page, [EP] … vastly understate the dangers posed by an uncontrolled leak and vastly overstate the company's preparedness to deal with one,* according to an Associated Press analysis.
>
> \* \* \*
>
> In the spill scenarios detailed in the documents, fish, marine mammals and birds escape serious harm; beaches remain pristine; water quality is only a temporary problem. And those are the projections for a leak about 10 times worse than what has been calculated for the ongoing disaster.
>
> \* \* \*
>
> *The plans contain wildly false assumptions about oil spills. BP's proposed method to calculate spill volume judging by the darkness of the oil sheen is way off. The internationally accepted formula would produce estimates 100 times higher.*
>
> \* \* \*
>
> In early May, at least 80 Louisiana state prisoners were trained to clean birds by listening to a presentation and watching a video. It was a work force never envisioned in the plans, which contain no detailed references to how birds would be cleansed of oil.
>
> \* \* \*
>
> There are other examples of how BP's plans have fallen short:
>
> *Beaches where oil washed up within weeks of a spill were supposed to be safe from contamination because BP promised it could marshal more than enough boats to scoop up all the oil before any deepwater spill could reach shore a claim that in retrospect seems absurd.*
>
> "The vessels in question maintain the necessary spill containment and recovery equipment to respond effectively," one of the documents says.
>
> *BP asserts that the combined response could skim, suck up or otherwise remove 20 million gallons of oil each day from the water. But that is about how much has leaked in the past six weeks and the slick now covers about 3,300 square miles,* according to Hans Graber, director of the University of Miami's satellite

Page 73 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

sensing facility. *Only a small fraction of the spill has been successfully skimmed. Plus, an undetermined portion has sunk to the bottom of the Gulf or is suspended somewhere in between.*

*The plan uses computer modeling to project a 21 percent chance of oil reaching the Louisiana coast within a month of a spill. In reality, an oily sheen reached the Mississippi River delta just nine days after the April 20 explosion.* Heavy globs soon followed. *Other locales where oil washed up within weeks of the explosion were characterized in BP's regional plan as safely out of the way of any oil danger.*

BP's site plan regarding birds, sea turtles or endangered marine mammals ("no adverse impacts") also have proved far too optimistic.

While the exact toll on the Gulf's wildlife may never be known, the effects clearly have been devastating.

More than 400 oiled birds have been treated, while dozens have been found dead and covered in crude, mainly in Louisiana but also in Mississippi, Alabama and Florida. More than 200 lifeless turtles, several dolphins and countless fish also have washed ashore.

*The response plans anticipate nothing on this scale. There weren't supposed to be any coastline problems because the site was far offshore.*

"Due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected," the site plan says.

* * *

*Perhaps the starkest example of BP's planning failures: The company has insisted that the size of the leak doesn't matter because it has been reacting to a worst-case scenario all along.*

*Yet each step of the way, as the estimated size of the daily leak has grown from 42,000 gallons to 210,000 gallons to perhaps 1.8 million gallons, BP has been forced to scramble to create potential solutions on the fly, to add more boats, more boom, more skimmers, more workers. And containment domes, top kills, top hats.*

*While a disaster as devastating as a major oil spill will create unforeseen problems, BP's plans do not anticipate even the most obvious issues, and use mountains of words to dismiss problems that have proven overwhelming.*

231.

The Presidential Commission found that there was no "comprehensive and systematic risk-analysis, peer-review, or management of change process" for any of the following key decisions, amongst others:

Page 74 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

1     •   Failing to wait for the correct amount of centralizers;

2     •   Failing to wait for the foam stability test results and/or redesigning slurry;

3     •   Failing to run a cement evaluation log;

4     •   Failing to use the correct spacer to avoid disposal issues;

5     •   Failing to recognize the dangers inherent in displacing the mud from the riser before
6        the surface cement plug had been set;

7     •   Failing to properly place the cement plug at the appropriate level and instead placing
8        it 3,000 feet before the mud line;

9     •   Failing to install additional physical barriers during the temporary abandonment
10       procedure;

11     •   Failing to perform further well integrity diagnostics in light of the troubling and
12       unexplained negative pressure test failures; and

13     •   Failing to monitor the mud pits and conducting other simultaneous operations during
14       mud displacement.

15                     232.

16       The Presidential Commission then concluded that: *"The evidence now available does not*

17 *show that the BP team members (or other companies' personnel) responsible for these decisions*

18 *conducted any sort of formal analysis to assess the relative riskiness of available alternatives."*

19 ***The Failed Use of Unprecedented Amounts of Dispersants***

20                     233.

21       As set forth below, BP's extensive and potentially problematic use of dispersants further

22 demonstrated its lack of preparedness to respond to the spill.

23                     234.

24       On April 22, 2010, BP began spraying massive amounts of dispersants – namely

25 "Corexit" – on the oil that had reached the surface of the Gulf of Mexico.  Dispersants such as

26 Corexit are not intended to remove oil from the water; rather, energy from wind and waves

Page 75 - COMPLAINT

1   naturally disperses oil and dispersants may accelerate the process by allowing the oil to mix with

2   water more easily, dispersing the oil vertically and horizontally in the water column.

3                                     235.

4           However, dispersants pose several serious health and environmental threats.  For

5   example, dispersants – including Corexit – decrease the amount of oil on the surface of the

6   water, but *increase* the amount of oil in the water column.  Corexit therefore enables the oil to

7   spread over a wider area, significantly increasing the exposure of marine life to toxic chemicals

8   and oil.  In addition, chemically dispersed oil can be toxic not just in the short term, but also over

9   the long term.  Accordingly, the decision to engage in wide-spread use of dispersants must be

10  carefully considered, particularly given the fact that studies have found that dispersants may not

11  increase biodegradation rates and *might even inhibit biodegradation*.

12                                    236.

13          Furthermore, Corexit is a chemical dispersant that contains 2-butoxy ethanol.  According

14  to the New Jersey Department of Health, 2-butoxy ethanol "may be a carcinogen in humans.

15  There may be no safe level of exposure to a carcinogen, so all contact should be reduced to the

16  lowest possible level."  BP's OSRP for the Gulf of Mexico makes no mention of this serious side

17  effect.

18                                    237.

19          Between April 22, 2010 through April 26, 2010, BP and its subcontractors applied 14,654

20  gallons of Corexit to the surface of the Gulf of Mexico.  Then, from April 27, 2010 to May 3,

21  2010, BP and its subcontractors applied another 141,358 gallons of Corexit to the surface of the

22  Gulf of Mexico.  The following week, they applied an additional 168,988 gallons of Corexit to

23  the surface of the Gulf of Mexico.  The Presidential Commission found that BP's extreme use of

24  Corexit was "*novel*" and had never been used in these "*unprecedented volumes*."  The

25  Presidential Commission stated that while oil spill "responders had often deployed dispersants to

26

Page 76 - COMPLAINT

1    respond to spills" it had "*never*" been done "in such volumes; during the Exxon Valdez spill,

2    responders sprayed about *5,500 gallons [of dispersants], and that use was controversial.*"

3                                      238.

4         As the volume of dispersants sprayed on the surface grew dramatically, BP then raised

5    the idea of applying dispersants directly at the well.  Once again, however, the Presidential

6    Commission found that oil spill responders "*had never before applied dispersants in the deep*

7    *sea*" and "*responders were concerned about the absence of information of the effects of*

8    *dispersants in the deepwater environment.  No federal agency had studied subsea dispersant use*

9    *and private studies had been extremely limited.*"

10                                      239.

11        Because no federal agency had ever allowed the subsea release of dispersants in a

12   deepwater environment, on May 10, 2010, the U.S. Coast Guard and EPA prohibited its use

13   "until initial testing demonstrates the effectiveness of subsurface dispersant application."  Then,

14   during a May 24, 2010 press conference, EPA Administrator Lisa Jackson announced that the

15   government was instructing BP to "take immediate steps to significantly scale back the overall

16   use of dispersants" and expressed EPA's belief that BP "can reduce the amount of dispersant

17   applied by as much as half, and I think probably 75 percent, maybe more."  Based on the

18   unknown and highly risky side effects of dispersants, on May 26, 2010, the U.S. Coast Guard

19   and EPA issued a joint letter and directive stating, in part, as follows:

20        Reduction in Use of Dispersants.  BP shall implement measures to limit the total
          amount of surface and subsurface dispersant applied each day to the minimum
21        amount possible. *BP shall establish an overall goal of reducing dispersant*
          *application by 75%* from the maximum daily amount used as follows:
22

23        a.  Surface Application.    *BP shall eliminate the surface application of*
              *dispersants.*  In rare cases when there may have to be an exemption, BP must
24            make a request in writing to the [Federal On Scene Coordinator ("FOSC")]
              providing justification which will include the volume, weather conditions,
25            mechanical or means for removal that were considered and the reason they
              were not used, and other relevant information to justify the use of surface
26            application.  The FOSC must approve the request and volume of dispersant
              prior to initiating surface application.

Page 77 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

b. Subsurface Application. *BP shall be limited to a maximum subsurface application of dispersant of not more than 15,000 gallons in a single calendar day.* Application of dispersant in amounts greater than specified in this Addendum 3 shall be in such amounts, on such day(s) and for such application (surface or subsurface) only as specifically approved in writing by the FOSC.

240.

"*Despite this directive*," the Presidential Commission noted that "*surface use of dispersants continued.*" While the Company did seek exemptions from the directive, "*EPA expressed frustration that BP sought regular exemptions, and it repeatedly asked for more robust explanations of why BP could not use mechanical recovery methods, such as skimming and burning, instead of dispersants.*" On July 14, 2010, EPA ultimately prohibited the use of dispersants altogether.

**The Failed Use of A Cofferdam**

241.

Knowing that dispersants would be unable to significantly lessen the environmental catastrophe, BP began to theorize other ways that it might be able to contain and/or recover the spewing oil. The Company's new idea – which was noticeably absent from BP's OSRP – was to place a large containment dome (or "cofferdam") over the larger of the two leaks, with a pipe at the top channeling oil and gas to a ship on the surface of the Gulf of Mexico, the *Discoverer Enterprise*. BP had several cofferdams already, but those had been designed, and had only been utilized, in shallow water scenarios and had never been tested in a similar deepwater environment. Thus, BP was forced to quickly attempt to modify one of its existing cofferdams for these new and unintended purposes. The modification of the preexisting cofferdam was complete on or about May 4, 2010. BP began its attempt to place the 98-ton dome to the sea floor late in the evening on May 6, 2010.

242.

It was essentially guaranteed that the *ad hoc* modifications that were hurriedly made to the cofferdam would be unsuccessful. In his book on the *Deepwater Horizon* incident published

Page 78 - COMPLAINT

1    in late 2010, *Disaster on the Horizon*, former drilling engineer Bob Cavnar ("Cavnar") described

2    the initial containment dome effort as the "*silliest contraption*" that BP built in the aftermath of

3    the incident, and that the steps to construct and lower it down to the leaking BOP "never made

4    much sense . . . they were more for show – to look like they were doing something while they

5    were trying to come up with a real plan." Cavnar stated in an interview that the cofferdam was

6    "destined to fail" due to the "scientific certainty" that gas hydrates would immediately form in

7    the device and clog it, and describes in his book the results of its deployment as "almost

8    instantaneous failure."

9                                     243.

10         Likewise, the Presidential Commission noted:

11         BP's Suttles publicly cautioned that previous successful uses had been in much
           shallower water. BP recognized that chief among potential problems was the risk
12         that methane gas escaping from the well would come into contact with cold sea
           water and form slushy hydrates, essentially clogging the cofferdam with
13         hydrocarbon ice. *Notwithstanding the uncertainty, BP, in a presentation to the
           leadership of the Department of Interior, described the probability of the
14         containment dome's success as "Medium/High." Others in the oil and gas
           industry were not so optimistic: many experts believed the cofferdam effort was
15         very likely to fail because of the hydrates.*

16                                     244.

17         Not surprisingly, the effort did fail. Hydrates accumulated during the installation of the

18   dome, yet BP only had a plan to deal with hydrates once the cofferdam was in place. Thus, when

19   crews started to maneuver the cofferdam into position on May 7, 2010, hydrates formed before

20   they could even place the dome over the leak, immediately clogging the opening through which

21   oil was to be funneled. This error in planning almost led to another catastrophe. As noted by the

22   Presidential Commission:

23         Because hydrocarbons are lighter than water, the containment dome became
           buoyant as it filled with oil and gas while BP tried to lower it. BP engineers told
24         [the Company's Vice President overseeing the project Richard] Lynch that they
           had "lost the cofferdam" as the dome, full of flammable material, floated up
25         toward the ships on the ocean surface. Averting a potential disaster, the engineers
           were able to regain control of the dome and move it to safety on the sea floor. *In
26         the wake of the cofferdam's failure, one high-level government official recalled*

Page 79 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1  *Andy Inglis, BP's Chief Executive Officer of Exploration and Production, saying with disgust, "If we had tried to make a hydrate collection contraption, we*
2  *couldn't have done a better job."*

3                                  245.

4     In the days after the failure of the cofferdam, BP temporarily utilized a device known as a

5  "riser insertion tube" to collect some of the oil.  However, BP abandoned the effort after only a

6  few days because of the relatively minor amount of oil the device actually managed to collect.

7  ***The "Top Kill" and "Junk Shot" Efforts Fail***

8                                  246.

9     Following the failure of the Company's cofferdam experiment, BP tried to stop the

10 flowing oil by embarking on so-called "top kill" and "junk shot" efforts.  Both methods are

11 industry techniques that have been historically applied to stop the flow of oil from a blown-out

12 well.

13                                 247.

14    BP, like the rest of the oil industry, was well aware of the Ixtoc I Oil Spill in 1979 in

15 which a rig exploded, caught fire, sank, killed workers and released millions of gallons of oil into

16 the Gulf of Mexico.  In the Ixtoc spill, the same two techniques were attempted and it took

17 approximately 290 days to bring that well under control.  BP's Oil Spill Response Plan made no

18 mention of having to rely on either of these methods let alone provide any qualification as to

19 how effective each method might be in a similar circumstance.  Further, the Presidential

20 Commission noted that neither technique "*had []ever been used in deepwater.*"  In the end, both

21 efforts failed to control the proliferation of oil from the Macondo well.

22                                 248.

23    A top kill – also known as a momentum or dynamic kill – involves pumping heavy mud

24 into the top of the well through the BOP's choke and kill lines, at rates and pressures high

25 enough to force escaping oil back down the well and into the reservoir.  A junk shot

26 complements a top kill and involves pumping material (including pieces of tire rubber and golf

Page 80 - COMPLAINT

1    balls) into the bottom of a BOP through the choke and kill lines. That material is supposed to get

2    caught on obstructions within the BOP and impede the flow of oil and gas. By slowing or

3    stopping the flow of oil, a successful junk shot makes it easier to execute a top kill.

4                                       249.

5        BP's top kill and junk shot plan began on the afternoon of May 26, 2010. As with the

6    cofferdam experiment, BP gave mixed messages about the potential likelihood of success to both

7    the government and the public. In this regard, the Presidential Commission concluded, in

8    relevant part, as follows:

> As with the cofferdam, BP struggled with public communications surrounding the
> top kill. ***At the time, both industry and government officials were highly
> uncertain about the operation's probability of success. One MMS employee
> estimated that probability as less than 50 percent, while a BP contractor said
> that he only gave the top kill a "tiny" chance to succeed. But BP's Hayward
> told reporters, "We rate the probability of success between 60 and 70 percent."***
> After the top kill failed, that prediction may have lessened public confidence in
> BP's management of the effort to contain the well.

14                                       250.

15        During three separate attempts over the next three days, BP pumped mud at rates

16    exceeding 100,000 barrels per day and fired numerous shots of "junk" into the BOP. After the

17    third unsuccessful attempt, BP acknowledged that the plan was a failure. BP's explanation of the

18    failed attempts focused on the well's 16-inch casing, the outermost barrier between the well and

19    the surrounding rock for more than 1,000 vertical feet. That casing was fabricated with three sets

20    of weak points, or "rupture disks." During the well's production phase, the hot oil coursing

21    through the production casing, which is inside the 16-inch casing, would lead to a buildup of

22    pressure in the well. If the pressure buildup was too high, it could cause the collapse of one of

23    the two casings. The disks were designed to rupture and relieve this potential buildup of

24    pressure before a casing collapsed. According to BP, pressures created by the initial blowout

25    could have caused the rupture of disks to collapse inward, compromising the well's integrity.

26

Page 81 - COMPLAINT

1

251.

2      The Presidential Commission, however, disagreed with BP's explanation and found, in

3  part, that the "[c]ollapse of the rupture disks *was only one of BP's possible explanations for the*

4  *unsuccessful top kill. But the company presented it to the government as the most likely*

5  *scenario.*" Indeed, the U.S. Government noted that it "*did not fully accept BP's analysis of what*

6  *happened*" and, in contrast, believed that "*the top kill likely failed because the rate at which oil*

7  *was flowing from the well was many times greater than the then-current 5,000 barrels-per day*

8  *estimate*. Because BP did not pump mud into the well at a rate high enough to counter the actual

9  flow, oil and gas from the well pushed mud back up the BOP and out of the riser."

10  ***The "Top Hat" Failed to Collect the "Vast Majority" of the Spewing Oil***

11

252.

12      In the aftermath of the failed top kill and junk shot plan, BP began shifting its main focus

13  to collecting the oil rather than killing the well itself.  On May 29, 2010, BP announced that it

14  would attempt to cut off the portion of the riser still attached to the top of the BOP and install a

15  collection device – or "top hat," which would then be connected via a new riser to the *Discoverer*

16  *Enterprise* vessel.  As before, BP's Oil Spill Response Plan failed to mention the top hat

17  technique as a potential remedy in the event of an oil spill.  BP began installing the top hat on

18  June 1, 2010 and had it in place by 11:30 p.m. on June 3, 2010.  By June 8, 2010 – forty-nine

19  days after the explosion occurred – the *Discoverer Enterprise* was collecting about 15,000

20  barrels of oil per day – or approximately 25 percent of the oil being released.

21

253.

22      BP also developed a system to bring oil and gas to the surface through the choke line on

23  the BOP.  More specifically, BP outfitted a vessel called the *Q4000* with collection equipment,

24  including an oil and gas burner imported from France. This vessel and resource was also never

25  mentioned in BP's Oil Spill Response Plan.

26

Page 82 - COMPLAINT

1

254.

2     While BP was able to slowly start collecting some of the oil, the Company was, in the

3 words of the Presidential Commission, once again "overly optimistic about the percentage of the

4 oil it could remove or collect."  Indeed, the Presidential Commission found, in part, as follows:

5        *On June 1, Suttles said that he expected the top hat, when connected to the*
       *Discoverer Enterprise, to be able to collect the "vast majority" of the oil. Within*
6       *days, it became apparent that the top hat and Discoverer Enterprise were*
       *inadequate.  On June 6, Hayward told the BBC that, with the Q4000 in place,*
7       *"we would very much hope to be containing the vast majority of the oil."  But*
       *when the Q4000 came online in mid-June, the two vessels' joint capacity of*
8       *25,000 barrels per day was still insufficient.*

9                                     255.

10     In the wake of the failure to contain most of the oil using the top hat, the U.S. Coast

11 Guard continued questioning BP's response to the spill.  As noted, in part, by the Presidential

12 Commission:

13       BP's Lynch said that the speed at which the company brought capacity online was
       limited solely by the availability of dynamically positioned production vessels.[4]
14       One senior Coast Guard official challenged BP's definition of availability:  he
       suggested that BP did not consider options such as procuring ships on charter with
15       other companies until the government pushed it to do so.  Obtaining another
       production vessel might have enabled BP to collect oil through the BOP's kill line
16       at a rate comparable to that of the *Q4000*.

17 *The Well Is Finally Capped*

18                                     256.

19     Following the limited success of the top hat procedure, BP began presenting its final

20 well-control plans to government experts.  According to the Presidential Commission Report:

21       The [U.S. government] science advisors would question BP's assumptions,
       forcing it to evaluate worst-case scenarios and explain how it was mitigating risk.
22       *The government saw its pushback as essential because BP would not, on its own,*
       *consider the full range of possibilities. **According to one senior government***
23       ***official, before the increased supervision, BP "hoped for the best, planned for***
       ***the best, expected the best**.*"  [Paul] Tooms, BP's Vice President of Engineering,
24       believed that the government science advisors unnecessarily slowed the

25 _____

26 [4]  Dynamically positioned vessels have computer-controlled systems that maintain the vessel's
    exact position and direction, despite external factors such as wind, waves, and current.

Page 83 - COMPLAINT

1  containment effort, arguing that scientists consider risk differently than engineers
2  and that BP had expertise in managing risk.  *BP, however, was not in the best position to tout that expertise: its well had just blown out.*

3                                              257.

4  By late June, BP was working towards deploying a "capping stack," yet another *post hoc*

5  measure nowhere reflected in BP's OSRP for the Gulf of Mexico.  The capping stack was

6  essentially a smaller version of a BOP, designed to sit atop the BOP and stop the flow of oil and

7  gas.

8                                              258.

9  On July 9, 2010, Coast Guard Admiral Thad Allen ("Admiral Allen") authorized BP to

10  install the capping stack, but not to close it.  Sealing the capping stack would increase the

11  pressure in the well.  There was a concern that if one or more of the rupture disks had in fact

12  ruptured, the increased pressure could force hydrocarbons into the surrounding formation,

13  leading to uncontrolled eruptions from the ocean floor at other locations.

14                                             259.

15  The installation of the capping stack was completed on July 12, 2010.  The next day,

16  experts conducted a "well integrity test" to determine if the well had been compromised and to

17  see whether oil could flow into the rock formation.  According to the Presidential Commission:

18  "[t]he test was to last from 6 to 48 hours, and BP had to monitor pressure, sonar, acoustic, and

19  visual data continuously, as recommended by the [U.S. government's] Well Integrity Team."

20                                             260.

21  On July 15, 2010, after a 24-hour delay to repair a leak, BP shut the capping stack and

22  began the well integrity test.  For the first time in 87 days – and after approximately five million

23  barrels of oil had already seeped into the Gulf of Mexico – the well had finally stopped spewing

24  oil.  Unfortunately, however, by that time, the vast environmental damage had already occurred

25  and, as noted by *The New York Times* on August 6, 2010, "BP's containment efforts had

26  captured only approximately 16 percent of the spill."

Page 84 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1

261.

2      Meanwhile, on July 19, 2010, BP publicly raised the possibility of actually killing the

3 well through a procedure called a "static kill." Like the top kill, the static kill involved pumping

4 heavy drilling mud into the well in an effort to push oil and gas back into the reservoir.

5 However, because the oil and gas were already static, the pumping rates required for the static

6 kill to succeed were far lower than the top kill. The U.S. government approved the static kill

7 procedure on August 2, 2010. By 11:00 p.m. on August 3, 2010, the static kill appeared to have

8 worked. On August 8, 2010, Admiral Allen reported that the cement had been pressure-tested

9 and was holding.

10

262.

11      In mid-September 2010, the first relief well – which BP had begun to drill in early May –

12 finally intercepted the Macondo well, allowing BP to pump in cement and permanently seal the

13 reservoir. Thus, on September 19, 2010 – 152 days after the blowout – the U.S. government

14 finally announced that "*the Macondo well is effectively dead.*" In total, 206 million gallons of

15 crude oil spilled into the Gulf of Mexico, thousands of square miles of fishing grounds were

16 closed through 2010 and billions of dollars of tourist revenue in the area were lost.

17 **VIII.   BP MADE MATERIALLY FALSE OR MISLEADING STATEMENTS AND**

18         **OMITTED MATERIAL FACTS**

19

263.

20      Before the relevant period, BP experienced a series of high-profile safety lapses that

21 resulted in the loss of life, damage to the environment, harm to BP's reputation, and significant

22 costs to BP in the form of criminal pleas and fines, civil settlements, and remediation expenses.

23 In particular, the 2005 Texas City refinery explosion and the 2006 Alaska oil spills were

24 extremely damaging to the Company and left investors concerned about the ability of BP to

25 operate safely and without catastrophic failures.

26

Page 85 - COMPLAINT

264.

Responding to these concerns, beginning on May 9, 2007, BP sought to assure its
investors that BP was a company committed to ensuring safe operations through the
implementation of the Baker Panel recommendations and, in particular, its process safety system,
OMS.  BP reaffirmed this commitment to safety for three years, and at nearly every opportunity.
In fact, in May 2009, BP's Hayward lamented that he had "got so bored with saying 'safety,
people, and performance' but [he had] determined that [he was] not going to say anything else."
This public commitment to right BP's past wrongs was touted as a sea change in BP's
operations.

265.

BP consistently touted its operations in the deepwater Gulf of Mexico, a region that had
become one of the most important areas of production for the Company and which BP hailed as
a "profit centre" and a "high margin" production area.  In fact, however, BP's deepwater drilling
operations created undisclosed risks of a catastrophic system failure that ultimately was realized
when the *Deepwater Horizon* exploded and oil began to spew from the Macondo well.
Moreover, the explosion revealed that BP never committed to developing effective safety
protocols and systems through OMS on rigs that BP did not fully-own, had not completed OMS
in the Gulf of Mexico as it had claimed, and did not have procedures in place that would guide
its employees through best practices to avoid an otherwise preventable spill or to contain a spill,
should one occur.

**The May 9, 2007 Statements**

266.

On May 9, 2007, BP issued its 2006 Sustainability Report, which stated, in part:

 During 2006, we undertook specific investments and targeted programmes in
response to the Texas City incident as well as building more comprehensive
systems for managing process safety across the group. . . .  During 2006, we built
on the learning from more recent incidents and industry best practice to develop a
new operating management system (OMS) to achieve further improvements and

Page 86 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

1
2

reductions in risk.  Our goals remain unchanged: no accidents, no harm to people and no damage to the environment.  *The OMS is a comprehensive system that covers all aspects of our operations*, including three dimensions of safety – personal safety, process safety and the environment.

3
4
5
6
7

However, we recognize that we have more to do to achieve excellence in process safety, which includes preventing accidental releases of hazardous materials from industrial processes that can have catastrophic effects, such as fires, which may result in fatalities, injuries or environmental damage.  This was one of the main findings of the BP US Refineries Independent Safety Review Panel under former US Secretary of State James A Baker, III, which reported in January 2007.  The panel made 10 recommendations, all of which BP will implement, in areas ranging from leadership to performance indicators[.]

8

*   *   *

9
10
11

*The new OMS will apply to all operations* by the end of 2010 and includes safety, integrity, environmental management and health. . . .  *Each site will have its own local OMS*, based on a consistent group-wide framework. . . . The aim of the OMS is to have consistent standards of design, construction, operating procedures and maintenance that help to ensure the reliability and integrity of our plants.

12

*   *   *

13
14
15
16

In 2006, this approach was approved as a group practice, part of the new OMS, defining the environmental impact management processes and requirements to which BP will operate.  We intend that all new projects in BP will use the practice [of assessing "environmental requirements for new projects"] by the end of 2007. The practice was developed primarily for major projects where the potential for environmental impact is often the greatest. However, it also applies to smaller projects that may have the potential for similar levels of impact in environmentally sensitive areas.  (Footnote omitted)

17

267.

18  The foregoing misrepresentations, which caused BP securities to trade at artificially

19  inflated prices, were materially false or misleading when made, and were known by BP,

20  including BP's Hayward as chairman of GORC and special liaison to SEEAC, to be materially

21  false or misleading at that time, or were made with reckless disregard for the truth, for the

22  following reason, among others:  BP misled investors with regard to BP's OMS program

23  applying to "all aspects of our operations," "all operations," and "all new projects in BP" when,

24  in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP

25  leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico.

26

Page 87 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

**The July 24, 2007 Statements**

268.

On July 24, 2007, BP held a conference call with analysts and investors, during which BP's Hayward stated:

> First, safety. We are ensuring that we have consistent, safe, reliable operations across BP. We are implementing the Baker Panel recommendations. We are also in the early days of establishing a new way of operating in BP – *with the progressive rollout of a common group-wide Operating Management System*.

269.

The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by BP's Hayward to be materially false or misleading at that time, or was made with reckless disregard for the truth, for the following reasons, among others:   BP's Hayward misled investors with regard to BP's OMS program as providing a "common" or "group-wide" solution when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico.

**The September 25, 2007 Statements**

270.

On  September 25, 2007, BP's Inglis spoke at the Sanford Bernstein 4th Annual Strategic Decisions Conference, during which he misrepresented the scope of BP's OMS:

> One aspect of our focus on safe and reliable operations that I mentioned earlier, is our new standardized *Operating Management System (OMS).  This will provide a blueprint for safety and all aspects of operations throughout BP*, making sure operations are undertaken to a consistently high standard worldwide.

271.

The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by BP's Inglis to be materially false or misleading at that time, or was made with reckless disregard for the truth, because BP's Inglis stated that OMS would apply to "all aspects of operations" and failed to

Page 88 - COMPLAINT

1    disclose that BP's OMS would apply only to rigs that BP fully-owned but not to BP's operations

2    where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of

3    Mexico.

4    **The November 8, 2007 Statements**

5                         272.

6       On November 8, 2007, BP's Hayward spoke at the Houston Forum about BP's

7    implementation of the Baker Panel recommendations.  During his presentation, BP's Hayward

8    stated, in part, as follows:

9
10         ***We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel.***  BP remains absolutely committed to taking these lessons and becoming a world leader in process safety.

11                         273.

12       The foregoing misrepresentation, which caused BP securities to trade at artificially

13    inflated prices, was materially false or misleading when made, and was known by BP's Hayward

14    to be false at that time, or was made with reckless disregard for the truth, for the following

15    reasons, among others: BP's Hayward misled investors about BP's implementation of the Baker

16    Panel's recommendations because he falsely represented BP's intention to implement the

17    policies, procedures, and recommendations detailed in the Baker Report.

18    **The February 22, 2008 Statements**

19                         274.

20       On February 22, 2008, BP released its 2007 Annual Review, in which BP stated that

21    safety was BP's top priority.  The 2007 Annual Review included the following statement by

22    BP's Hayward: "When I took over as group chief executive, the immediate task was to restore

23    the integrity and the efficiency of BP's operations.  ***I set out three priorities: safety, people and***

24    ***performance***."

25

26

Page 89 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

275.

The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by BP, including BP's Hayward as its CEO, to be materially false or misleading at that time, or was made with reckless disregard for the truth, for the following reason, among others: BP and BP's Hayward misled investors with regard to BP's efforts to "restore the integrity and the efficiency of BP's operations," which supposedly was to be achieved by implementing the Baker Panel's recommendations. BP's repeated statements falsely represented BP's intention to implement the policies, procedures, and recommendations detailed in the Baker Report.

**The February 27, 2008 Statements**

276.

On February 27, 2008, BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts (in which BP's Hayward participated). There, BP's Hayward stated, in part, as follows:

> Notwithstanding this track record *our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations*. Integrity related incidents have fallen significantly over the last three years and oil spills of more than one barrel continue a strong downward trend.
>
> Safe and reliable operations remain our number one priority.

277.

The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by BP's Hayward to be materially false or misleading at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     BP's Hayward misled investors with regard to BP's implementation of the Baker Panel's recommendations because his repeated statements falsely represented BP's intention to

Page 90 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

1   and actual progress in implementing the policies, procedures, and recommendations detailed in

2   the Baker Report; and

3         (b)    BP's Hayward misrepresented that BP was implementing OMS "across all of

4   BP's operations" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's

5   operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in

6   the Gulf of Mexico.

7   **The April 17, 2008 Statements**

8                             278.

9         On April 17, 2008, BP's Hayward and BP Chairman Peter Sutherland delivered speeches

10   at the Company's 2008 Annual General Meeting.  BP posted transcripts of the speeches on its

11   publicly-accessible website.  In his speech, BP's Hayward again asserted that safety was of the

12   utmost importance at BP and distinguished BP from other oil companies based on its deepwater

13   operations.  In particular, BP's Hayward stated, in part, as follows:

14         When I took over as chief executive last May, I said that we would focus on three
15         basic priorities: safety, people, and performance.  Everyone at BP understands
      those priorities. And while I am in this role they will remain the priorities.

16         Safety is our number one priority and in 2007 our overall safety record continued
17         to improve.  Over the last eight years our safety performance according to the
      standard industry measure has improved threefold and is now among the best in
18         our industry.

19         ***Our intense focus on process safety continues.  We are making good progress in
      addressing the recommendations of the Baker Panel and have begun to
20         implement a new Operating Management System across all of BP's operations.***
      This is aimed at ensuring that our operations across the world look and feel the
21         same everywhere - and perform to the same high standard.

22                             279.

23         The foregoing misrepresentations, which caused BP securities to trade at artificially

24   inflated prices, were each materially false or misleading when made, and were known by BP's

25   Hayward to be materially false or misleading at that time, or were made with reckless disregard

26   for the truth, for the following reasons, among others:

Page 91 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1      (a)     BP's Hayward misled investors with regard to BP's implementation of the Baker

2 Panel's recommendations because his repeated statements falsely represented BP's intention to

3 and actual progress in implementing the policies, procedures, and recommendations detailed in

4 the Baker Report; and

5      (b)     BP's Hayward misrepresented that BP was implementing OMS "across all of

6 BP's operations" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's

7 operations where BP leased rigs from others, as it did with Transocean's Deepwater Horizon in

8 the Gulf of Mexico.

9 **The December 17, 2008 Statements**

10                             280.

11      On December 17, 2008, BP's Hayward gave a speech at the HRH Prince Of Wales's 3rd

12 Annual Accounting for Sustainability Forum. BP posted a transcript of the speech on its

13 publicly-accessible website. BP's Hayward claimed that BP was continuing to improve its

14 process safety practices. More specifically, BP's Hayward stated, in part, as follows:

15     BP had a number of high-profile safety lapses in recent years, notably at our
16     Texas City refinery, where there was tragic and unacceptable loss of life.

17     These lapses exposed shortcomings - but they also gave us a huge opportunity to
      learn and improve the way we operate. ***We opened ourselves up to scrutiny - and***
18     ***we listened more to our front-line operations people - who, of course, really***
      ***know what is going on on the ground. And we have continuously reported***
19     ***progress against a response plan and against an independent external report.***

20     One of the many consequences for us has been to develop and to embed a new
      Operating Management System right across BP - and we operate in 100 countries
21     - so that is no mean feat.

22                             281.

23      The foregoing misrepresentations, of consistent progress in safety processes, a potent

24 OMS, and thus, safe, reliable and responsible deep sea drilling operations, which caused BP

25 securities to trade at artificially inflated prices, were each materially false or misleading when

26 made or included material omissions, and were known by BP's Hayward to be materially false or

Page 92 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400 Fax (503) 373-7067

1    misleading at that time, or were made with reckless disregard for the truth, for the following

2    reasons, among others: BP's Hayward misrepresented that BP was implementing OMS "across

3    all of BP's operations" when, in fact, OMS applied only to rigs that BP fully-owned but not to

4    BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater*

5    *Horizon* in the Gulf of Mexico.

6    **The February 24, 2009 Statements**

7                                        282.

8           On February 24, 2009, BP issued its 2008 Annual Review in which BP repeatedly

9    assured investors of its supposed continuing commitment to safety.  For example, in the 2008

10   Annual Review BP made the following false statement:

11          Safety, both personal and process, remains our highest priority.  2008 was one of
          our best ever years for personal safety, with our performance expected to remain
12         among the best in the industry.  During the year we began migrating to *the new
          BP OMS, which has an increased focus on process safety and continuous
13         improvement*.  The majority of our operations in North America Gas, *the Gulf of
          Mexico*, Colombia and the Endicott field in Alaska *all completed the migration
14         to the OMS in 2008*.

15                                       283.

16          BP's 2008 Annual Review also contained the "Group chief executive's review," in which

17   BP's Hayward asserted that safety was BP's "number one priority" and discussed the "safe and

18   reliable" Gulf of Mexico operations.  More specifically, BP's 2008 Annual Review included the

19   following statement by BP's Hayward:

20          Q:  At the start of the year what priorities did you set out for BP?

21          Safety, people and performance, and these remain our priorities.  Our number
          one priority was to do everything possible to achieve safe, compliant and
22         reliable operations.  Good policies and processes are essential but, ultimately,
          safety is about how people think and act.  That's critical at the front line but it
23         is also true for the entire group. Safety must inform every decision and every
          action.  *The BP operating management system (OMS) turns the principle of
24         safe and reliable operations into reality by governing how every BP project,
          site, operation and facility is managed*.
25
                                        *  *  *
26

Page 93 - COMPLAINT

Q: How did Exploration and Production perform?

It was an excellent year, with major projects such as Thunder Horse in the Gulf of Mexico and Deepwater Gunashli in Azerbaijan coming onstream. That, together with safe and reliable performance from our existing operations, contributed to underlying production growth – in contrast to the falling output of our major competitors – and more than compensated for the effects of Hurricanes Ike and Gustav and other operational issues.

284.

The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by BP, including BP's Hayward, to be materially false or misleading at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    BP misled investors by stating that the Gulf of Mexico operations had completed the transition to OMS when, in fact, OMS had not been implemented in the Gulf of Mexico as of April 2010, and BP conceded the falsity of the representation at the hearing on Defendants' motions to dismiss on November 4, 2011 in the *In re BP plc Sec. Litig.* action (Transcript Doc. No. 304 at 58:15-21;

(b)    BP and BP's Hayward misrepresented that OMS governed "how every BP project, site, operation and facility is managed" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico; and

(c)    An internal BP strategy document issued in December 2008 warned GORC members, including BP's Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform Company-wide process safety procedures.

Page 94 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

**The March 4, 2009 Statements**

285.

On March 4, 2009, BP filed its 2008 Annual Report with the SEC on Form 20-F. In the report, BP misrepresented the scope and implementation of its OMS, BP's marquee process safety initiative, and made numerous false statements about its supposed safe practices and the quality of its deepwater Gulf of Mexico operations. Specifically, BP misrepresented that eight sites, including the Gulf of Mexico, had "completed the transition to OMS in 2008."

286.

For example, the Form 20-F stated, in part, as follows:

We continue to implement our new operating management system *(OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site.*

When fully implemented, OMS will be the single framework within which we will operate, consolidating BP's requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety. . . . The OMS establishes a set of requirements, and provides sites with a systematic way to improve operating performance on a continuous basis. BP businesses implementing OMS must work to integrate group requirements within their local system to meet legal obligations, address local stakeholder needs, reduce risk and improve efficiency and reliability. A number of mandatory operating and engineering technical requirements have been defined within the OMS, to address process safety and related risks.

All operated businesses plan to transition to OMS by the end of 2010. *Eight sites completed the transition to OMS in 2008*; two petrochemicals plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, *the Gulf of Mexico,* Colombia and the Endicott field in Alaska. . . . For the sites already involved, implementing OMS has involved detailed planning, including gap assessments supported by external facilitators. A core aspect of OMS implementation is that each site produces its own 'local OMS', which takes account of relevant risks at the site and details the site's approach to managing those risks. As part of its transition to OMS, a site issues its local OMS handbook, and this summarizes its approach to risk management. Each site also develops a plan to close gaps that is reviewed annually. The transition to OMS, at local and group level, has been handled in a formal and systematic way, to ensure the change is managed safely and comprehensively.

Experience so far has supported our expectation that having one integrated and coherent system brings benefits of simplification and clarity, and that the process of change is supporting our renewed commitment to safe operations.

Page 95 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

* * *

- Executive management has taken a range of actions to demonstrate their leadership and commitment to safety. The group chief executive has consistently emphasized that safety, people, and performance are our top priority, a belief made clear in his 2007 announcement of a forward agenda for simplification and cultural change in BP. Safety performance has been scrutinized by the Group Operations Risk Committee (the GORC), chaired by the group chief executive and tasked with assuring the group chief executive that group operational risks are identified and managed appropriately. . . .

287.

The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by BP to be materially false or misleading at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     BP's Hayward signed the certification statement for the foregoing statement and was the Chairman of GORC and was ultimately responsible and charged with oversight and implementation of OMS;

(b)     BP and BP's Hayward knew OMS was not implemented in the Gulf of Mexico in 2008, that BP would not "beg[i]n the process of cutover to OMS" in the Gulf of Mexico until Fall 2009, and that OMS had not even been implemented in the Gulf of Mexico as of April 2010.

(c)     Approximately one month prior to publication of BP's 2008 Annual Report, BP's Hayward received a report directly from BP's Inglis confirming that BP had not completed the transition to OMS in the Gulf of Mexico by the conclusion of 2008;

(d)     An internal BP strategy document issued in December 2008 warned GORC and its members, including BP's Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents", thereby misleading investors that BP's operations in the Gulf of Mexico were operating within uniform company-wide process safety procedures;

Page 96 - COMPLAINT

1    (e)    BP and BP's Hayward knew that process safety was an integral part of OMS, and

2    that the purpose of OMS was to prevent major accidents, such as the blowout that occurred on

3    the *Deepwater Horizon* on April 20, 2010.   BP and BP's Hayward also knew that the risk of a

4    deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of

5    Mexico."

6    (f)    BP and BP's Hayward misrepresented that OMS was a "common" system that

7    applied as a "single operating framework" to "all BP operations" and would be "adopted by all

8    operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's

9    operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in

10   the Gulf of Mexico;

11   (g)    By 2009 and 2010, BP's OMS lagged far behind the safety programs of its

12   industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of

13   Mexico (and was not implemented on the *Deepwater Horizon*).  Moreover, employees in key

14   positions in Gulf of Mexico operations had no knowledge of OMS requirements; and

15   (h)    BP failed to disclose or indicate the following:  (1) BP had inadequate safety

16   procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf

17   of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of its Gulf

18   of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico; and (4)

19   BP lacked adequate internal safety and risk management controls.

20   **The March 10, 2009 Statements**

21                                        288.

22           On March 10, 2009, BP's EP, which discusses BP's purported safety protocol for the

23   Mississippi Canyon Block 252, was "deemed submitted" by the MMS.  The document was

24   initially received by the MMS on February 23, 2009 and was available to the public and BP's

25   investors no later than March 10, 2009.  BP's EP falsely stated, in part, that:

26

Page 97 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

*I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge*, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan.

\* \* \*

An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. *If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal* and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. No adverse activities to fisheries are anticipated as a result of the proposed activities.

\* \* \*

*In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.*

289.

In addition, BP's EP stated that:

An accidental oil spill from the proposed activities could cause impacts to beaches. However, *due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.* Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate *there is little risk of contact or impact to the coastline and associated environmental resources*.

290.

BP's EP also contained identical statements to the statement in the immediately preceding paragraph, except that they pertained to wetlands, coastal wildlife, refuges, and wilderness areas.

291.

Section 7.1 of BP's EP also falsely estimated a worst-case discharge scenario of 162,000 barrels of oil per day, an amount it falsely assured the MMS that it was prepared to respond to.

Page 98 - COMPLAINT

292.

Additionally, before BP could begin operations at the Macondo site, federal regulations required BP to submit its EP demonstrating that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment. 30 C.F.R. §§250.201, 250.202.  BP did not have such a plan or a means of conducting their proposed activities.

293.

Further, federal regulations required that BP's EP be accompanied by "oil and hazardous substance spills information" and "environmental impact analysis information."  30 C.F.R. §§250.212, 250.219, 250.227.

294.

Among the information required to accompany the EP was a "blowout scenario," described as follows:

> A scenario for the potential blowout of the proposed well in your EP that you expect will have the highest volume of liquid hydrocarbons.  Include the estimated flow rate, total volume, and maximum duration of the potential blowout.  Also, discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and rig package constraints.  Estimate the time it would take to drill a relief well. 30 C.F.R. §250.213(g).

295.

The oil and hazardous spills information accompanying the EP was also required to include an oil spill response plan providing the calculated volume of BP's worst-case discharge scenario (*See* 30 C.F.R. §254.26(a)), and a comparison of the appropriate worst-case discharge scenario in [its] approved regional [Oil Spill Response Plan] with the worst-case discharge scenario that could result from [its] proposed exploration activities; and a description of the worst-case discharge scenario that could result from [its] proposed exploration activities. *See* 30 C.F.R. §§254.26(b), (c), (d), and (e); 30 C.F.R. §250.219.

Page 99 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1                                           296.

2          Federal regulations required BP to conduct all of its lease and unit activities according to

3   its approved EP, or suffer civil penalties or the forfeiture or cancellation of its lease. 30 C.F.R.

4   §250.280.

5                                           297.

6          The foregoing misrepresentations which caused BP securities to trade at artificially

7   inflated prices, were each materially false or misleading when made, and were known by BP to

8   be materially false or misleading at that time, or were made with reckless disregard for the truth,

9   for the following reasons, among others:

10         (a)     As explained by a group of eight U.S. Senators in a May 17, 2010 letter to U.S.

11  Attorney General Eric H. Holder, Jr., there was no "proven equipment and technology" to

12  respond to the spill.  The Senators wrote that "[m]uch of the response and implementation of

13  spill control technologies appears to be taking place on an ad hoc basis."  Indeed, BP

14  acknowledged on May 10, 2010 that: "*[a]ll of the techniques being attempted or evaluated to*

15  *contain the flow of oil on the seabed involve significant uncertainties because they have not been*

16  *tested in these conditions before*";

17         (b)     BP falsely represented that its EP was based on an analysis of the Mississippi

18  Canyon Block 252 site when, in fact, BP's EP was boilerplate language copied from one or more

19  exploration plans that MMS had previously approved for other distinct drilling sites;

20         (c)     BP misrepresented that BP was prepared to stop a blowout at Mississippi Canyon

21  Block 252 or contain the resulting oil spill when, in fact, BP was wholly unprepared;

22         (d)     In connection with its EP, BP sought a permit from the MMS to drill to a total

23  depth of 19,650 feet at the Macondo Well.  Following the sinking of the *Deepwater Horizon*, a

24  BP crewman admitted that this depth had been misrepresented to the MMS, and that BP had in

25  fact drilled in excess of 22,000 feet, in violation of its permit;

26

Page 100 - COMPLAINT

1       (e)     BP misrepresented that an oil spill would not adversely impact beaches, wetlands,

2  and other environmentally sensitive areas;

3       (f)     Concealed from the investing public was BP's failure to have sufficient internal

4  safety and risk management processes to satisfy the above referenced regulation.  In fact, BP's

5  Suttles acknowledged on May 10, 2010, that BP did not actually have a response plan with

6  "proven equipment and technology" in place that could contain the *Deepwater Horizon* Spill.

7  Later, BP's Hayward admitted that "BP's contingency plans were inadequate," and that the

8  company had been *"making it up day to day."*  BP's Hayward further admitted that it was "an

9  entirely fair criticism" to blame BP for the disorganized and poor cleanup effort because

10  *"[w]hat's undoubtedly true is that we did not have the tools you'd want in your tool kit"* to stop

11  the leak from the Macondo well in the Gulf of Mexico in the aftermath of the explosion;

12       (g)     On May 12, 2010, H. Lamar McKay, Chairman, President and Chief Operating

13  Officer of BP America, admitted in testimony to the House Subcommittee on Oversight and

14  Investigations, Committee on Energy and Commerce, that BP did not have the capability and

15  technology to respond to the *Deepwater Horizon* oil spill.

16       (h)     The Presidential Commission concluded, "there was nothing to suggest that BP's

17  engineering team conducted a formal, disciplined analysis of the combined impact of [] risk

18  factors on the prospects of a successful cement job"; and

19       (i)     Finally, BP's Inglis stated after the *Deepwater Horizon* disaster that BP never

20  invested a dollar in developing methods to contain an oil spill.

21  **The April 16, 2009 Statements**

22                             298.

23       On April 16, 2009, BP issued its 2008 Sustainability Review, which stated, in part: "You

24  can see a similar balanced approach in our new *operating management system (OMS), which is*

25  *to be implemented at each BP site*.  It covers everything from compliance and risk management

26  through to governance and measuring results."

Page 101 - COMPLAINT

1                                          299.

2        The foregoing misrepresentation, which caused BP securities to trade at artificially

3 inflated prices, was materially false and misleading when made, and was known by BP to be

4 materially false and misleading at that time, or was made with reckless disregard for the truth, for

5 the following reason, among others:  BP misrepresented that it was implementing OMS "at each

6 BP site" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations

7 where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of

8 Mexico.

9 **The June 30, 2009 Statements**

10                                          300.

11        On June 30, 2009, BP publicly filed its revised oil spill response plan for the Gulf of

12 Mexico – entitled "Regional Oil Spill Response Plan – Gulf of Mexico" or "BP's Regional

13 OSRP for the GOM".  According to BP's Regional OSRP for the GOM, the "***TOTAL WORST***

14 ***CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 barrels***

15 ***of oil per day to 250,000 barrels of oil per day***.  More specifically, BP's Regional OSRP for the

16 GOM stated:  (i) an oil spill occurring less than ten miles from the shoreline could create a worst

17 case discharge of 28,033 barrels of oil per day; (ii) an oil spill that occurred greater than ten

18 miles from the shoreline could create a worst case discharge of 177,400 barrels of oil per day;

19 and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could

20 create a worst case discharge of 250,000 barrels of oil per day.  BP's Regional OSRP for the

21 GOM explicitly states that the Company and its subcontractors ***could recover approximately***

22 ***491,721 barrels of oil per day*** (or more than 20.6 million gallons) in the event of an oil spill in

23 the Gulf of Mexico.  The Company further claimed and provided certified statements to the

24 MMS that BP and its subcontractors "***maintain the necessary spill containment and recovery***

25 ***equipment to respond effectively to spills***."

26

Page 102 - COMPLAINT

1          301.

2          The foregoing misrepresentations, which caused BP securities to trade at artificially

3  inflated prices, that BP and its subcontractors "maintain the necessary spill containment and

4  recovery equipment to respond effectively to spills" and that nearly 500,000 barrels of oil per

5  day could be recovered were each materially false or misleading when made, and were known by

6  BP to be materially false or misleading at that time, or were made with reckless disregard for the

7  truth, for the following reasons, among others:

8          (a)      BP's Oil Spill Response Plan contained numerous errors, gross deficiencies and

9  was wholly inadequate to respond to a deepwater oil spill; and

10         (b)      BP had failed to draw up sufficient emergency response plans, with BP's

11  Hayward admitting that during the spill "*we were making it up day to day.*"  In addition, BP's

12  Suttles admitted that BP failed to have an oil spill response plan with "proven equipment and

13  technology" in place that could contain the oil spill.

14  **The February 26, 2010 Statements**

15         302.

16         On February 26, 2010, BP issued its 2009 Annual Review.  In the Annual Review, BP

17  made misrepresentations concerning the scope of OMS.  In a section entitled "Sustaining

18  momentum and growth," BP acknowledged that its safety protocols are material to investors by

19  including a separate section on safety entitled "Safety, reliability, compliance and continuous

20  improvement."  That section states:

21         Safe, reliable and compliant operations remain the group's first priority.  A key enabler
22         for this is the BP operating management system *(OMS), which provides a common
           framework for all BP operations*, designed to achieve consistency and continuous
23         improvement in safety and efficiency.  Alongside mandatory practices to address
           particular risks, *OMS enables each site to focus on the most important risks in its own
24         operations and sets out procedures on how to manage them in accordance with the
           group-wide framework.*

25

26

Page 103 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

303.

The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, that BP's OMS "provides a common framework for *all* BP operations" and "enables *each site* to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework" were each materially false or misleading when made, and/or omitted to disclose material facts necessary to make the statements not misleading, for the following reasons, among others:

(a)     BP and BP's Hayward knew that OMS was not fully implemented in the Gulf of Mexico in 2008 or at the time of the *Deepwater Horizon* disaster.  Other BP personnel, including GORC member John Baxter, testified that OMS was not implemented in the Gulf of Mexico as of April 2010;

(b)     As of the date of the foregoing statement, OMS applied to only one drilling rig – the BP-owned PDQ on *Thunderhorse* – out of the seven drilling rigs in Gulf of Mexico. Moreover, BP knew that contracted drilling rigs without OMS accounted for the majority of deepwater wells drilled in the Gulf of Mexico – which were the chief economic driver for BP Exploration and Production;

(c)     BP  made the decision not to apply key elements of OMS, including Safety and Operations Audits and Major Accident Risk analysis, to Gulf of Mexico joint ventures and Gulf of Mexico exploration, including the *Deepwater Horizon*;

(d)     By 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon*).  Moreover, employees in key positions in BP's Gulf of Mexico operations had no knowledge of OMS requirements;

(e)     Key personnel in the Gulf of Mexico (David Sims, David Rich, Patrick O'Bryan) lacked the knowledge, experience and expertise of those they were replacing (Ian Little, Harry

Page 104 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1   Thierens, and Kevin Lacy) as such BP's OMS implementation in the Gulf of Mexico was

2   disorganized and incomplete; and

3         (f)     A 2009 rig audit of the *Deepwater Horizon* revealed that not all relevant

4   personnel on the rig were knowledgeable about drilling and well operation practices and rig crew

5   members were not knowledgeable about well operation practices, including containing a

6   blowout.

7   **The March 5, 2010 Statements**

8                                 304.

9        On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F.  In the

10  report, BP continued to tout its position as the largest producer of oil in deepwater Gulf of

11  Mexico operations while delivering safety in its operations.  In addition, in the Form 20-F BP

12  falsely stated, in part, that:

13       Safe, reliable and compliant operations remain the group's first priority. A key
14       enabler for this is the ***BP operating management system (OMS), which provides
     a common framework for all BP operations, designed to achieve consistency
15       and continuous improvement in safety and efficiency.***

16                                \* \* \*

17       This performance follows several years of intense focus on training and
     procedures across BP. ***BP's operating management system (OMS), which
18       provides a single operating framework for all BP operations***, is a key part of
     continuing to drive a rigorous approach to safe operations.  2009 marked an
19       important year in the continuing implementation of OMS.

20                                \* \* \*

21       Our OMS covers all areas from process safety, to personal health, to
     environmental performance.

22                                \* \* \*

23       ***Following the tragic incident at the Texas City refinery in 2005 the [Safety,
24       Ethics, and Environment Assurance] committee has observed a number of key
     developments, including***: the establishment of a safety & operations (S&O)
     function with the highest calibre of staff; ***development of a group-wide operating
25       management system (OMS) which is being progressively adopted by all
     operating sites***; the establishment of training programmes in conjunction with
26       MIT that are teaching project management and operational excellence; the

Page 105 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1   dissemination of standard engineering practices throughout the group; and the
    formation of a highly experienced S&O audit team formed to assess the safety
2   and efficiency of operations and recommend improvements. Throughout this time
    the group chief executive has made safety the number one priority.

3                                          305.

4          The foregoing misrepresentations, which caused BP securities to trade at artificially

5   inflated prices, were each materially false or misleading when made, and were known by BP to

6   be materially false or misleading at that time, or were made with reckless disregard for the truth,

7   for the following reasons, among others:

8          (a)     BP falsely claimed that it had undertaken a series of "key developments" since the

9   Texas City refinery disaster and misled investors with regard to BP's implementation of the

10  Baker Panel's recommendations because BP's repeated statements falsely represented BP's

11  intent to and actual progress in improving its process safety since the Texas City disaster; and

12         (b)     BP misrepresented that OMS was a "common" system that applied as a "single

13  operating framework" to "all BP operations" and would be "adopted by all operating sites,"

14  when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where

15  BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of

16  Mexico.

17  **The March 22, 2010 Statements**

18                                         306.

19         On March 22, 2010, BP's Inglis delivered a speech at the Howard Weil Energy

20  Conference in New Orleans, Louisiana, in which he discussed the nearby deepwater Gulf of

21  Mexico operations.  BP posted a transcript of the speech on its publicly-accessible website.

22  During the presentation, BP's Inglis falsely stated, in part, as follows:

23         We are currently planning to make final investment decisions for 24 new major
           projects in the next two years.  Each project has been high-graded though our
24         project selection and progression process.  They are concentrated in the Gulf of
           Mexico, the North Sea, Azerbaijan and Angola – high margin production areas
25         that improve the portfolio and enable profitable growth.

26                                        * * *

Page 106 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

1
2
3

*Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance.* And I am pleased to say that in 2009 we saw continuing improvement in all aspects.

4

307.

5   The foregoing misrepresentation, which caused BP securities to trade at artificially

6   inflated prices, was materially false and misleading when made, and was known by BP and BP's

7   Inglis to be materially false and misleading at that time, or was made with reckless disregard for

8   the truth, for the following reasons, among others:

9          (a)    BP's Inglis was a member of GORC, and as such, was charged with oversight and

10  implementation of OMS with respect to BP's exploration and production activities in the

11  deepwater Gulf of Mexico.  Moreover, BP's Inglis received the quarterly Orange Book that

12  contained detailed reports concerning the scope of OMS and revealed that the status of its

13  implementation across BP's various business units, including Exploration and Production in the

14  Gulf of Mexico, was incomplete;

15         (b)    BP's Inglis made these statements about the importance of deepwater drilling in

16  the Gulf of Mexico as part of BP's asset portfolio during the Howard Weil Energy Conference,

17  which bills itself as "one of the premier investor conferences in the energy industry."  *See*

18  http://howardweil.com/energy-conference.aspx.  However, as of the date of Inglis' statement,

19  OMS applied to only one drilling rig out of the seven drilling rigs in Gulf of Mexico, the BP-

20  owned PDQ on *Thunderhorse*.  Moreover, as Chief Executive of Exploration and Production,

21  BP's Inglis knew, or was reckless in not knowing, that over half of the deepwater wells drilled in

22  the Gulf of Mexico – which were the chief economic driver for BP Exploration and Production –

23  were drilled by contracted rigs that did not apply OMS, including the *Deepwater Horizon*;

24         (c)    BP's Inglis (and other GORC members) made the decision to not apply key

25  elements of OMS, including Safety and Operations Audits and Major Accident Risk analysis, to

26

Page 107 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

1     Gulf of Mexico joint ventures and Gulf of Mexico exploration, including the *Deepwater*

2     *Horizon*;

3          (d)      BP's Inglis testified that "[o]ne of the purposes of OMS would be to prevent loss

4     of primary containment." Moreover, on July 13, 2009, BP's Inglis sent an email to the Upstream

5     Senior Leadership Team that expressed concern over contractor operated rigs – *e.g.* the

6     *Deepwater Horizon* – not conforming to BP's Control of Work practices (¶ 175);

7          (e)      BP had only begun to implement its OMS in a pilot stage in the Gulf of Mexico

8     when BP, in part due to a re-organization led by BP's Inglis, terminated and/or displaced the key

9     employees responsible for the implementation of OMS. It was not true that BP was in the final

10    stages of rolling out OMS in the Gulf of Mexico in 2010 and employees in key positions,

11    including Wells Team Leaders and Well Site Leaders, in Gulf of Mexico operations had no

12    knowledge of OMS requirements;

13         (f)      Key personnel in the Gulf of Mexico (David Sims, David Rich, Patrick O'Bryan)

14    lacked the knowledge, experience and expertise of those they were replacing (Ian Little, Harry

15    Thierens, and Kevin Lacy), and BP's OMS implementation in the Gulf of Mexico was

16    disorganized and incomplete;

17         (g)      There was a company failure to implement an appropriate OMS protocol which

18    would have ensured that the individual decision makers at the rig level understood how cost-

19    savings and corner-cutting could affect the process safety of the *Deepwater Horizon*; and

20         (h)      By 2009 and 2010, BP's OMS lagged far behind the safety programs of its

21    industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of

22    Mexico (and was not implemented on the *Deepwater Horizon*).

23    **The March 23, 2010 Statements**

24                             308.

25        On March 23, 2010, BP's Hayward delivered a speech at the Peterson Institute for

26    International Economics in Washington, D.C. in which he discussed BP's changes to its safety

Page 108 - COMPLAINT

1  program following the Texas City, Texas refinery explosion.  BP posted a transcript of the

2  speech on its publicly-accessible website.  During the presentation, BP's Hayward falsely stated,

3  in part, that:

> Five years ago on this day, fifteen people died and many more were injured, when an explosion tore through our Texas City refinery.
>
> *That tragic accident has changed in a profound and fundamental way our approach to safety and operations integrity - providing a safe working environment is a paramount responsibility, and our first and foremost priority.*

8                                        309.

9          The foregoing misrepresentation, which caused BP securities to trade at artificially

10  inflated prices, was materially false or misleading when made, and was known by BP and BP's

11  Hayward to be materially false or misleading at that time, or was made with reckless disregard

12  for the truth, for the following reason, among others:  BP's Hayward misrepresented that BP had

13  changed its approach to safety "in a profound and fundamental way" in response to the Texas

14  City disaster, when, in fact, BP's repeated statements falsely represented BP's intention to and

15  actual progress in implementing the policies, procedures, and recommendations detailed in the

16  Baker Report that were to achieve process safety reforms following the Texas City disaster.

17  **The April 15, 2010 Statements**

18  **The 2009 Sustainability Review**

19                                        310.

20          On April 15, 2010, BP issued its 2009 Sustainability Review, which contained a Q&A

21  session with BP's Hayward in a section entitled "Group Chief Executive's Review."  There,

22  Hayward reemphasized the misrepresentation contained in BP's 2008 Annual Report (which he

23  signed), that eight sites (including the Gulf of Mexico) completed the transition to OMS in 2008:

24      • **Group Chief Executive's Review**

25      *Question*:  What progress has BP made on safety during 2009?

26

Page 109 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1    *Answer*:   Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system (OMS).  The OMS contains rigorous and tested processes for reducing risks and driving continuous improvement.  I see it as the foundation for a safe, responsible and high-performing BP.  ***Having been initially introduced at eight sites in 2008,*** the OMS rollout extended to 70 sites by the end of 2009, including all our operated refineries and petrochemicals plants.  ***This means implementation is 80% complete***.

2

3

4

5                       311.

6      The foregoing misrepresentations, which caused BP securities to trade at artificially

7 inflated prices, were each materially false or misleading when made, and were known by BP and

8 BP's Hayward to be materially false or misleading at that time, or were made with reckless

9 disregard for the truth, for the following reasons, among others:

10     (a)     BP's Hayward, as Chairman of GORC, was ultimately responsible for and

11 charged with oversight and implementation of OMS;

12     (b)     BP's Hayward knew that OMS was not implemented in the Gulf of Mexico in

13 2008, that BP had not "beg[u]n the process of cutover to OMS" in the Gulf of Mexico until Fall

14 2009, and that BP had not implemented OMS in the Gulf of Mexico as of April 2010.  Other BP

15 personnel, including GORC member John Baxter, testified that OMS was not implemented in the

16 Gulf of Mexico as of April 2010;

17     (c)     BP's Hayward made the foregoing statement, which reemphasized and confirmed

18 the earlier statement made by BP in its 2008 Annual Report on Form 20-F that eight sites,

19 including the Gulf of Mexico, had completed the transition to OMS despite knowledge that the

20 Gulf of Mexico had not completed the transition to OMS in 2008;

21     (d)     BP's Hayward misrepresented that OMS was a "common" system that applied as

22 a "single operating framework" to "all BP operations" and would be "adopted by all operating

23 sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations

24 where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of

25 Mexico.  Moreover, BP's Hayward was aware or reckless in disregarding, that OMS was never

26

Page 110 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400  Fax (503) 373-7067

1    meant to apply, and in fact, never did apply, to contracted third-party rigs, which accounted for

2    the majority of BP's deepwater wells drilled in the Gulf of Mexico during the relevant period;

3         (e)     Approximately one month prior to publication of BP's 2008 Annual Report, BP's

4    Hayward received a report directly from Inglis confirming that the Gulf of Mexico had not

5    completed the transition to OMS by the conclusion of 2008;

6         (f)     As members of GORC, BP's Hayward and Inglis received documents that put

7    them on notice that the Gulf of Mexico had not completed the transition to OMS;

8         (g)     An internal BP strategy document issued in December 2008 warned GORC

9    members, including Hayward, that there were "major" process-safety concerns in the Gulf of

10    Mexico that permitted the accumulation of risks prior to and in response to incidents and

11    therefore increased the likelihood and severity of "process-safety related incidents" thereby

12    misleading investors that operations in the Gulf of Mexico were operating within uniform

13    company-wide process safety procedures;

14         (h)     BP's Hayward knew that process safety was an integral part of OMS, and that the

15    purpose of OMS was to prevent major accidents, such as the blowout that occurred on the

16    *Deepwater Horizon* on April 20, 2010.  He also knew that the risk of a deepwater blowout was

17    "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico";

18         (i)     By 2009 and 2010, BP's OMS lagged far behind the safety programs of its

19    industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of

20    Mexico (and was not implemented on the *Deepwater Horizon*) Moreover, employees in key

21    positions in Gulf of Mexico operations had no knowledge of OMS requirements;

22         (j)     There was a company failure to implement an appropriate Operations

23    Management Safety protocol which would have ensured that the individual decision makers at

24    the rig level understood how cost-savings and corner-cutting could affect the process safety of

25    the *Deepwater Horizon*; and

26

Page 111 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1      (k)      Defendants failed to disclose or indicate the following: (1) BP had inadequate

2    safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in

3    the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of

4    its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico;

5    and (4) BP lacked adequate internal safety and risk management controls.

6                                             312.

7           Additionally, the 2009 Sustainability Review, published April 15, 2010, which

8    emphasized BP's systematic approach to safe and environmentally responsible operations, stated

9    further, in part:

10         BP's operating management system (*OMS*) *provides a single framework for all*
           *BP operations to follow*, covering all areas from process safety, to personal
11         health, to environmental performance.

12         Providing an integrated and consistent way of working, the OMS helps ensure
           that a rigorous approach to safe operations continues to be taken. Its principles
13         and processes are designed to simplify the organization, improve productivity,
           *enable consistent execution* and focus BP on performance.
14

15                                            313.

16          The foregoing misrepresentations, which caused BP securities to trade at artificially

17   inflated prices, were each materially false or misleading when made, and were known by BP and

18   BP's Hayward to be false at that time, or were made with reckless disregard for the truth, for the

19   following reasons, among others:

20          (a)      Because the 2009 Sustainability Review was "material to be placed before

21   shareholders which addresses environmental, safety and ethical performance," SEEAC was

22   required to review the 2009 Sustainability Review and make recommendations to the board

23   concerning its adoption and publication;

24          (b)      BP and BP's Hayward misled investors by stating that the Gulf of Mexico

25   operations had completed the transition to OMS when, in fact, BP and BP's Hayward knew that

26   OMS had not been implemented in the Gulf of Mexico as of April 2010, and BP conceded the

Page 112 - COMPLAINT

1   falsity of this statement at the hearing on Defendants' motions to dismiss on November 4, 2011

2   in the *In re BP plc Sec. Litig.* action (Transcript Doc. No. 304 at 58, lns 15-21);;

3          (c)      BP and BP's Hayward misled investors with regard to BP's OMS program,

4   because BP did not intend for OMS to apply to BP's operations that were not fully-owned by BP,

5   as was the case with Transocean's *Deepwater Horizon* in the Gulf of Mexico;

6          (d)      An internal BP strategy document issued in December 2008 warned GORC

7   members, including Hayward, that there were "major" process-safety concerns in the Gulf of

8   Mexico that permitted the accumulation of risks prior to and in response to incidents and

9   therefore increased the likelihood and severity of "process-safety related incidents" thereby

10  misleading investors that operations in the Gulf of Mexico were operating within uniform

11  Companywide process safety procedures; and

12         (e)      BP and BP's Hayward further misled investors regarding BP's OMS program

13  given that they knew that Gulf of Mexico joint ventures (such as the Macondo well) were "not in

14  scope" of the BP Safety & Operations audit program.

15  **The 2009 Sustainability Report**

16                                      314.

17       On April 15, 2010, BP issued its 2009 Sustainability Report, which was evaluated and

18  recommended for publication by SEEAC prior to its publication.  The Sustainability Report

19  contained misrepresentations related to BP's capability to respond to oil spills:

20       •  **Oil Spills**

21      BP recognizes the risk posed to the environment from spills and takes a range of
22      measures to prevent any loss of hydrocarbons.

23      *Our approach*

24      Our strategy to address spills has three components:

25      Prevention: we seek to assure the integrity of vessels and pipelines used to
    transport oil and other hydrocarbons.

26

Page 113 - COMPLAINT

1

***Preparation: we seek to ensure an infrastructure is in place to deal effectively
with spills and their impacts. Our operating facilities have the capacity and
resources to respond to spill incidents and we participate in industry and
international forums to coordinate contingency planning and emergency
response.***

2

3

4

Performance: we record incidents, learn lessons and aim to reduce the number of
losses from primary containment.

5

315.

6

Moreover, BP's 2009 Sustainability Report stressed BP's capability to operate safely,

7

primarily through its implementation of OMS and commitment to improving process safety:

8

- A Systematic Approach

9

10

BP constantly seeks to improve its safety performance through the procedures,
processes and training programmes that we implement in pursuit of our goal of
"no accidents, no harm to people and no damage to the environment."

11

12

Our commitment to safe, reliable and responsible operations starts with the group
chief executive Tony Hayward and his leadership team: a commitment that filters
down through the organization and is regularly communicated to all staff.

13

14

15

Safety performance is a regular focus of the group chief executive's formal
communications such as BP's quarterly results and in less formal communications
such as his regular townhalls with BP staff.  BP's leadership has continued to
reinforce the importance of safety when undertaking regular site visits to BP
facilities around the world and from all parts of the business.

16

17

"I am extremely proud of BP's 2009 safety performance – it reflects a sustained
effort across all our operations over many years." – Tony Hayward, Group Chief
Executive

18

*Promoting Safe Operations*

19

20

21

22

23

We are carrying forward our efforts on process safety, which is an integral part of
our operating management system (OMS) and ingrained within our capability
programmes. As participants in a second round of operations leadership sessions
at MIT this year, the group chief executive and his executive team were
instrumental in establishing the concept of continuous improvement to help drive
systematic safety and reliability in our operations.  Continuous improvement is a
means of empowering our operations managers and supervisors, who are closest
to our operational problems, to develop the necessary solutions.

* * *

24

25

- **Striving for Safe Operations**

26

Page 114 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1   ***BP continues to implement its operating management system (OMS), a
    cornerstone of achieving safe, reliable and responsible operations at every BP
2   operation***

3   Taking a systematic approach is integral to improving safety and operating
    performance in BP operated sites. Our operating management system covers all
4   areas from process safety, to personal health, to environmental performance.

5                                    * * *

6   *A Unifying Way of Operating*

7   We have successfully introduced OMS at every refinery worldwide in advance of
    the internal expectations. Hugh Parsons, Vice President with responsibility for
8   management processes in refining states that "the OMS framework has given us a
    common path, applicable across different sites and assets worldwide. It has
9   provided a unifying way of operating. This is true not only for refining but across
    the whole of BP, where we have a much clearer definition of what 'good
10  operations' looks and feels like, regardless of the business context."

11                                   * * *

12  • **Process Safety**

13  BP is fully committed to becoming a recognized industry leader in process safety
    management and continues to work to achieve this.

14  Process safety involves applying good design principles, engineering and
15  operating and maintenance practices to manage our operations safely.

16  *Process Safety Reporting*

17  To track our progress in process safety management, we measure lagging
    indicators which record events that have already occurred, such as oil spills, and
18  leading indicators that focus on the strength of our controls to prevent undesired
    incidents, such as inspections and tests of safety-critical equipment.

19                                    316.

20       The foregoing misrepresentations, which caused BP securities to trade at artificially

21  inflated prices, were each materially false or misleading when made, and were  known by BP to

22  be materially false or misleading at that time, or were made with reckless disregard for the truth,

23  for the following reasons, among others:

24       (a)     Because the 2009 Sustainability Report was "material to be placed before

25  shareholders which addresses environmental, safety and ethical performance," SEEAC was

26  required to review the 2009 Sustainability Report and make recommendations to the board

Page 115 - COMPLAINT

1    concerning its adoption and publication, and SEEAC, including BP's Hayward, specifically

2    discussed and reviewed the content of the "2009 Sustainability Review" and the companion

3    document titled "2009 Sustainability Reporting," which were published simultaneously, before

4    they were released to the public.

5         (b)    BP also was aware that its safety and operations audits consistently uncovered

6    facts that were contrary to public representations of improved process safety and operations;

7         (c)    The 2009 rig audit of the *Deepwater Horizon* confirmed that not all relevant

8    personnel on the rig were knowledgeable about drilling and well operation practices including

9    containing a blowout, and safety goals were not commonly known or properly communicated;

10        (d)    The Presidential Commission concluded, "there was nothing to suggest that BP's

11   engineering team conducted a formal, disciplined analysis of the combined impact of [] risk

12   factors on the prospects of a successful cement job";

13        (e)    By 2009 and 2010, BP's OMS lagged far behind the safety programs of its

14   industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of

15   Mexico (and was not implemented on the *Deepwater Horizon*).  Moreover, employees in key

16   positions in Gulf of Mexico operations had no knowledge of OMS requirements;

17        (f)    BP's Gulf of Mexico operations had failed to implement BP's OMS in any robust

18   manner and the individuals responsible for its implementation had been terminated or moved

19   outside of Gulf of Mexico operations;

20        (g)    BP's highest officers had knowledge that its Gulf of Mexico operations had

21   caused oil spills in 2008 and two of its rigs (the *Deepwater Horizon* and the *Atlantis*) had

22   reported operational safety problems, which would have been reported to GORC and, as such,

23   put Defendants on notice of the inadequacy of their safety processes in the Gulf of Mexico;

24        (h)    BP conducted its operations in the Gulf of Mexico without any legitimate oil spill

25   response plan, understated its exposure from drilling operations in the Gulf of Mexico, and

26   lacked adequate internal and safety controls; and

Page 116 - COMPLAINT

1       (i)     According to BP's own internal reporting, decisions regarding the Macondo well

2  "appear to have been made by the BP Macondo well team in an ad hoc fashion … This appears

3  to have been a key causal factor to the blowout."

4  ***As the Truth Begins to Emerge, BP Continues to Deceive Investors***

5  **April 20, 2010**

6                       317.

7      On the evening of April 20, 2010, after the markets closed, the Macondo well suffered a

8  significant – yet preventable – blowout, leading to a fatal explosion aboard the *Deepwater*

9  *Horizon* killing 11 crew members and injuring many others.  After attempts to stop the blowout

10  failed, the surviving crew members abandoned ship, as the rig became engulfed in flames.  Oil

11  and gas spewed from the Macondo well onto the rig and into the Gulf of Mexico.

12  **April 21, 2010**

13                       318.

14      On April 21, 2010, BP issued two press releases about the *Deepwater Horizon* explosion.

15  In the first press release, BP confirmed a statement by Transocean reporting a fire aboard the rig.

16  In the second press release, BP offered its full support to Transocean and said it "stood ready to

17  assist" in responding to the tragedy.  However, neither press release acknowledged that oil was

18  currently leaking from the Macondo well into the Gulf of Mexico.

19  **April 22, 2010**

20                       319.

21      At approximately 10:22 a.m. on April 22, 2010, the *Deepwater Horizon* rig sank, further

22  damaging the riser that had connected the rig to the wellhead on the ocean floor.

23  **April 24 - 26, 2010**

24                       320.

25      On Saturday, April 24, 2010, while the unsuccessful attempts to activate the BOP

26  continued, ROVs discovered additional leaks in the broken riser.  Although officials had initially

Page 117 - COMPLAINT

1    estimated that it would take the ROVs 24 to 36 hours to deploy the BOP, by Monday, April 26,

2    2010, oil continued to spew into the Gulf of Mexico.  This news caused BP's ordinary shares to

3    fall 31.8p, or 5%, to close at 610p per share on April 27, 2010.

4    **The April 28 - 29, 2010 Statements**

5                                    321.

6         On April 28, 2010, after the markets closed, Coast Guard leader Rear Admiral Landry

7    announced during a joint press conference with BP that NOAA had increased its estimate of the

8    oil flow rate from 1,000 to 5,000 barrels per day.

9                                    322.

10        During the joint press conference, BP's Suttles again reiterated that BP's best estimate

11   was that ***1,000 barrels of oil per day were flowing from the Macondo well***.  In addition, BP's

12   Suttles stated, in part, as follows:

13        Late this afternoon, while monitoring the blowout preventer area, which we have
          done continuously since the event began, we discovered a new point of leak.  This
14        leak is just beyond the top of the blowout preventer in the pipe work called the
          riser.  Given the location, ***we do not believe this changes the amount currently***
15        ***estimated to be released***.

16                                    323.

17        The following day, April 29, 2010, Department of Homeland Security Janet Napolitano

18   announced that "*today I will be designating that this is a spill of national significance*."

19                                    324.

20        On the same day, April 29, 2010, BP's Suttles conducted several media interviews to

21   discuss the oil flow rate from the Macondo well.  For example, during an interview with The

22   Early Show, Suttles stated, in part, as follows:  "***I think that somewhere between one and five***

23   ***thousand barrels a day is probably the best estimate we have today***."  BP's Suttles made a

24   nearly identical false statement later in the day during an interview with The Today Show.

25

26

Page 118 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

325.

On the news that spill estimates had increased to 5,000 barrels per day and Secretary Napolitano's designation of the spill as one of "national significance," BP's ordinary shares fell 40.8p or almost 7% to close at 584.2p on April 29, 2010.

326.

Although the price of BP securities fell in response to this news, the price of BP's securities were still artificially inflated due to the false and misleading statements made by BP's Suttles on April 28 and 29, 2010. Each of these misrepresentations were materially false or misleading when made, and were known by BP and BP's Suttles to be materially false or misleading at that time, or were made with reckless disregard for the truth because they falsely represented that the amount spilling from the Macondo well was between 1,000 and 5,000 barrels of oil per day. In contrast, BP failed to disclose that the Company's "*best estimate*" of the amount of oil flowing from the well was more likely between 5,758 barrels per day and a high of 14,266 barrels per day – well above the amount claimed by BP. Further, Rainey's deposition testimony in MDL 2179 indicated that one internal estimate of the amount of oil flowing from the well was as high as 92,000 barrels per day. These figures were provided to BP's senior management in two internal BP documents dated April 26, 2010 and April 27, 2010 – *i.e., before* BP's Suttles made his public misrepresentations. In a hearing before the U.S. House of Representatives on May 26, 2010, Representative Edward Markey was outraged about Suttles's misrepresentations and stated, in part, as follows:

> Yesterday, BP provided me with an internal document dated April 27, 2010, and cited as BP Confidential that shows a low estimate, a best guess, and a high estimate of the amount of oil that was leaking. According to this BP document, the company's low estimate of the leak on April 27 [2010] was 1,063 barrels per day. *Its best guess was 5,758 barrels per day. Its high estimate was 14,266 barrels per day.*
>
> * * *
>
> BP has also turned over another document dated April 26 [2010] which includes a 5,000 barrel per day figure as well. *So when BP was citing the 1,000-barrel per*

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1   *day figure to the American people on April 28th, their own internal documents from*
    *the day before show that their best guess was a leak of 5,768 barrels per day and*
2   *their high estimate was more than 14,000 barrels* that were spilling into the Gulf
    every day.

3                                        327.

4          Likewise, in a May 27, 2010 news conference, President Obama remarked that BP had

5   failed to be fully forthcoming in describing the rate of the oil leak:

6          *I think it is a legitimate concern to question whether BP's interests in being fully*
           *forthcoming about the extent of the damage is aligned with the public interest.  I*
7          *mean, their interests may be to minimize the damage, and to the extent that they*
           *have better information than anybody else, to not be fully forthcoming.  So my*
8          *attitude is we have to verify whatever it is they say about the damage.*

9          This is an area, by the way, where I do think our efforts fell short.  And I'm not
           contradicting my prior point that people were working as hard as they could and
10         doing the best that they could on this front.  But I do believe that *when the initial*
           *estimates came that there were -- it was 5,000 barrels spilling into the ocean per*
11         *day*, that was based on satellite imagery and satellite data that would give a rough
           calculation.  *At that point, BP already had a camera down there, but wasn't fully*
12         *forthcoming in terms of what did those pictures look like.*

13                                       328.

14         In his book on the *Deepwater Horizon* incident, former drilling engineer Bob Cavnar

15  explained that "*[n]o one in the industry ever believed the flow was less than 20,000 barrels a*

16  *day.*"  In an interview, Cavnar said that the characteristics of the Macondo well, in particular the

17  fact that it was drilled into "High Pressure High Temperature" pay sands and the specific fact

18  that the well's pressure had blown out the *Deepwater Horizon's* riser, dictated a higher flow rate.

19  "If pressure directly from the pay sands blows out a major deepwater rig, by definition it's going

20  to result in a very significant flow of oil," he said.

21                                       329.

22         It is not surprising that BP continuously misrepresented the known amounts of oil that

23  were being released from the well.  As noted in a *Rolling Stone* article dated June 8, 2010:  "*For*

24  *BP, the motive [to downplay the amount of oil seeping into the Gulf] is financial:  Under the*

25  *Clean Water Act, the company could owe fines of as much as $4,300 for every barrel [of oil]*

26  *spilled, in addition to royalties for the oil it is squandering.*"

Page 120 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

**May 3, 2010**

1

2                                            330.

3          On May 3, 2010, after initially blaming Transocean and others for the Macondo well

4    blowout and spill, BP admitted that it was fully responsible for the disaster in the Gulf of

5    Mexico.  More specifically, BP's Hayward told NPR's Steve Inskeep that:  "It is indeed BP's

6    responsibility to deal with this, and we are dealing with it ….  We will absolutely be paying for

7    the cleanup operation.  There is no doubt about that.  It's our responsibility – we accept it fully."

8    On this news, the Company's BP's ordinary shares fell from 575.5p per share to close at 552.84p

9    per share on Tuesday, May 4, 2010.[5]

10   **The May 5, 2010 Statements**

11                                            331.

12         On May 5, 2010, Hayward conducted an interview with journalists from the Houston

13   Chronicle, at BP's offices in Houston.  In reference to the oil flow rate at the Macondo well,

14   Hayward stated, "***A guesstimate is a guesstimate.  And the guesstimate remains 5,000 barrels a***

15   ***day***."

16                                            332.

17         The foregoing misrepresentation, which caused BP securities to trade at artificially

18   inflated prices, was materially false or misleading when made, and was known by Hayward to be

19   false at that time, or was made with reckless disregard for the truth because it falsely represented

20   that the amount spilling from the Macondo well was approximately 5,000 barrels of oil per day.

21   In contrast, BP failed to disclose that the Company's "best estimate" of the amount of oil flowing

22   from the well was actually between 5,758 barrels per day and 14,266 barrels per day –

23   significantly larger than the amount claimed by Hayward.

24

25   _____

26   [5]  The London Stock Exchange was closed on Monday, May 3, 2010 for Early May Bank
     Holiday.

Page 121 - COMPLAINT

## SUBSEQUENT STATEMENTS AND EVENTS

**The Saturday May 29 – June 1, 2010 Statements**

333.

On Saturday, May 29, 2010, while trading markets were closed, BP revealed that the "top kill" procedure it had begun a few days earlier had failed.  The failure of the "top kill" indicated that BP would be unable to stop the oil spill and would have to rely on efforts to try to contain the spill while it completed the relief wells.  The failed attempt to kill the well by using the "top kill" and "junk shot" efforts shocked investors.  As noted by ABC News on Saturday, May 29, 2010: "We begin tonight with *breaking news* from the Gulf.  *After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that the effort has failed. . . . That live picture so many Americans have been keeping track of [i.e., the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf.  This is another crushing blow when it comes on what is now day 40 of this crisis.*" Similarly, on that same day, the Agence France Presse reported, in part, that: "*The announcement [that the top kill and junk short plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history* . . ." Moreover, *The Business Insider* made clear that the failure of the top kill would lead to BP's securities being "*slaughtered in London trading on Monday.*"

334.

On that same day, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  The article provided *new* evidence that:

Internal documents from BP show that there were serious problems and safety concerns with the Deepwater Horizon rig *far earlier than those the company described to Congress last week.*

\* \* \*

The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control."  *And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.*

Page 122 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

1          335.

2          On Tuesday, June 1, 2010, minutes before the close of the U.S. market, U.S. Attorney

3    General Eric Holder announced that the U.S. Department of Justice had opened formal criminal

4    and civil probes into BP in response to the oil spill and its false assurances that it could stop the

5    flow of oil.  On the disclosure of the failed top kill procedure and *The New York Times* article,

6    the Company's ordinary shares fell from 494.8p on Friday, May 28, 2010 to close at 430p on

7    June 1, 2010, a decline of more than 13%.

8    **June 2, 2010**

9          336.

10         On June 2, 2010, BP's Hayward admitted that it was "an entirely fair criticism" to blame

11   BP for the disorganized and poor cleanup effort because ***[w]hat's undoubtedly true is that we***

12   ***did not have the tools you would want in your tool kit***" to stop the leak from the Macondo well

13   in the Gulf of Mexico in the aftermath of the explosion.

14   **June 9, 2010**

15         337.

16         On June 9, 2010, fears that the Company would suspend dividends caused a further

17   decline in BP securities.  On this news, BP's ordinary shares also fell from 408.9p per ordinary

18   share on June 8, 2010 to close at 391.9p per ordinary share on June 9, 2010, a decline of 17p or

19   4%.

20         338.

21         Speculation regarding the possibility that BP would suspend dividend payments

22   continued on June 9, 2010.  An Associated Press article published on the afternoon of June 9,

23   2010 entitled "Dividend Worries Weigh on BP Shares" explained, "cutting the dividend would

24   have a big impact in Britain, as BP accounts for around 12-13 percent of payments from

25   companies in the blue-chip FTSE 100 index . . . ."

26

Page 123 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400   Fax (503) 373-7067

**June 14, 2010**

339.

Then, on June 14, 2010, BP's Board of Directors met to discuss suspending the Company's dividend payments in light of the Company's agreement to setup a $20 billion claim fund for damages caused by the *Deepwater Horizon* catastrophe. On that date, *The New York Times* reported, in part, as follows:

> To make sure that all claims are paid, the Obama administration has stepped up the pressure on the company, demanding that it set aside money to pay for future liabilities before paying dividends to shareholders, which now amount to about $10.5 billion annually. Senate Democrats are asking BP to set up a $20 billion cleanup fund. BP, which has spent about $1.5 billion on the cleanup so far, has said it expects to be able to pay all spill costs from its regular operating funds. ***But in response to the federal government's requests, BP's board met Monday to consider its options.*** A spokesman said the company did not expect to announce decisions about its dividend until after its chairman and its chief executive spoke with Mr. Obama on Wednesday at a meeting the president had called. ***A person with direct knowledge of the discussions said the board was considering three options: suspending payment of the dividend for two quarters, paying the dividend in bonus shares rather than cash, or placing an amount equal to the dividend payment in escrow while continuing to pay for the cleanup separately.***

340.

On this news, the Company's ordinary shares fell 8%. Indeed, according to another news source: "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed US demands that it suspend dividend payments until it pays for the cleanup of the Gulf oil spill."

## IX. BP'S WRONGFUL CONDUCT CAUSED OREGON'S LOSS

341.

BP's wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Oregon. Throughout the relevant period, the market prices of BP's ordinary shares were artificially inflated as a direct result of BP's materially false and misleading statements and omissions. For example, prior to the *Deepwater Horizon* incident, securities analysts touted BP's renewed dedication to safety and BP's operations in the Gulf of Mexico as one of the main focuses for BP's future results:

Page 124 - COMPLAINT

- A February 28, 2008 analyst report from JP Morgan stated that "Safety and operations: although BP has already made significant progress in this area through the implementation of the Baker panel recommendation and their 'sixpoint plan', safety and operations remains one of BP's main priorities."

- An October 9, 2009 analyst report from Bank of America stated that "[w]e believe that the focus of results will centre around . . . the ongoing exploration effort in the Gulf of Mexico (GoM) . . ."

- A February 1, 2010 analyst report from Dolmen Stockbrokers stated "we also foresee better production figures as a consequence of early restoration of operations at the company's US refineries and the ramping up of production in the Gulf of Mexico."

- A March 3, 2010 analyst report from Bank of America stated that "the development of recent deepwater discoveries in the GoM (eg, Tiber field) along with further growth from TNKBP is set to be the key drivers."

- A March 3, 2010 analyst report from JP Morgan described BP's Gulf of Mexico projects as "high margin."

- A March 12, 2010 analyst report from Bank of America stated that "[w]hilst BP has limited experience in Brazil, we would argue that their knowledge of the GoM – particularly in the Lower Tertiary area - is second to none and are clearly taking a positive view here."

342.

When the truth became known, the prices of BP's ordinary shares declined precipitously as the artificial inflation was removed from the prices of these securities, causing substantial damage to Oregon. The chart below shows the fluctuation of the price of BP's ordinary shares throughout the relevant period.

Page 125 - COMPLAINT

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel (503) 934-4400 Fax (503) 373-7067

**BP Ordinary Shares' Reaction Throughout the Relevant Period**



343.

During the relevant period, BP's ordinary shares traded as high as 655.40 GBp per share.

344.

On April 20, 2010, prior to the explosion on the *Deepwater Horizon*, BP's ordinary shares were trading at 655.40 GBp as Defendants continued to deceive investors regarding its true risk profile and its utter lack of process safety controls. That night, after the markets closed, the explosion aboard the *Deepwater Horizon* occurred.

345.

Due to Defendants' ongoing misrepresentations and omissions regarding the true state of BP's safety measures and operational protocols the explosion and resulting oil spill, the truth regarding Defendants' failure to implement process safety controls emerged on April 20, 2010

Page 126 - COMPLAINT

1 and within a week the share price had dropped ten dollars and it would continue to plummet

2 during the weeks of subsequent corrective disclosures.

3                                     346.

4       On April 29, 2010, NOAA increased its estimate regarding the amount of oil that was

5 spewing into the Gulf of Mexico from 1,000 to 5,000 barrels per day and the U.S. government

6 declared the Macondo disaster a spill of national significance.  This news caused BP ordinary

7 shares to fall from £6.25 per share on April 28, 2010 to close at $5.84 per share on April 29,

8 2010.

9                                     347.

10      On May 3, 2010, BP admitted full responsibility for the disaster in the Gulf of Mexico.

11                                    348.

12      On May 10, 2010, BP's Hayward admitted that the volume of oil spilling into the Gulf of

13 Mexico was far greater than BP's initial statements indicated.  Additionally, BP revealed that oil

14 spill costs to date had reached $350 million.

15                                    349.

16      On May 24, 2010, BP announced that the costs for remediating the oil spill to date had

17 more than doubled, from $350 million to $760 million.  In addition, the Company announced

18 that it was capturing less oil than it expected.  Finally, pressure on BP continued to grow because

19 the U.S. government threatened to take over the oil spill response effort because of BP's lack of

20 progress.  On this news, BP's ordinary shares fell from 517.75p on Friday, May 21, 2010 to close

21 at 493p on Monday, May 24, 2010.

22                                    350.

23      On Saturday, May 29, 2010, while trading markets were closed, BP revealed that the "top

24 kill" procedure it had begun a few days earlier had failed.  This was highly material to investors.

25 For example, ABC News reported the "***breaking news***" and stated, on Saturday, May 29, 2010,

26 as follows: "We begin tonight with ***breaking news*** from the Gulf.  ***After so much talk that Top***

Page 127 - COMPLAINT

1    *Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that*

2    *the effort has failed. . . . That live picture so many Americans have been keeping track of [i.e.,*

3    *the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into*

4    *the Gulf.  This is another crushing blow when it comes on what is now day 40 of this crisis.*"

5    Similarly, on that same day, the Agence France Presse reported, in part, that: "***The***

6    ***announcement [that the top kill and junk short plans failed] is a stunning setback for efforts***

7    ***to halt what has become the worst oil spill in US history*** . . ."  Finally, *The Business Insider*

8    made clear that the failure of the top kill would lead to BP's securities being "***slaughtered in***

9    ***London trading on Monday.***"

10                                              351.

11            On that same day, *The New York Times* published an article entitled "Documents Show

12   Early Worries About Safety of Rig."  The article provided new evidence regarding serious safety

13   concerns with the *Deepwater Horizon* rig far earlier than those previously described by BP.  The

14   next day, Sunday, May 30, 2010, Dudley conducted an interview and admitted that BP's original

15   oil flow estimates were vastly understated.  On these disclosures, BP's ordinary shares fell from

16   494.8p per ordinary share on Friday, May 28, 2010 to close at 430p per ordinary share on

17   Tuesday, June 1, 2010, a decline of 64.8p or more than 13%.[6]

18                                              352.

19            On June 9, 2010, fears that the Company would suspend dividends caused a further

20   decline in BP securities.  An Associated Press article dated June 9, 2010 entitled "Dividend

21   Worries Weigh on BP Shares" explained, "[s]hares in BP PLC fell further on Wednesday [June

22   9, 2010] amid fears the British oil company will bow to U.S. political pressure to cut dividends

23   to help pay for the Gulf of Mexico oil spill disaster."  On this news, BP's ordinary shares fell

24   from 408.9p per ordinary share on June 8, 2010 to close at 391.9p per ordinary share that same

25   day, a decline of 17p or 4%.

26   _____

     [6] The UK financial markets were closed on Monday, May 31, 2010 for the Spring Bank holiday.

Page 128 - COMPLAINT

1                                        353.

2          Speculation regarding the possibility that BP would suspend dividend payments

3   continued on June 9, 2010.  Indeed, the Associated Press article published on the afternoon of

4   June 9, 2010 (after the close of the London Stock Exchange) explained that "Cutting the

5   dividend would have a big impact in Britain, as BP accounts for around 12-13 percent of

6   payments from companies in the blue-chip FTSE 100 index . . . ."  On this news, and after the

7   markets re-opened, BP ordinary shares fell an additional 7% from 391.9p per share on June 9,

8   2010 to 365.5p per share on June 10, 2010.

9                                        354.

10         On June 14, 2010, BP's Board of Directors officially met to discuss suspending the

11  Company's dividend payments in light of the Company's agreement to setup a $20 billion claim

12  fund for damages caused by *Deepwater Horizon* catastrophe.  According to one news source:

13  "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed US

14  demands that it suspend dividend payments until it pays for the cleanup of the Gulf oil spill."  On

15  this news, BP's ordinary shares fell from 391.9p per share on Friday, June 11, 2010 to close at

16  362p per share on Monday, June 14, 2010, a decline of nearly 30p per share or almost 8%.

17                                       355.

18         In all, as a consequence of the revelation of truth concerning BP securities during the

19  relevant period, the Company's securities fell in value by 48% and caused Oregon to suffer

20  losses in the amount of $18,848,641.

21                                       356.

22         BP materially misstated the risks of the Company's operations, particular with respect to

23  deepwater drilling in the Gulf of Mexico.  The adverse consequences of the materialization of

24  this risk as disclosed by BP were entirely foreseeable to BP at all relevant times.  BP's conduct,

25  as alleged herein, proximately caused foreseeable losses and damages to Plaintiff.

26

Page 129 - COMPLAINT

## X.     OREGON RELIED ON BP'S MISREPRESENTATIONS TO ITS DETRIMENT

357.

Oregon relied on an efficient market that set the price for BP ordinary shares based on the publically available information in the market and is also is entitled to a presumption of reliance on BP's material misrepresentations or omissions for the following reasons:

(a)     BP made public misrepresentations or failed to disclose material facts during the relevant period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's ordinary shares traded on the London Stock Exchange and in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the BP's ordinary shares; and

(e)     OPERF purchased BP ordinary shares during the time-frame in which BP misrepresented or failed to disclose material facts, without knowledge of the misrepresented or omitted facts.

358.

At all relevant times, the markets for BP ordinary shares were efficient for the following reasons, among others: (a) BP filed periodic public reports with the SEC; and (b) BP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services, and such public information was efficiently incorporated into the price of BP's ordinary shares.

359.

Oregon relied on the integrity and efficiency of the market and trusted that the market price of BP's ordinary shares to accurately reflected the material statements made by BP in its

Page 130 - COMPLAINT

1   annual reports, 20-F's, press releases, and public statements, including each and every one of the

2   material statements or omissions referenced above.  As a result of those misrepresentations and

3   omissions, the price of BP's securities was artificially inflated throughout May 2007 through and

4   including May 2010.

5                                             360.

6          Oregon had no reason to know of the facts, described above, that were not disclosed by

7   BP.  Rather, Plaintiff relied on the price of BP's ordinary shares, which reflected all the

8   information in the market, including BP's misstatements or omissions.

9                                             361.

10         Had Oregon been aware that BP was, among other things, mischaracterizing the safety of

11  its operations, particularly those that it conducted in the riskiest of its businesses, Oregon would

12  not have made the securities purchases that it did for the prices for which it paid.

13                                            362.

14         During the relevant period, Oregon's money managers regularly reviewed BP's annual

15  reports and other SEC filings, read analyst reports regarding BP, and otherwise conducted

16  research on the Company in order to determine whether investment by Oregon was appropriate.

17  As a result, Oregon's money managers believed BP's ordinary shares to be an appropriate

18  investment for Oregon and were unaware of the significant risks posed by the securities.

19                                    **CLAIM I**
                               **Violation of ORS 59.135**
20                              **(Against All Defendants)**

21                                            363.

22         Plaintiffs repeat and reallege each and every allegation contained above as if fully set

23  forth herein.

24                                            364.

25         Oregon purchased BP ordinary shares, and in connection with Oregon's purchases of

26  those ordinary shares BP violated (a) ORS 59.135(1) (through a device, scheme and/or artifice to

Page 131 - COMPLAINT

1    defraud), (b) ORS 59.135(2) (through untrue statements of material fact and omissions of

2    material fact that were necessary to make the statements made not misleading), and/or (c) ORS

3    59.135(3) (through acts, practices and/or courses of business that operated as a fraud).

4                       365.

5         BP's violations of ORS 59.135(1), (2), and (3) caused Oregon actual damages in the

6    amount of $18,848,641, which damages are recoverable by Oregon pursuant to ORS 59.137.

7    The value of BP's ordinary shares was artificially inflated as a direct result of BP's device,

8    scheme and artifice to defraud; and/or its material misrepresentations and omissions of fact;

9    and/or its acts, practices and course of business that operated as a fraud. Prior to the disclosure

10    of BP's material misrepresentations and omissions, its stock traded as high as 655.40 GBp.

11    Following partial disclosures regarding the true nature of BP's safety practices or lack thereof,

12    and disclosure of the material misrepresentations and omissions, the value of BP's stock

13    plummeted 48 percent.

14                       366.

15         As set forth in the foregoing allegations, Oregon relied on BP's fraud, material

16    misrepresentations and omissions, and deceptive business practices through its individual

17    reliance and/or its reliance on an efficient market that set the price for BP's securities on the

18    London Stock Exchange based on the publically available information known to the market.

19                       367.

20         Furthermore, by their conduct, BP America and BP E&P materially aided the Company's

21    violations of (a) ORS 59.135(1) (through a device, scheme and/or artifice to defraud), (b) ORS

22    59.135(2) (through untrue statements of material fact and omissions of material fact that were

23    necessary to make the statements made not misleading), and/or (c) ORS 59.135(3) (through acts,

24    practices and/or courses of business that operated as a fraud).

25

26

Page 132 - COMPLAINT

1    368.

2    BP's violations of ORS 59.135(1), (2), and (3) caused Oregon actual damages in the

3    amount of $18,848,641.  The value of BP's ordinary shares was artificially inflated as a direct

4    result of BP's device, scheme and artifice to defraud; and/or its material misrepresentations and

5    omissions of fact; and/or its acts, practices and course of business that operated as a fraud.  Prior

6    to the disclosure of BP's material misrepresentations and omissions, its stock traded as high as

7    655.40 GBp.  Following partial disclosures regarding the true nature of BP's safety practices or

8    lack thereof, and disclosure of the material misrepresentations and omissions, the value of BP's

9    stock plummeted 48 percent.

10   369.

11   Defendants are jointly and severally liable to Oregon for damages caused by BP's

12   violations of ORS 59.135(1), (2), and (3), which damages are recoverable by Oregon pursuant to

13   ORS 59.137.

14   370.

15   Oregon is entitled to an award of its costs and reasonable attorney fees under ORS

16   59.137(4), including expert witness fees.

17   371.

18   Oregon is also entitled to prejudgment interest at the statutory rate of 9% as set forth in

19   ORS 59.137(1) and ORS 82.010 from the date its purchases of BP ordinary shares until the entry

20   of judgment.

21   **CLAIM II**
     **Common Law Fraud**
22   **(Against All Defendants)**

23   372.

24   Plaintiffs repeat and reallege each and every allegation contained above as if fully set

25   forth herein.

26

Page 133 - COMPLAINT

1          373.

2          As alleged herein, Defendants made material misrepresentations and omitted to disclose

3   material facts about BP's capability to safely drill in the Gulf of Mexico and its ability to

4   adequately contain and respond to an oil spill if one occurred while drilling in the Gulf of

5   Mexico.

6          374.

7          The aforesaid misrepresentations and omissions by Defendants were made with

8   knowledge of their falsity and were made with the intent that they should be acted upon by

9   Plaintiff and to induce reliance thereon by Plaintiff when making investment decisions.

10         375.

11         The aforesaid misrepresentations and omissions by Defendants constitute fraud under

12  common law.

13         376.

14         Plaintiff reasonably relied on Defendants' misrepresentations and omissions when

15  deciding to purchase BP ordinary shares and when otherwise making investment decisions with

16  regard to those securities during the relevant period, and did not know of any of the

17  misrepresentations and omissions at the time the investment decisions were made.  Plaintiff's

18  reliance was justified since they were unaware of the true facts; if the true facts had been known

19  to Plaintiff, Plaintiff would not have acted as it did in holding and purchasing BP ordinary

20  shares.

21         377.

22         As a direct and proximate cause of the fraud and deceit by Defendants, Plaintiff suffered

23  damages in connection with its investments in BP ordinary shares in the amount of $18,848,641.

24

25

26

Page 134 - COMPLAINT

378.

The fraud and deceit committed by Defendants was intentional and/or involved conscious acts that willfully and wantonly disregarded the rights of others, including Plaintiff. As a result, Plaintiff intends to amend this Complaint to seek an award of punitive damages.

**XI.   PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.   Actual damages in the amount of $18,848,641; its costs and reasonable attorney fees including expert witness fees under ORS 59.137(4); and prejudgment interest at the statutory rate of 9% from the date of purchase;

b.   An award of costs, expenses and reasonable attorneys' fees in this litigation; and

c.   Awarding Plaintiff such other relief as this Court may deem just and proper.

**XII.   DEMAND FOR JURY TRIAL**

Oregon hereby demands a trial by jury as to all issues.

DATED this 19th day of April, 2012.

JOHN R. KROGER
Attorney General

OREGON DEPARTMENT OF JUSTICE

**Keith S. Dubanevich,** OSB No. 975200
Chief of Staff and Special Counsel,
Office of the Attorney General
**Frederick M. Boss**, OSB No. 911424
Chief Counsel, Civil Enforcement Division

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone:     (503) 934-4400
Facsimile:      (503) 373-7067
Email:           keith.dubanevich@doj.state.or.us
                     fred.boss@doj.state.or.us

Page 135 - COMPLAINT

1

and

2

(AS SPECIAL ASSISTANT ATTORNEYS GENERAL)

3

4

COHEN MILSTEIN SELLERS & TOLL PLLC

5

**Steven J. Toll** (*to be admitted Pro Hac Vice*)
Email: stoll@cohenmilstein.com

6

**Julie Goldsmith Reiser** (*to be admitted Pro Hac Vice*)
Email: jreiser@cohenmilstein.com

7

**Joshua S. Devore** (*to be admitted Pro Hac Vice*)
jdevore@cohenmilstein.com

8

**Joshua M. Kolsky** (*to be admitted Pro Hac Vice*)
jkolsky@cohenmilstein.com

9

1100 New York Avenue N.W.

10

West Tower, Suite 500
Washington, D.C.  20005-3964

11

Tel: (202) 408-4600
Fax: (202) 408-4699

12

13

STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.

14

15

By:

16

**Gary M. Berne, OSB No. 774077**
Email: gberne@stollberne.com

17

**Scott A. Shorr, OSB No. 961873**
Email: sshorr@stollberne.com

18

**Jacob S. Gill, OSB No. 033238**
Email: jgill@stollberne.com

19

20

209 SW Oak Street, Suite 500

21

Portland, OR  97204
Telephone: (503) 227-1600

22

Facsimile: (503) 227-6840

23

**Attorneys for Plaintiff**

24

Trial Attorneys:          Gary M. Berne (for all notices)

25

Keith S. Dubanevich
Steven J. Toll

26

Scott A. Shorr
Julie Goldsmith Reiser

Page 136 - COMPLAINT